1  SEAN K. KENNEDY (No. 145632)
   Federal Public Defender
2  (E-mail:  Sean_Kennedy@fd.org)
   CARLTON F. GUNN (No. 112344)
3  Deputy Federal Public Defender
   (E-mail:  Carlton_Gunn@fd.org)
4  CHARLES C. BROWN (No. 179365)
   Deputy Federal Public Defender
5  (E-mail:  Charles_ Brown@fd.org)
   321 East 2nd Street
6  Los Angeles, California  90012-4202
   Telephone (213) 894-1700
7  Facsimile (213) 894-0081

8
   Attorneys for Defendant
9  MICHAEL PEPE

10
                    UNITED STATES DISTRICT COURT
11
                   CENTRAL DISTRICT OF CALIFORNIA
12
                          WESTERN DIVISION
13

14

15  UNITED STATES OF AMERICA,       )   NO. CR 07-168-DSF
                                    )
16              Plaintiff,          )   **NOTICE OF MOTION; MOTION
                                    )   TO SUPPRESS EVIDENCE;
17        v.                        )   MEMORANDUM OF POINTS
                                    )   AND AUTHORITIES**
18  MICHAEL PEPE,                   )
                                    )   Hearing Date:   July 30, 2007
19              Defendant.          )   Hearing Time:  8:30 a.m.
                                    )
20  _____)

21

22  TO:    ACTING UNITED STATES ATTORNEY GEORGE CARDONA, AND

23  ASSISTANT UNITED STATES ATTORNEY PATRICIA DONAHUE:

24

25        PLEASE TAKE NOTICE that on July 30, 2007, at 8:30 a.m., defendant,

26  Michael Pepe, will bring on for hearing the following motion:

27

28

1

MOTION

2

3        Defendant, Michael Pepe, through his counsel of record, Deputy Federal

4   Public Defender Carlton F. Gunn and Deputy Federal Public Defender Charles

5   Brown, hereby moves this Honorable Court for an order suppressing all evidence

6   found during (1) searches of defendant's home in Phnom Penh, Cambodia by a

7   combined group of Cambodian and American law enforcement officers during June,

8   2006 and (2) subsequent searches of defendant's computer and other computer media

9   by American government agents alone at American facilities in Singapore and/or

10   other locations.  This motion is made pursuant to the Fourth Amendment to the

11   United States Constitution and is based upon the attached memorandum of points and

12   authorities, all files and records in this case, and such additional argument and

13   evidence as may be presented at the hearing on this motion.

14

15                                Respectfully submitted,

16                                SEAN K. KENNEDY
                                  Federal Public Defender

17

18   DATED: June  25 , 2007         By___ /S/_____

19                                CARLTON F. GUNN
                                  Deputy Federal Public Defender

20

21

22   DATED: June  25 , 2007         By___ /S/_____

23                                CHARLES C. BROWN
                                  Deputy Federal Public Defender

24

25

26

27

28

1  **MEMORANDUM OF POINTS AND AUTHORITIES**

2

3

4  I.

5  INTRODUCTION

6

7  Michael Pepe is charged with four counts of engaging in illicit sexual conduct

8  with a minor in foreign places, in violation of 18 U.S.C. § 2423(c) .  Trial is presently

9  set to commence on January 29, 2007.  This motion seeks to suppress evidence found

10  in two sets of searches: (1) searches of Mr. Pepe's home by a combined group of

11  Cambodian and American law enforcement officers in Phnom Penh, Cambodia

12  during June, 2006; and (2) subsequent searches of a computer, thumb drive, and

13  digital media card[1] by American government agents alone at American facilities in

14  Singapore and/or other locations.

15

16  II.

17  STATEMENT OF FACTS

18

19  Between June 14, 2006 and June 15, 2006, two nongovernmental organizations

20  advocating for abused children in Cambodia provided information to the Bangkok,

21  Thailand office of the United States Bureau of Immigration and Customs

22  Enforcement that a United States citizen who was later identified as Mr. Pepe had

23  sexually abused and raped a number of children at his home in Phnom Penh,

24  Cambodia.  See Exhibit A, at 2.  American agents interviewed at least one of the

25  alleged victims, conducted additional investigation regarding Mr. Pepe's background,

26

27      [1]  A thumb drive is a computer storage device approximately the size of a
thumb, which can store much larger amounts of data than a diskette or CD.  A digital
28  camera media card is a computer chip which is inserted in a digital camera and stores
digital images when photographs are taken with the camera.

3

1    and apparently concluded there was a basis for American charges under 18 U.S.C.

2    § 2423(c). *See id.*

3

4       It also appears that the American agents and/or the nongovernmental

5    organizations contacted Cambodian law enforcement authorities. Those authorities,

6    accompanied by one or more American agents and nongovernmental organization

7    representatives, arrested Mr. Pepe on June 17, 2006, for rape and debauchery. *See*

8    Exhibit A, at 3. Mr. Pepe's home was searched that same day, and then searched

9    again on at least one – and possibly more – occasions during the period from June 17

10   through June 21. *See* Declaration of Michael Pepe, ¶ 2.[2] Various items of evidence,

11   including physical objects, documents, and two computers and other computer media,

12   including a thumb drive and a digital camera media card, were seized during the

13   searches.

14

15       American agents appear to have been an integral part of the searches,

16   moreover. Initially, it appears that American agents from at least two different

17   agencies – the Diplomatic Security Service and the Bureau of Immigration and

18   Customs Enforcement – were present and participated in the searches. Secondly,

19   many, if not most, of the items of evidence were seized not by Cambodian officers

20   but by the American agents and/or nongovernmental organization representatives

21   who also assisted with the search. *See, e.g.*, Exhibit B, at 3 (report of interview of

22   one of alleged victims referring to cloth rope, which was kept inside closet "which is

23   where AIA Phillips discovered it during the search warrant"). *See also* Declaration of

24   Michael Pepe, ¶ 4. Thirdly, it was an American agent and a nongovernmental

25   organization representative named Ron Dunne who signed as the "1st Witness" and

26

27 _____

28       [2] Different reports which have been provided in discovery reflect different dates.

1    "2nd Witness" on a "Search Record" dated June 21, 2006.[3]  *See* Exhibit C.[4]  Finally,

2    all or much of the evidence seized was turned over to the American agents.  *See*

3    Exhibit D (United States Customs Service "Custody Receipt for Seized Property and

4    Evidence").

5

6            As far as what authority there was for the searches, it is clear that there was no

7    American search warrant.  Whether there was a Cambodian search warrant, at least at

8    the time of the first search, is less clear.  There is a Cambodian search warrant

9    included in the discovery which is dated June 17, 2006, *see* Exhibit E, but it appears

10   to have been so dated after the fact.  What suggests this is that the "Summary Report"

11   which accompanies the search warrant in the discovery and was prepared "to request

12   a residential search warrant for [Mr. Pepe's house]" is (1) dated June 19, 2006 and (2)

13   relies on, inter alia, "information from the victim child named [redacted] dated 18

14   June 2006."  Exhibit F.

15

16           In addition to the searches of Mr. Pepe's home, there were subsequent searches

17   of the computer and computer media that were purely American.  On June 20, 2006,

18   the Acting Regional Security Officer Attaché at the United States Embassy in Phnom

19   Penh sent a letter to the Cambodian Police Commissioner General stating: "[A]gents

20   request that they have access to the evidence, specifically, Mr. Pepe's computer, hard

21   drive, memory stick, and USB thumb drive so that they may be sent to the United

22   States for computer forensic testing."  Exhibit G.  This request was granted, and one

23   of the computers, the thumb drive, and the digital camera media card were quickly

24

25

26
_____

27          [3]  As discussed *infra* pp. 8-9, this likely violated Cambodian law.

28          [4]  Exhibits C, E, and F are English translations of Cambodian records provided
     by the government in discovery.

5

1 sent to an American forensic computer analyst in Singapore.[5]  That analyst received

2 the items on June 30, 2006, and subsequently conducted an extensive forensic

3 analysis – apparently without any  warrant – on June 30, 2006.  *See* Exhibit H.  *See*

4 *also* Exhibit A, at 9-11.  The examination revealed pornographic and non-

5 pornographic images of various minors, including minors believed to be the alleged

6 victims, sometimes with and sometimes without a man "who closely matches Pepe's

7 physical description," and some of which were in a bedroom and/or bathroom

8 recognized as Mr. Pepe's.  Exhibit A, at 9-11.  There were also photos of Mr. Pepe

9 fully clothed, in which he apparently could be definitely identified.  *See* Exhibit A, at

10 11.

11

12                                                III.

13                                          ARGUMENT

14

15 A.     THE SEARCHES OF MR. PEPE'S HOME WERE JOINT VENTURES

16 BETWEEN FOREIGN AND AMERICAN AUTHORITIES AND SO ALL OF THE

17 EVIDENCE FOUND IN THE SEARCHES MUST BE SUPPRESSED UNLESS THE

18 GOVERNMENT SHOWS THE SEARCH WAS REASONABLE UNDER THE

19 FOURTH AMENDMENT.

20

21         1.      The Fourth Amendment Applies Because the Search Was a Joint

22 Venture Between the Cambodian and American Officials.

23

24         Whether the Fourth Amendment applies to foreign officials' search of an

25 American citizen's property in a foreign country depends on the extent of American

26

27         [5]  The other computer and additional computer media were not sent to
Singapore.  Those items are the subject of a search warrant recently obtained here in
28 Los Angeles which may be subject to challenge on other grounds.  *See infra* p. 15
n.10.

1   officials' participation in the search.  The leading Ninth Circuit case on the question
2   states the rule as follows:

3               With certain exceptions not applicable here, Fourth Amendment
4               principles do not apply to searches by foreign authorities in their
5               own countries, even if the targets of the search are American.
6               (Citation omitted.)  If, however, United States agents'
7               participation in the investigation is so substantial that the action is
8               a joint venture between United States and foreign officials, the law
9               of the foreign country must be consulted at the outset as part of the
10              determination whether or not the search was reasonable.
11  *United States v. Peterson*, 812 F.2d 486, 490 (9th Cir. 1987).

12

13      Here, there is a wealth of evidence that the search was a joint venture between
14  Cambodian and American officials.  First, the investigation appears to have been
15  initiated by or at least jointly pursued by American officials investigating a violation
16  of American law.  Second, American officials were not only present at, but actively
17  participated in, the search; indeed, they appear to have been more active than the
18  Cambodian officials.  *See* Declaration of Michael Pepe, ¶ 4.  Third, American
19  officials took possession of all or most of the evidence seized within a few days.
20  Finally, there is corroboration in the fact that the ultimate prosecution of Mr. Pepe is
21  taking place here in the United States, and he was never prosecuted in Cambodia.[6]

22

23      2.      The Applicability of the Fourth Amendment Requires that the
24  Government Show the Search Was Reasonable.

25

26      What the Fourth Amendment requires given the fact that the search was a joint

27  _____

28      [6] Mr. Pepe was held in custody in Cambodia for seven to eight months, but he
    was never prosecuted there.

7

venture is "a determination whether or not the search was reasonable." *United States v. Peterson*, 812 F.2d at 490, *quoted supra* p. 7.  But this does not incorporate all of the requirements that the Fourth Amendment places on searches by American officials.  This is because the Fourth Amendment is not directed at foreign officials, and what an American court does will not alter the search policies of another sovereign nation.  *United States v. Brulay*, 383 F.2d 345, 348 (9th Cir. 1987).  Instead of looking to the usual Fourth Amendment rules, "the law of the foreign country must be consulted at the outset as part of the determination."  *Peterson*, 812 F.2d at 490.

In the present case, this means the government must show – at the very least – that the search comported with Cambodian law.  *Cf. United States v. Carbajal*, 956 F.2d 924, 930 (9th Cir. 1992) (burden on government to show reasonableness of warrantless search).[7]  And it appears questionable whether the government can do this, for the search appears to have violated Cambodian law in at least two respects.

First, Cambodian law provides that, except in the case of certain types of offenses which the defense believes are not what was alleged here, searches must be authorized by a judge or a prosecutor.  The warrant which has been provided in the discovery here, while dated June 17, 2006, appears to have been actually issued on some later date, for it is based on a report that is dated June 19, 2006 and refers to information obtained on June 18, 2006.  *See supra* p. 5.

Second, there is a special provision in Cambodian law requiring that a search "must be conducted in the presence of the suspect and two witnesses, preferably

---

[7]  While the burden is normally on the defense when there was a search warrant, and there may have been a Cambodian search warrant at some point here, the existence of a foreign warrant which does not satisfy Fourth Amendment requirements seems insufficient to shift the burden on the question of important Fourth Amendment constitutional rights.  *See generally* 6 Wayne R. LaFave, *Search and Seizure* 43-45 (4th ed. 2004).

1   neighbors or owners of the building."  Exhibit I, at 20, § 1.[8]  Yet the witnesses who

2   signed the "Search Record" for at least one search were neither neighbors nor owners

3   of the building, but an American agent and a nongovernmental organization

4   representative who were intimately involved in both the searches and the

5   investigation that led up to it.  *See supra* pp. 3-5.

6

7   B.      THE EVIDENCE FOUND IN THE SEARCH OF MR. PEPE'S COMPUTER,

8   THUMB DRIVE, AND DIGITAL CAMERA MEDIA CARD MUST BE

9   SUPPRESSED BECAUSE THOSE SEARCHES WERE CONDUCTED SOLELY

10  BY AMERICAN OFFICIALS AND THAT MADE THE FOURTH

11  AMENDMENT'S SEARCH WARRANT REQUIREMENT APPLICABLE.

12

13      The searches of the computer, thumb drive, and digital camera media card

14  differ from the searches of Mr. Pepe's home in that they were conducted solely by

15  American officials.  This eliminates one of the main concerns underlying the focus on

16  compliance with foreign law in the joint venture foreign search cases – that the

17  Fourth Amendment is not directed at foreign officials and cannot alter their conduct,

18  *see supra* p. 8.  Applying the ordinary requirements of the Fourth Amendment – such

19  as the existence of probable cause and the use of warrants – to searches conducted

20  solely by American officials poses no such problem.  It is one thing to say that our

21  courts will not expect foreign officials to comply with American law rather than the

22  foreign officials' own law; it is another thing to say that even American officials

23  acting alone may ignore American law.

24

25      The fact that the American officials chose to conduct the search of the

26  computer, thumb drive, and digital camera media card in another country should not

27

28          [8]  Alternatively, the witnesses may be family members.  *See* Exhibit I, art. 20, §
    2.

affect the applicability of the Fourth Amendment or its scope, moreover.  As

explained in *United States v. Conroy*, 589 F.2d 1258 (5th Cir. 1979):

> The Fourth Amendment not only protects all within our bounds; it
> also shelters our citizens wherever they may be in the world from
> unreasonable searches by our own government.  (Citations
> omitted.)  The mere consent of foreign authorities to a seizure that
> would be unconstitutional in the United States does not dissipate
> its illegality even though the search would be valid under local
> law.

*Id*. at 1264-65.  *See also United States v. Streifel*, 665 F.2d 414, 419-20 n.8 (2nd Cir.

1981) (rejecting government argument that Fourth Amendment does not apply to

search of vessel on high seas); *United States v. Saylor*, 374 F.2d 894, 900 (Ct. Cl.

1967) (holding Fourth Amendment applied to civilian living in residential compound

under control of American military abroad); *Powell v. Zuckert*, 366 F.2d 634, 639-40

(D.C. Cir. 1966) (applying Fourth Amendment prohibition of general warrants to

search of Air Force employee's off-base private dwelling by American agents in

Japan); *United States v. Best*, 184 F.2d 131, 138 (1st Cir. 1950) ("[W]e assume, and

we think it is probably so, that the protection of the Fourth Amendment extends to

United States citizens in foreign countries under occupation by our armed forces.").


United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), the most recent

Supreme Court case dealing with foreign searches, does not undercut the cases just

cited, moreover.  *Verdugo-Urquidez* dealt with application of the Fourth Amendment

to searches by American agents in foreign countries of nonresident aliens.  *See id.* at

261.  And the holding in *Verdugo-Urquidez* turned on that status, for the Court held

that the Fourth Amendment did not apply to nonresident aliens in foreign countries

because the Fourth Amendment grants protections to only "the people" and "the

people" means American citizens and other people living in the United States.  *See id*.

1 at 265-66 (quoting U.S. Const. amend. IV).

2

3   At least two district courts after *Verdugo-Urquidez* have followed the *Conroy*

4 and/or *Powell* cases cited *supra*.  First, then District, now Circuit, Judge Paez – in

5 *Colello v. S.E.C.*, 908 F. Supp. 738 (C.D. Cal. 1995) – wrote:

6      The Government's first argument – that by placing their

7      assets abroad, plaintiffs (U.S. citizens) are not entitled to the full

8      panoply of Constitutional rights – was rejected long ago.  The Bill

9      of Rights unquestionably protects a citizen or his property from

10     incursions by the U.S. government regardless of location.  In *Reid*

11     *v. Covert*, 354 U.S. 1, 77 S. Ct. 1222, 1 L. Ed. 2d 1148 (1957), the

12     Supreme Court explained:

13       At the beginning, we reject the idea that when the

14       United States acts against citizens abroad it can do so

15       free of the Bill of Rights.  The United States is

16       entirely a creature of the Constitution.  Its power and

17       authority have no other source.  It can act only in

18       accordance with all the limitations imposed by the

19       Constitution.  When the Government reaches out to

20       punish a citizen who is abroad, the shield which the

21       Bill of Rights and other parts of the Constitution

22       provide to protect his life and liberty should not be

23       stripped away just because he happens to be in

24       another land.  This is not a novel concept.  To the

25       contrary, it is as old as government.  It was

26       recognized long before Paul successfully invoked his

27       right as a Roman citizen to be tried in strict

28       accordance with Roman law.

354 U.S. at 5-6, 77 S. Ct. at 1225.  *See also, Rosado v. Civiletti*,

621 F.2d 1179, 1189 (2nd Cir.), *cert. denied*, 449 U.S. 856, 101 S.

Ct. 153, 66 L. Ed. 2d, 70 (1980); *United States v. Conroy*, 589

F.2d 1258, 1264 (5th Cir.), *cert. denied*, 444 U.S. 831, 100 S. Ct.

60, 62 L. Ed. 2d, 40 (1979); *Powell v. Zuckert*, 366 F.2d 634, 640

(D.C. Cir. 1966).

*Colello*, 908 F. Supp. at 753-54.  Similarly, another district judge followed *Conroy* in

2001, writing: "[I]t is not determinative that [the agent's] seizure [of defendant's

property] took place inside a United States Embassy.  'The Fourth Amendment not

only protects all within our bounds; it also shelters our citizens wherever they may be

in the world from unreasonable searches and seizures by our own government.'"

*United States v. Wharton*, 153 F. Supp. 2d 878, 881-82 (W.D. La. 2001) (quoting

*Conroy*, 589 F.2d at 1264).


Some judges have suggested in dicta that the warrant requirement of the Fourth

Amendment may not apply overseas, at least in some circumstances, *see, e.g., United

States v. Barona*, 56 F.3d 1087, 1092 n.1 (9th Cir. 1995); *see also United States v.

Bin Laden*, 126 F. Supp. 2d 264, 276-77 (S.D.N.Y. 2000),[9] but that suggestion should

---

[9] The majority opinion in *Barona* reads *Verdugo-Urquidez* as resolving the issue, *see Barona*, 56 F.3d at 1092 n.1, but the dissenting opinion in *Verdugo-Urquidez* cited *Conroy* and pointed out that "nothing in the Court's opinion questions the validity of the rule, accepted by every Court of Appeals to have considered the question, that the Fourth Amendment applies to searches conducted by the United States Government against United States citizens abroad" and that "[a] warrantless unreasonable search and seizure is no less a violation of the Fourth Amendment because it occurs in Mexicali, Mexico, rather than Calexico, California." *Verdugo-Urquidez*, 494 U.S. at 283 n.7 (Brennan, J., dissenting).  Other commentators have also recognized that *Verdugo-Urquidez* is not dispositive. *See* Comment, *The Need for Warrants Authorizing Foreign Intelligence Searches of American Citizens Abroad: A Call for Formalism*, 69 U. Chi. L. Rev. 403, 405 n.17 (2002) (concluding that "Supreme Court case law, while ambiguous, suggests that the warrant requirement could be generally applicable" and "[g]iven the heavily fractured nature of the Court, the precedential status of *Verdugo* is unclear"); advisory committee note to proposed 1990 amendment to Federal Rule of Criminal Procedure 41, *reprinted in* 129 F.R.D. 557, 581-82 (1990) (noting that "[s]ome searches and seizures by federal officers outside the territory of the United States may be governed by the Fourth Amendment" and that "[a]lthough the amendment rests on the assumption that the

1  be rejected for several reasons, at least in the circumstances of this case.  First, one of

2  the reasons given – that there is no express statutory authority for issuance of a

3  warrant to search property in a foreign country, *see Bin Laden*, 126 F. Supp. 2d at

4  275-76 – (a) may rest on a false premise and (b) cannot override the Constitution even

5  if the underlying premise is not false.  As explained in *United States v. Wharton*,

6  *supra*:

7           Certainly, the rights guaranteed by the Fourth Amendment

8           cannot be abrogated because Congress has failed to enable the

9           federal courts to enforce those very rights.  Indeed, some argue

10          that United States District Courts have a common law right to

11          issue warrants even when statutory authorization is lacking.

12 *Wharton*, 153 F. Supp. 2d at 882.  *See also United States v. Best*, 184 F.2d at 138

13 ("Obviously, Congress may not nullify the guarantees of the Fourth Amendment by

14 the simple expedient of not empowering any judicial officer to act on an application

15 for a warrant."); *Bin Laden*, 126 F. Supp. 2d at 276-77 n.16 (collecting cases

16 suggesting possible inherent power to issue search warrants under Fourth

17 Amendment).

18

19          Second, in the present case, the only reason the evidence was in a foreign

20 country was because American officials chose to send the evidence to Singapore

21 instead of the United States.  Indeed, according to the letter requesting the evidence,

22 the agents originally intended to send the evidence to the United States,  *see* Exhibit

23 G, and that is where another computer and other computer media, *see supra* p. 6 n.5,

24

25 Constitution applies to some extraterritorial searches, *cf*. *United States v. Verdugo-Urquidez*, 110 S. Ct. ---- , --- U.S. ---- (1990) (Fourth Amendment inapplicable to

26 extraterritorial searches of property owned by nonresident aliens), it does not address the question of when the Constitution requires a warrant").  And the view of Judge

27 Paez – who wrote his opinion in *Colello v. S.E.C.* after *Barona* and is now also sitting on the Ninth Circuit – appears more consistent with the view that the warrant

28 requirement does apply to American agents' searches of American citizens in foreign countries.

1    in fact were sent.  If there was concern about how to get a warrant to conduct the

2    search in Singapore, the agents could have sent all of Mr. Pepe's computers and

3    computer media to Los Angeles, or some other American location.  *Cf. United States*

4    *v. Wharton*, 153 F. Supp. 2d at 882-83 (holding agent acted reasonably when he

5    returned defendant's property to the United States, where a search warrant was later

6    issued pursuant to Rule 41 of Federal Rules of Criminal Procedure).  To let American

7    officials avoid the warrant requirement when they *could* have conducted a search in

8    the United States but *chose* to conduct the search in a foreign country would allow

9    the grossest manipulation of Fourth Amendment requirements.

10

11        Third, the search here apparently took place on American-controlled premises

12   where there is likely American jurisdiction under the "special maritime and territorial

13   jurisdiction of the United States" provision of 18 U.S.C. § 7.  That provision extends

14   jurisdiction over substantive crimes "where American citizens and property need

15   protection, yet no other government effectively safeguards those interests."  *United*

16   *States v. Corey*, 232 F.3d 1166, 1171 (9th Cir. 2000).  These same reasons suggest

17   extension of American constitutional protections, especially when the conduct at

18   issue is that of solely American agents in support of an American investigation and

19   subsequent prosecution.

20

21        In sum, the Fourth Amendment's warrant requirement must apply to a search

22   like the computer search in the present case, whether or not it applies in all

23   circumstances.  The agents' failure to get a warrant before searching the computer,

24   the thumb drive, and the digital camera media card made the search of those items

25   unlawful.

26

27

28

14

IV.

CONCLUSION

The searches of Mr. Pepe's home in June, 2006 were a joint venture between the Cambodian and American agents, and so the government must show that those searches were reasonable under the Fourth Amendment, at least in the sense of complying with Cambodian law.  The subsequent searches of the computer, the thumb drive, and the digital camera media card were unlawful because they were conducted by American agents alone without a warrant, and that violates the Fourth Amendment regardless of where the American agents conducted the searches.  The Court should suppress the evidence found in these searches as well as any fruits.[10]

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED: June  25 , 2007          By    /S/ _____
                                       CARLTON F. GUNN
                                       Deputy Federal Public Defender

DATED: June  25 , 2007          By    /S/ _____
                                       CHARLES C. BROWN
                                       Deputy Federal Public Defender

---

[10]  Two additional search warrants have been disclosed in recently provided additional discovery which are based on affidavits that contain detailed summaries of the evidence found in the search of the computer, thumb drive, and digital camera media card which is challenged in this motion.  Because the warrants are based on this evidence, it would appear that any evidence found in the searches conducted pursuant to the warrants would be a fruit of the searches challenged in this motion.  There appear to be other bases for challenging these recently disclosed search warrants, however, so the defense will address all of the issues in a separate motion if and when the government discloses evidence found in those searches that it intends to use at trial.

1

## DECLARATION OF MICHAEL PEPE

2

3          I, Michael Pepe, hereby declare and state:

4

5          1.      I am the defendant in the above-entitled action.

6

7          2.      I was present on two occasions when Cambodian and American agents

8     (accompanied by at least one nongovernmental organization representative named

9     Ron Dunne) searched my home in Phnom Penh, Cambodia in June, 2006.  I believe

10    the first search was on June 17, 2006 and the second search was on June 20, 2006 or

11    June 21, 2006.  I was renting the home and I had been living there for over two years.

12

13         3.      I did not give the agents consent to search my home.

14

15         4.      It is my recollection that the Cambodian police officers did very little

16    searching, at least as far as I could see.  Most of the searching that I was able to see

17    was done by an American agent named Gary Phillips and an American named Ron

18    Dunne who was working for a non-governmental organization named the

19    International Justice Mission.

20

21         I declare under penalty of perjury that the foregoing is true and correct to the

22    best of my knowledge.

23

24    DATED:   ____6/14/07_____          _____/S/_____

25                                                              MICHAEL PEPE

26

27

28

P:\Gunn\PEPE\PLDM xSuppress.wpd                              16

1

TABLE OF CONTENTS

Page

MOTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

MEMORANDUM OF POINTS AND AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . .  3

    I.  INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

    II.  STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

    III.  ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

        A.   THE SEARCHES OF MR. PEPE'S HOME WERE JOINT
             VENTURES BETWEEN FOREIGN AND AMERICAN
             AUTHORITIES AND SO ALL OF THE EVIDENCE
             FOUND IN THE SEARCHES MUST BE SUPPRESSED
             UNLESS THE GOVERNMENT SHOWS THE SEARCH
             WAS REASONABLE UNDER THE FOURTH AMENDMENT.. . . . .  6

           1.   The Fourth Amendment Applies Because the Search
               Was a Joint Venture Between the Cambodian and
               American Officials.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

           2.   The Applicability of the Fourth Amendment Requires
               that the Government Show the Search Was Reasonable.. . . . . .  7

        B.   THE EVIDENCE FOUND IN THE SEARCH OF
             MR. PEPE'S COMPUTER, THUMB DRIVE, AND
             DIGITAL CAMERA MEDIA CARD MUST BE
             SUPPRESSED BECAUSE THOSE SEARCHES
             WERE CONDUCTED SOLELY BY AMERICAN
             OFFICIALS AND THAT MADE THE FOURTH
             AMENDMENT'S SEARCH WARRANT REQUIREMENT
             APPLICABLE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

    IV.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

DECLARATION OF MICHAEL PEPE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

TABLE OF AUTHORITIES

CASES                                                                 Page

*Colello v. S.E.C.,*
    908 F. Supp. 738 (C.D. Cal. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 13

*Powell v. Zuckert,*
    366 F.2d 634 (D.C. Cir. 1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 12

*Reid v. Covert,*
    354 U.S. 1 (1957). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Rosado v. Civiletti,*
    621 F.2d 1179 (2nd Cir.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Barona,*
    56 F.3d 1087 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*United States v. Best,*
    184 F.2d 131 (1st Cir. 1950). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 13

*United States v. Bin Laden,*
    126 F. Supp. 2d 264 (S.D.N.Y. 2000). . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*United States v. Brulay,*
    383 F.2d 345 (9th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Carbajal,*
    956 F.2d 924 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Conroy,*
    589 F.2d 1258 (5th Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 12

*United States v. Corey,*
    232 F.3d 1166 (9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Peterson,*
    812 F.2d 486 (9th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*United States v. Saylor,*
    374 F.2d 894 (Ct. Cl. 1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Streifel,*
    665 F.2d 414 (2nd Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Verdugo-Urquidez,*
    494 U.S. 259 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12, 13

*United States v. Wharton,*
    153 F. Supp. 2d 878 (W.D. La. 2001). . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

TABLE OF AUTHORITIES

STATUTES, RULES AND REGULATIONS                                                Page

18 U.S.C. § 2423(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3, 4

18 U.S.C. § 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

U.S. Const. amend. IV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

OTHER

Wayne R. LaFave, *Search and Seizure* (4th ed. 2004). . . . . . . . . . . . . . . . . . . . . . . .  8

Comment, *The Need for Warrants Authorizing Foreign Intelligence Searches of American Citizens Abroad: A Call for Formalism,*
   69 U. Chi. L. Rev. 403 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12