SEAN K. KENNEDY (No. 145632)
Federal Public Defender
(E-mail: Sean_Kennedy@fd.org)
CARLTON F. GUNN (No. 112344)
Deputy Federal Public Defender
(E-mail: Carlton_Gunn@fd.org)
CHARLES C. BROWN (No. 179365)
Deputy Federal Public Defender
(E-mail: Charles_Brown@fd.org)
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone (213) 894-1700
Facsimile (213) 894-0081

Attorneys for Defendant
MICHAEL PEPE

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR 07-168-DSF |
| Plaintiff, | **REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR DISCOVERY OF COMPUTER EVIDENCE** |
| v. | |
| MICHAEL PEPE, | Hearing Date: July 23, 2007 |
| Defendant. | Hearing Time: 8:30 a.m. |

Defendant, Michael Pepe, through his counsel of record, Deputy Federal Public Defender Carlton F. Gunn and Deputy Federal Public Defender Charles Brown, hereby replies to the government's opposition to his Motion for Discovery of Computer Evidence. This reply is based on the attached memorandum of points

///

///

1   and authorities, all files and records in this case, and such further evidence and
2   argument as may be presented at the hearing on the motion.
3
4                                    Respectfully submitted,
5                                    SEAN K. KENNEDY
6                                    Federal Public Defender
7
    DATED:  July 17, 2007            By
8                                    CARLTON F. GUNN
9                                    Deputy Federal Public Defender
10
11                                   Respectfully submitted,
12                                   SEAN K. KENNEDY
13                                   Federal Public Defender
14
    DATED:  July 18, 2007            By                /s/
15                                   CHARLES C. BROWN
16                                   Deputy Federal Public Defender
17
18
19
20
21
22
23
24
25
26
27
28

1   **MEMORANDUM OF POINTS AND AUTHORITIES**

2

3   I.

4   <u>INTRODUCTION</u>

5

6   Michael Pepe is charged in a multi-count indictment with engaging in illicit

7   sexual conduct with a minor in foreign places, in violation of 18 U.S.C. § 2423(C).

8   Evidence seized in the case included a computer and a thumb drive on which there is

9   both child pornography and non-pornographic photographs that the government

10  intends to use at trial.  The drives also contain various photographs, documents, and

11  other materials which may be relevant to defense investigation and/or useful as

12  defense evidence at trial.

13

14  Because the computer evidence is important in these respects, the defense

15  needs access to it.  First, it must conduct a forensic computer analysis to investigate

16  possible exculpatory explanations for the child pornography and other photographs

17  the government believes are incriminating.  Second, it needs other materials on the

18  computer for defense investigation and/or consideration as defense evidence.

19

20  The government has refused to provide a copy of the computer drives in

21  question, based on recently enacted 18 U.S.C. § 3509(m).[1]  The defense has moved to

22  compel the government to provide copies, under a reasonable protective order, on the

23  ground that (1) § 3509(m) does not apply in the circumstances of this case and (2)

24  § 3509(m) violates Mr. Pepe's constitutional rights if it does apply.  Assuming

25  arguendo § 3509(m) does apply and is constitutional, the defense has moved for an

26  order that the government (a) provide access to mirror images of the drives in a

27

28  _____

[1]  The government may be willing to provide copies of other computer media, such as CDs and diskettes, which do not contain child pornography.

3

neutral location and (b) at least provide copies of the drives with the child pornography images deleted.  This reply addresses the government's arguments in response to the defense motion.

II.

ARGUMENT

A.      § 3509(m) DOES NOT PREVENT THE COURT FROM ORDERING THE GOVERNMENT TO PROVIDE THE DEFENSE WITH COMPLETE MIRROR IMAGES OF THE COMPUTER DRIVES.

1.      Application of § 3509(m) Would Violate the Presumption Against Statutory Retroactivity if Not the Ex Post Facto Clause Itself.

The government's response to the defense argument against retroactive application of § 3509(m) focuses solely on the Ex Post Facto Clause of the Constitution.  It ignores the additional principle upon which the defense relies – the "general 'presumption against statutory retroactivity' that is 'founded upon sound considerations of general policy and practice, and accords with long held and widely shared expectations about the usual operation of legislation.'"  Motion, at 10 (quoting *Landgraf v. USI Film Products*, 511 U.S. 244, 293 (1994)).  This principle sweeps more broadly than the constitutional ex post facto prohibition, as the Supreme Court recognized in *Landgraf*.  The Court there explained:

> The Constitution's restrictions, of course, are of limited scope. Absent a violation of one of [the Constitution's] specific provisions, the potential unfairness of retroactive civil legislation is not a sufficient reason for a court to fail to give a statute its intended scope.  [Footnote omitted] . . . However, a requirement

4

1    that Congress first make its intention clear helps ensure that

2    Congress itself has determined that the benefits of retroactivity

3    outweigh the potential for disruption or unfairness.

4 *Landgraf*, 511 U.S. at 267-68.  *See also id.* at 272 ("[W]hile the *constitutional*

5 impediments to retroactive civil legislation are now modest, prospectivity remains the

6 appropriate default rule."  (Emphasis in original.)).

7

8    Here, the "requirement that Congress first make its intention clear" is not

9 satisfied.  There is no suggestion in either the statutory language or the legislative

10 history that retroactive application was intended.  Indeed, other sections of the Adam

11 Walsh Act, if anything, suggest the opposite.  *See* Motion, at 11.

12

13    2.    The Computer Drives, as Opposed to the Images Themselves, or Even

14 the Data on the Drives, Are Not "Child Pornography" to Which § 3509(m) Applies.

15

16    What is the child pornography and what are the tools or hardware used to make

17 the child pornography viewable becomes almost a metaphysical question.  The

18 government points to a definition of "visual depiction" that includes "data stored on

19 computer disk or by electronic means which is capable of conversion into a visual

20 image."  Government's Opposition, at 15 (quoting 18 U.S.C. § 2256(5)).  But this

21 definition does not include the computer disk itself, or the tools on the computer disk.

22 And the definition of child pornography itself refers to "computer or computer-

23 generated image or picture."  18 U.S.C. § 2256(8).

24

25    At the very least, there is an ambiguity.  And ambiguity should be resolved in

26 favor of avoiding difficult constitutional questions.  *See Zadvydas v. Davis*, 533 U.S.

27 678, 689 (2001); *United States v. Ray*, 375 F.3d 980, 988-89 (9th Cir. 2004); *United*

28

5

1  *States v. Hernandez*, 322 F.3d 592, 601-02 (9th Cir. 2003).[2]

2

3      3.      §3509(m) Does Not Apply to Copies Made *by* the Government *for* the

4  Defense.

5

6      The government rejects the distinction between copies made *by* the defense and

7  copies made *by* the government *for* the defense based on an assumption that the

8  purpose of § 3509(m) is "to prevent the replication of child pornography as part of

9  discovery in a criminal prosecution." Government's Opposition, at 17. That is not

10  the purpose of the statute, however.

11

12      The purpose of the statute – as stated elsewhere in the government's brief, *see*

13  Government's Opposition, at 10, and in the case of *United States v. Johnson*, 456 F.

14  Supp. 2d 1016 (N.D. Iowa 2006) -- is "to prevent the unnecessary *distribution* of child

15  pornography used in connection with criminal trials." Government's Opposition, at

16  10 (emphasis added).[3] Were the purpose of the statute to prevent *replication* of child

17  pornography, it would place limits on copies made even by the government. Yet it

18  places no such limits; instead, the government is allowed to make as many copies as it

19  wishes and look at them as often as it wants.

20

21      Requiring the government to make any copies provided to the defense does

22

23      [2] The government notes in a footnote that there is no constitutional right to
24  discovery, citing *Weatherford v. Bursey*, 429 U.S. 545 (1977). *See* Government
    Opposition, at 10 n.2. The constitutional right being claimed by the defense here is
25  not a constitutional right to discovery, however. It is a constitutional right to access
    to evidence and effective assistance of counsel. *See* Motion, at 12-14.

26      [3] The *Johnson* court did go on to say that even this purpose suggested the
27  government could not make copies for the defense, *see id.*, 456 F. Supp. 2d at 1019,
    but the defense respectfully suggest that this conclusion is wrong, because it ignores
    the plain language of the statute. As discussed in the defense moving papers, *see*
28  Motion, at 18. It is not clear that the plain language of the statute was pointed out to
    the court in *Johnson*.

1   advance the purpose of preventing unnecessary *distribution* of child pornography,

2   moreover.  It means the government can know about and keep track of all the copies

3   that exist.  This allows it to limit the individuals who have access to the copies

4   (through appropriate court orders), control the conditions under which those

5   individuals examine and use the copies (again through appropriate court orders), and,

6   perhaps most important, retrieve and destroy all copies once they are no longer

7   necessary (again through appropriate court orders).  Placing control over the copying

8   process in a single entity makes it much easier to assure that there is no unauthorized

9   dissemination or use while at the same time protecting the rights of defendants and

10   recognizing the responsibilities of defense counsel and their agents.

11

12       4.    <u>The Government Has Not Demonstrated that Making the Evidence</u>

13   <u>Available at the ICE Office in Long Beach Satisfies the "Reasonably Available"</u>

14   <u>Requirement of § 3509(m).</u>

15

16       In asserting that making the evidence available at the ICE office in Long Beach

17   satisfies the "reasonably available" requirement of  § 3509(m), the government points

18   to recent experience with one potential[4] defense expert, Marcus Lawson.  Mr.

19   Lawson, who would know better than anyone, has a different view of his experience

20   than the government, however .  *See* Declaration of Carlton F. Gunn, ¶ 2.  Mr.

21   Lawson ran into multiple problems in conducting his analysis at the ICE office.

22   These are detailed in notes he has provided to defense counsel in one of the other

23   cases, and which are being separately filed in camera and under seal because their

24   disclosure to the government could reveal defense trial strategy in one of the other

25

26

27   ───────────────

28       [4]  Whether or not Mr. Lawson will in fact be retained as the defense expert will
depend in part on what access to the evidence the Court orders in its ruling on this
motion.

1 | cases.[5] *See* Summary of Forensic Computer Examination Problems in *United States*
2 | *v. Chris Buessem*, CR 07-009-ER.

4 |     Mr. Lawson has indicated that these problems can be lessened, but not
5 | eliminated, if mirror images are shipped to the FBI office in Spokane. *See*
6 | Declaration of Carlton F. Gunn, ¶ 3. Mr. Lawson has his office in that city and has a
7 | working relationship with the FBI office there. If the mirror images were made
8 | available there, Mr. Lawson could avoid some of the problems he had at the ICE
9 | office in Long Beach, including the following:

10 |     1.    He would be able to use his forensic desktop computers instead of laptop
11 | computers because the desktop computers cannot be transported on a plane, but
12 | can be transported by car. These computers have an advantage over laptop
13 | computers because they can run analyses overnight.

14 |     2.    He would be able to return to his office relatively quickly to get software
15 | that he had not brought with him when he realized during his forensic
16 | examination that that software was necessary.

17 |     3.    Similarly, if there was a problem with a computer and/or other hardware,
18 | he would be able to return to his office and get a replacement computer and/or
19 | other hardware relatively quickly.

20 |     4.    If he ran into a problem during the forensic examination regarding which
21 | he wished to consult with one of his assistants, the assistant would be more
22 | readily available.

23 | Declaration of Carlton F. Gunn, ¶ 3.

25 |     The Court should therefore at least order that the mirror images be transported

---

27 |     [5] This illustrates another problem with a defense expert being required to work
28 | in a law enforcement office. There is always the potential that the expert's requests, equipment, or explanation of problems will reveal what he is considering in the way of defenses or potential government evidence that the defense must defend against.

1  to the Spokane FBI office.  § 3509(m) clearly permits this, for the FBI office in

2  Spokane is just as much of a "government facility" as the ICE office in Long Beach.[6]

3

4  B.      IF THE COURT RULES § 3509(m) DOES BAR THE DEFENSE FROM

5  BEING GIVEN MIRROR IMAGES, IT SHOULD ORDER MIRROR IMAGES BE

6  KEPT IN A NEUTRAL LOCATION, WHICH CAN BE AN EVIDENCE ROOM AT

7  THE ROYBAL COURTHOUSE.

8

9         The government responds to the defense argument that the mirror images may

10  be placed in another government office such as the Federal Public Defender's office

11  by arguing that the definitions of "government facility" and "government" in the

12  statutory provisions cited by the defense are different than the meaning intended in

13  § 3509(m).  It points to no different definition in §3509 (m), however.  In any event,

14  the Spokane FBI office that is suggested as an alternative *supra* would certainly

15  qualify.

16

17         Further, the defense has recently developed information about other more

18  neutral and more local facilities that even the government would have to agree are

19  within the requirements of § 3509(m).  Specifically, there are rooms within the

20  control of this district court – including at least one in the Roybal Courthouse – which

21  are available for the secure storage of discovery.  Such a room was used for the

22  storage of classified computer evidence and forensic examination of such evidence in

23  the recent espionage case of *United States v. Chi Mak*, SA CR 05-293(A)-CJC.  *See*

24  Exhibit A.  While analysis in that room was not as satisfactory as analysis in an

25  expert's office, it did provide (1) greater confidentiality for the defense investigation

26  and (2) 24-hour/7-day access for the expert which an expert does not have in a law

27

28  [6] The Spokane FBI office has told Mr. Lawson that it will not agree to accept evidence from non-FBI cases without a court order.  That can easily be solved by this Court, for this Court has the power to issue an order.

1  enforcement office.

2

3       Storage of child pornography computer evidence for forensic examination in

4  such a room is clearly within § 3509(m), moreover.  That is because the statute

5  provides that such evidence "shall remain in the care, custody, and control of either

6  the Government *or the court*."  18 U.S.C. § 3509(m) (emphasis added).

7

8       The computer evidence in the present case can and should be kept in one of

9  these rooms if the Court decides § 3509(m) precludes the defense expert from being

10 given a copy to examine in his office.  And it should be the original mirror images

11 with equal access for both the government's expert and the defense expert, so neither

12 side has an advantage in its analysis.  Nothing in § 3509(m) requires that copies of

13 the evidence remain in the control of the court *and* the government; rather, the statute

14 uses the word, "or."

15

16 C.    IF THE COURT RULES § 3509(m) DOES BAR THE DEFENSE FROM

17 BEING GIVEN MIRROR IMAGES CONTAINING CHILD PORNOGRAPHY, THE

18 GOVERNMENT CAN AND SHOULD PROVIDE MIRROR IMAGES WITH JUST

19 THE CHILD PORNOGRAPHY FILES DELETED.

20

21      Whether the government is opposing an order that it provide minor images

22 with just the child pornography files deleted is not entirely clear.  On the one hand, it

23 asserts that "this would be a time-consuming process for a forensic agent that would

24 produce an inexact copy of the hard drives."  Government's Opposition, at 20.  On

25 the other hand, it states that "[t]he government will attempt to work out a resolution,

26 if possible, and provide defendant with copies of the files (non child pornographic

27 images files, text files, operating files, etc.) that he seeks."  Government's

28 Opposition, at 20-21.

1

2      Defense counsel has consulted with both an assistant computer system

3  administrator employed in the Federal Public Defender's office and the preferred

4  defense expert, Marcus Lawson, and both indicate that mirror images with just the

5  child pornography files deleted can be produced.  *See* Declaration of Haji Shah.

6  Indeed, it is the understanding of defense counsel that a *government* expert recently

7  conceded this in a hearing in Sacramento, in the case of *United States v. Jeremy*

8  *Flinn*, CR-S-05-314-GEB.  *See* Declaration of Carlton F. Gunn, ¶ 7.  It may be easier

9  in the present case than some cases, moreover, because defense counsel's

10  examination and the investigative report suggest that there may be less images here

11  than in many child pornography cases.  *See* Declaration of Carlton F. Gunn, ¶ 4;

12  Exhibit B, at 9-11.

13

14      There may be some information lost in addition to the images, *see* Declaration

15  of Haji Shah, ¶ 3, but much information will be retained.[7]  That information will be

16  useful as a starting point – indeed, much more than a starting point – because forensic

17  computer analysis will at least focus and make more efficient later analysis in an out-

18  of-office location and might even make out-of-office analysis unnecessary.  *See*

19  Declaration of Carlton F. Gunn, ¶ 8.  It will also be useful because the defense wants

20  the remaining material on the computer drives, which includes a multitude of non-

21  child pornographic photos and a multitude of documents, for additional non-forensic

22  purposes, such as investigative leads and/or potential defense evidence.  *See*

23  Declaration of Carlton F. Gunn, ¶ 9.

24

25

26

27

---

28      [7] Defense counsel's understanding is that the government expert in
Sacramento believed the deletion could be done in a way that *no* information – or at
least no significant information – would be lost.

III.

## CONCLUSION

Section 3509(m) does not preclude the Court from ordering the government to provide a defense expert with mirror images of the computer evidence in its complete form, even with the child pornography, and so the Court should order the government to provide such mirror images.  If the Court does not believe it can do this, it should at least order (1) that either the defense expert be given access to the mirror images at the FBI office in Spokane near the preferred defense expert's office, or the mirror image be kept in a secure evidence room in the Roybal Courthouse and (2) that the government provide the defense with mirror images of the drives with just the child pornography files deleted.

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED:  July 17, 2007                    By _____
                                         CARLTON F. GUNN
                                         Deputy Federal Public Defender

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED:  July 18, 2007                    By_____/s/_____
                                         CHARLES C. BROWN
                                         Deputy Federal Public Defender

## DECLARATION OF CARLTON F. GUNN

I, Carlton F. Gunn, hereby declare and state:

1.    I am a Deputy Federal Public Defender in the Central District of California.  I and Deputy Federal Public Defender Charles Brown are assigned to represent Michael Pepe in the above-entitled action.

2.    I have reviewed the declaration of James H. Moran, which is attached to the government's opposition to our Motion for Discovery of Computer Evidence, which discusses, inter alia, two child pornography cases being handled by our office in which a defense expert named Marcus Lawson attempted to conduct a forensic computer examination in the ICE office in Long Beach, California.  After reviewing that declaration, I spoke with both Mr. Lawson, and one of the attorneys on one of the cases, Deputy Federal Public Defender John Littrell.  Mr. Lawson and Mr. Littrell both told me that there were a number of problems, of which Mr. Moran would not necessarily have been aware, with Mr. Lawson having to conduct the forensic examination in the ICE office.  Mr. Lawson and Mr. Littrell also provided me with some notes prepared by Mr. Lawson in which he summarized those problems.  I am separately filing those notes, in camera and under seal, because they could potentially reveal defense investigation strategy in the other case.

3.    Mr. Lawson did tell me that he believed problems of the sorts described in his notes could be lessened, though by no means completely eliminated, if he was able to examine the computer evidence at the FBI in Spokane, Washington, where Mr. Lawson has his office.  Mr. Lawson also told me he had developed a good working relationship with that office.  He indicated he has fewer problems when he conducts the examination there because of the following options:

a.    He would be able to take his forensic desktop computers instead of laptop computers because the desktop computers cannot be transported on a plane, but can be transported by car.  These computers have an advantage over laptop computers because they can run analyses overnight.

b.    He would be able to return to his office relatively quickly to get software that he had not brought with him when he realized during his forensic examination that that software was necessary.

c.    Similarly, if there was a problem with a computer and/or other hardware, he would be able to return to his office and get a replacement computer and/or other hardware relatively quickly.

d.    If he ran into a problem during the forensic examination regarding which he wished to consult with one of his assistants, the assistant would be more readily available.

4.    In our motion, we have requested as a last alternative that we be provided with mirror images of the various computer drives with just the child pornography files deleted.  We have reviewed all of the computer images described in the investigative report attached to the reply as Exhibit B, and I would estimate that the number of those child pornography images total no more than 200 and possibly less than 100.  This thus appears to be unlike many child pornography cases in which there are thousands of child pornography images.

5.    I also spoke with several people about the feasibility of making mirror images of the drives with the child pornography images deleted.  Among the people I spoke with about this were Mr. Lawson, another defense expert and an attorney who are in the midst of litigating a discovery motion like ours in a case in Sacramento, and an assistant computer systems administrator in our office.

6.      What the assistant computer systems administrator, Haji Shah, told me and suggested is detailed in his separate declaration which follows my declaration.  In brief summary, it appears that there may be some information lost in addition to child pornography images but much useful information will remain, possibly including all information other than the child pornography images and information about them.

7.      What the defense attorney and a defense expert in the Sacramento case told me was that the *government* expert who testified in that case, an agent named Jim Harris, stated in response to a question from the magistrate judge conducting the hearing that he believed he could provide a mirror image with child pornography files either deleted or replaced with something else.  Indeed, he believed the deletion could be done in a way that no information – or least no significant information -- would be lost.  I have not been able to get a transcript of Mr. Harris's testimony yet, but I will attempt to either do that or subpoena Mr. Harris to testify before this Court if the Court believes that is important to the Court's ruling.

8.      What Mr. Lawson told me is that he could use a program called BC Wipe to delete the child pornography images from mirror images prepared by either himself or a government expert.  He told me that the child pornography files and the information about them would be lost, but that the only other information that would be affected would be whatever computer files are accessed on "booting" of the computer, which could be a relatively small number of the files.  He told me that having a mirror image with just these changes would allow him to do a significant amount of forensic analysis in his office before going to look at the complete mirror images in a law enforcement office.  He further told me that such a preliminary forensic analysis would allow him to be more focused and efficient in any additional forensic analysis he might have to do on the complete mirror images at a law enforcement office.  Depending on what Mr. Lawson told me after such a preliminary

forensic analysis, we might not need to have him conduct additional forensic analysis in the government office.

9.     Further, regardless of how deletion of the child pornography files with the BC Wipe program might affect the remaining drives for purposes of forensic analysis, we believe the non-contraband photographs, documents, and software may be valuable for non-forensic purposes.  They could lead us to witnesses we wish to interview and/or other evidence we wish to develop.  I am deliberately avoiding being detailed because I do not want to disclose our investigation strategy to the government.  I note that rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure requires the government to allow the defendant to make copies of any "item [that] was obtained from or belongs to the defendant" without requiring any showing of materiality or need.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED: July 17, 2007

CARLTON F. GUNN
Deputy Federal Public Defender

# DECLARATION OF HAJI SHAH

I, Haji Shah, hereby declare and state:

1.      I am an assistant computer systems administrator employed by the Federal Public Defender for the Central District of California.  My duties in that position are to provide computer support services to the office and, at times, conduct in-house analysis of computer evidence. My resume is attached to this declaration, and I have also had additional training since creating that resume.  That training includes a three-day course in computer forensic analysis using a software program known as Encase, which is one of the most commonly used forensic computer analysis programs.  I also have experience within the office in using a forensic analysis program known as Forensic Tool Kit.

2.      I have spoken with Deputy Federal Public Defender Carlton F. Gunn and an outside forensic computer analysis expert named Marcus Lawson, whom our office has retained on a number of occasions, about the possibility of creating a mirror image of a computer drive with child pornography files removed through the process of wiping.  Mr. Lawson and I both believe that it is possible to wipe the child pornography files from the mirror image of the computer drive using a program named BC Wipe.  This program could be used to wipe just the child pornography files, though that process would also wipe the information about the child pornography files, such as the "created" date, the "last accessed" date, and other information.  The process of wiping a file goes further than merely deleting the file from the hard drive.  Simply deleting a file removes it from the hard drive's table of contents while leaving the file physically intact.  Wiping a file  overwrites the area on the hard drive where the file existed, removing any chance of recovering it.

3.     The vast majority of the other files on the computer would not be affected at all by this process of "wiping" the child pornography files.  The one exception might be files that are automatically accessed by the computer upon "booting," i.e., starting the computer up, which are known as "system files."  This would be a small number of files compared to the total number of files on the hard drive.

4.     In fact, I believe, though I am not certain, that even the system files on the  mirror image could be preserved in an untainted form.  I believe this could be done by connecting the mirror image to another computer as a secondary or portable drive and then booting, or starting up, the other computer.  I believe the booting process would then affect the system files on just the other computer, not the system files on the mirror image attached as a secondary drive.  Then the only files on the mirror image that would be affected would be the ones that were deliberately wiped with the BC Wipe program, i.e, the child pornography files (and the information about them).

5.     In any event, it would be at most the system files, and the child pornography files (and information about them) which were actually "wiped," that would be affected or altered by this "wiping" process.  The actual content files on the computer – such as other photographs, word processing documents, and software programs – would definitely not be affected.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED: July 17, 2007

_____
HAJI SHAH

HAJI SHAH

## EXPERIENCE

**Federal Public Defender, Los Angeles California**

5/05 to Present   *Assistant Computer System Administrator*:  Managing the operational support of three offices through evaluating technical needs, project implementation, technical support, and training.  Providing forensic analysis and expert opinions on technical evidence, including hard drive file systems, deleted or hidden files, email, database, and website analysis.

**United Parcel Service, Los Angeles California**

5/04 to 5/05   *Customer Technology Sales Support Supervisor*:  Provide consultation services and technical solutions for high-volume UPS customers, achieved by analyzing their operational processes and recommending  solutions that reduce cost and increase sales. Some demonstrated examples include:

- Streamlining a law firms document shipping and administration by implementing a web-based shipping tool that can be accessed on any PC, reducing the overall amount of time spent processing shipments.
- Simplifying the shipping process by integrating UPS's shipping software with popular accounting and warehouse management packages that use SQL, Microsoft Access or ODBC connections.

4/99 to 5/04   *Technology Support Specialist*:  Deploying technology-related projects across several facilities and auditing department performance.  Some accomplishments include:

- The management of a migration from a Token Ring-based network infrastructure to an Ethernet-based infrastructure.  This project involved eleven UPS facilities and included writing RFP's, cabling vendor selection, hardware purchasing, the development of a staged transition plan, and the delegation of work.
- The integration of Mail Boxes Etc to the UPS Store.  This initiative was the result of UPS's acquisition of MBE and involved the successful coordination and deployment of new network equipment across 110 UPS Stores.

## SKILLS

Business :  Analyzing business and operational processes; business case development, including  writing requests for proposals and cost analysis; managing and implementing projects, including managing resources, vendor bidding and selection, purchasing, and training.

Technical:  Microsoft & Novell server architectures including Active Directory and Exchange, administration and security; LAN/WAN design; database management; programming concepts; hardware/software support, including Microsoft Office and Word Perfect, forensic analysis of computer systems using Encase and Forensic Tool Kit.

## EDUCATION

**DeVry University**, October 1998:  Bachelor of Science in Technical Management

**Chaffey College**, June 1994:  Associate of Science in Computer Information Systems