GEORGE S. CARDONA
United States Attorney
THOMAS P. O'BRIEN
Assistant United States Attorney
Chief, Criminal Division
PATRICIA A. DONAHUE (SBN: 132610)
JOHN J. LULEJIAN (SBN: 186783)
Assistant United States Attorneys
Violent and Organized Crime Section
    United States Courthouse
    312 North Spring Street, 15th floor
    Los Angeles, California 90012
    Telephone: (213) 894-0640/8603
    Facsimile: (213) 894-3713
    E-mail: patricia.donahue@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>MICHAEL JOSEPH PEPE,<br><br>    Defendant. | CR No. CR 07-168-DSF<br><br>GOVERNMENT'S CONSOLIDATED OPPOSITION TO DEFENDANT'S MOTIONS (1) TO SUPPRESS EVIDENCE AND (2) TO SUPPRESS EVIDENCE DISCOVERED AS A RESULT OF COMPUTER SEARCH WARRANT; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF GARY PHILLIPS AND EDDY WANG |

Hearing:   September 17, 2007
Time:      10:00 a.m.
Place:     Courtroom of the
          Honorable Dale S. Fischer

     Plaintiff United States of America, by and through its counsel of record, hereby submits its opposition to (1) the Motion to Suppress Evidence (Docket No. 21), and (2) the Motion to Suppress Evidence Discovered as a Result of Computer Search Warrant (Docket No. 33), filed by defendant Michael Joseph Pepe.

1        This opposition is based on the attached memorandum of points and authorities and

2    declarations, the files and records of this case, and any additional argument and evidence

3    presented at the hearing.

4    Dated: August 22, 2007        Respectfully submitted,

5                        GEORGE S. CARDONA
                    United States Attorney

6

7                        THOMAS P. O'BRIEN
                    Assistant United States Attorney
                    Chief, Criminal Division

8

9                        *Patricia A. Donahue*
                    PATRICIA A. DONAHUE

10                       Assistant United States Attorney

11

12                       *John J. Lulejian*

13                       JOHN LULEJIAN
                    Assistant United States Attorney

14                       Attorneys for Plaintiff United States of America

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                         2

TABLE OF CONTENTS

PAGE

Table of Authorities  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I        INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II       STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III      ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

         A.    THE FOURTH AMENDMENT DOES NOT APPLY TO THE
               SEARCH CONDUCTED BY THE CAMBODIAN NATIONAL POLICE . . . . . 9

         B.    NEITHER EXCEPTION TO THE RULE ADMITTING EVIDENCE
               FROM FOREIGN SEARCHES APPLIES HERE  . . . . . . . . . . . . . . . . . . 9

               1.   The Search By The Cambodian National Police Did Not Shock
                    The Judicial Conscience  . . . . . . . . . . . . . . . . . . . . . . . . . 9

               2.   The Search Conducted By The Cambodian National Police Was
                    Not A "Joint Venture" With United States Law Enforcement  . . . . . . . . 10

         C.    EVEN IF THE SEARCH WAS A "JOINT VENTURE" WITH UNITED
               STATES LAW ENFORCEMENT, THE SEARCH WAS REASONABLE
               AND THE GOOD FAITH EXCEPTION APPLIES . . . . . . . . . . . . . . . . . . . 13

         D.    THE SEARCH OF PEPE'S COMPUTER MEDIA IS VALID  . . . . . . . . . . . . 15

         E.    THE SEARCH WARRANT ESTABLISHED PROBABLE CAUSE
               FOR THE MEDIA LISTED IN THE SEARCH WARRANT  . . . . . . . . . . . . . 19

         F.    THE EXECUTION OF THE SEARCH WAS PROPER IN TIME AND
               SCOPE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

IV       CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

i

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                                 **PAGE(S)**

Birdsell v. United States,
    346 F.2d 775 (5th Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Murray v. United States,
    487 U.S. 533 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19

Pfeifer v. United States Bureau of Prisons,
    615 F.2d 873 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Stonehill v. United States,
    405 F.2d 738 (9th Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

United States v. Angulo-Lopez,
    791 F.2d 1394 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

United States v. Barajs-Avalos,
    377 F.3d 1040 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

United States v. Barona,
    56 F.3d 1087 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 13

United States v. Behety,
    32 F.3d 503 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

United States v. Benedict,
    647 F.2d 928 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

United States v. Castillo,
    866 F.2d 1071 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

United States v. Clark,
    435 F.3d 1100 (9th Cir. 2006),
    cert. denied, ___ U.S. ____, 127 S. Ct. 2029 (2007) . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. Duran-Orozco,
    192 F.3d 1277 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19

United States v. Fannin,
    817 F.2d 1379 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

# TABLE OF AUTHORITIES (Cont'd)

**FEDERAL CASES**                                                    **PAGE(S)**

United States v. Gecas,
    120 F.3d 1419 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Heckenkamp,
    482 F.3d 1142 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

United States v. Hernandez,
    183 F. Supp. 2d 468 (D.P.R. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Hill,
    459 F.3d 966 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

United States v. Maher,
    645 F.2d 780 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

United States v. Marzano,
    537 F.2d 257 (7th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

United States v. McQuisten,
    795 F.2d 858 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

United States v. Peterson,
    812 F.2d 486 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

United States v. Reed,
    15 F.3d 928 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

United States v. Rose,
    570 F.2d 1358 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

United States v. Rosenthal,
    793 F.2d 1214 (11th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Schmidt,
    947 F.2d 362 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

United States v. Vasey,
    834 F.2d 782 (9th Cir.1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**TABLE OF AUTHORITIES (Cont'd)**

**FEDERAL CASES**                                          **PAGE(S)**

United States v. Wanless,
    882 F.2d 1459 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**STATE CASES**

United States v. Habershaw,
    No. CR. 01-10195-PBS, 2002 WL. 33003434 (D. Mass. May 13, 2002) . . . . . . . . . . . 24

**FEDERAL STATUTES**

18 U.S.C. § 2423(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 17, 18

## MEMORANDUM OF POINTS AND AUTHORITIES

### I

### INTRODUCTION

Defendant Michael Pepe ("Pepe") is charged with four counts of violating 18 U.S.C. § 2423(c), Engaging in Illicit Sexual Conduct in Foreign Places. Pepe is a United States citizen who traveled to Cambodia and raped and molested young girls. The Cambodian National Police ("CNP") executed a search warrant at defendant's residence in Cambodia and recovered substantial evidence that corroborates the statements made by the victims. That evidence has been turned over to United States Immigration and Customs Enforcement ("ICE") and brought to the United States.

Pepe's arrest, and the search of his residence, were conducted by the CNP. They were not done at the behest of the United States government. The Fourth Amendment and the exclusionary rule do not apply to the actions of foreign law enforcement. The fact that American law enforcement was present when the CNP conducted the search of defendant's residence in Cambodia does not transform the CNP's law enforcement activity into a joint venture. Accordingly, the evidence seized by the CNP is admissible. Moreover, even if the CNP search had been a joint venture, the search was lawfully conducted pursuant to a Cambodian search warrant. Compliance with foreign law renders the search reasonable, and the evidence seized admissible. In addition, since the good faith exception applies, even if the search violated Cambodian law, American law enforcement's good faith belief that Cambodian law was followed defeats defendant's suppression motion.

### II

### STATEMENT OF FACTS[1]

On or about June 14, 2006, the United States Embassy in Cambodia (the "Embassy") informed Gary J. Phillips, an Assistant Attache for U.S. Immigration and Customs Enforcement

---

[1] The facts set forth in this Statement of Facts are from the Declarations of Gary J. Phillips and Eddy Wang, both of which are attached hereto.

3

1  ("AIA") in Bangkok, Thailand, that the Embassy had received the following information from

2  World Hope International ("WHI"), a non-governmental organization:  The International Justice

3  Mission ("IJM"), another non-governmental organization, had learned that a 12-year old girl

4  claimed she was purchased, tied up, and raped by an American teacher of English, and that the

5  perpetrator had not yet been identified.

6        Later that day, IJM director Ron Dunne told AIA Phillips that an American citizen was

7  allegedly involved in sexually abusing at least five females between the ages of 10 and 18, and

8  that one of the victims was bound and raped.  Dunne also told AIA Phillips that as a result of

9  these allegations, the CNP had an American under surveillance.  In addition to AIA Phillips,

10  Dunne informed the CNP of the allegations of sexual abuse.

11        On or about June 15, 2006, Dunne told AIA Phillips that CNP and the municipal police

12  in Phnom Penh, Cambodia, were conducting surveillance of the American, and that the

13  American was inside his residence with victims.  Dunne also provided AIA Phillips with

14  information from an interview conducted by WHI on or about June 12, 2006 of the 12-year old

15  victim, "I.T."  In that interview, I.T. stated, among other things, that the man with whom she had

16  "sex" was known as "Michael" and was from the United States.  I.T. also described "Michael's"

17  residence and stated that "some young girls" were being tied up for the purpose of having sex

18  with "Michael."

19        On or about June 15, 2006, Dunne told AIA Phillips that an IJM investigator had located

20  Michael Pepe's house and that the local police were surveilling that house.  Dunne also provided

21  AIA Phillips with a copy of an IJM report that related that Michael Pepe (identified in the report

22  by his date of birth and his U.S. Passport number) was involved in "sexual trafficking."

23  According to that IJM report, I.T. stated that while she was at Pepe's house, she was bound and

24  sexually abused.  In addition, the IJM report noted that a medical examination conducted at a

25  Phnom Penh hospital showed injuries to I.T.'S vagina.

26        On or about June 16, 2006, at WHI, AIA Phillips interviewed I.T. in the presence of a

27  guardian.  Also present during the interview were Dunne, United States Embassy investigator

28

1  Suos Vansak, and WHI counselors.  The CNP was not present when AIA Phillips interviewed
2  I.T.  AIA Phillips's purpose in interviewing I.T. was to memorialize her statements in the event
3  that there would be a prosecution in the United States.  Also, if an American had harmed I.T., the
4  United States had an obligation to provide her with medical care.

5        In his capacity as an Assistant ICE Attache in Bangkok, Thailand, when AIA Phillips
6  receives information that a United States citizen may be involved in child abuse within the
7  jurisdiction of ICE Bangkok, he conducts a parallel investigation with whatever investigation is
8  being run by the local police.  When, as in this case, it appears that the child victim's family was
9  involved in selling the victim to the perpetrator, a non-governmental organization becomes the
10 legal guardian and caregiver of the child victim.  As part of his investigation, AIA Phillips asks
11 the non-governmental organization that has custody of the child victim for access to the child
12 victim so that he can interview the child victims without the police present.  AIA Phillips's
13 investigation is parallel, not joint, with that of the local police.

14       On or about June 16, 2006, AIA Phillips met with CNP General Un Sokunthea.  Dunne
15 also attended that meeting, and he gave General Un Sokunthea a copy of the IJM report
16 regarding the allegations against Michael Pepe.  At that meeting, AIA Phillips informed General
17 Un Sokunthea that ICE was conducting a parallel investigation.  AIA Phillips also thanked
18 General Un Sokunthea for the efforts of the CNP and he told her that if the CNP needed help, to
19 please let me know.  He made those statements to be courteous, diplomatic, and respectful to
20 local law enforcement.  He did not anticipate that the CNP would seek my help in its
21 investigation.  The CNP did not seek my help in its investigation until after the Cambodian
22 search warrant was executed and the computer media was seized.  As stated below, the CNP
23 sought ICE assistance in forensically analyzing the seized media.

24       On or about June 17, 2006, at approximately 12:40 p.m., after observing Michael Pepe
25 leave his residence and go to a tour business, the CNP arrested him for rape and debauchery in
26 violation of Cambodian law.  After arresting Pepe, the CNP transported him to his residence.
27 AIA Phillips was not present when the CNP arrested Pepe.  AIA Phillips learned of the arrest
28

5

1  from Dunne.  AIA Phillips did not instruct or advise the CNP to arrest Pepe.

2      Before arresting Pepe, the CNP had obtained a search warrant for his residence.  (A true

3  and correct copy of that Cambodian warrant is attached to the Declaration of Gary J. Phillips.).

4  At approximately 1:20 p.m. on June 17, 2006, the CNP began to execute the search warrant.

5  AIA Phillips did not instruct or advise the CNP to obtain a warrant to search Pepe's residence,

6  and he did not assist the CNP in obtaining the search warrant.  AIA Phillips does not know the

7  process by which a search warrant is obtained under Cambodian law.  It is his understanding that

8  the Cambodian prosecutor and the person whose house is being searched must be present.

9      AIA Phillips did not execute the Cambodian search warrant in Pepe's residence.  AIA

10  Phillips was present as an observer when the CNP executed the Cambodian search warrant on

11  Pepe's residence.  There were approximately twenty police officers searching Pepe's residence.

12  The Cambodian prosecutor and Pepe were present when the CNP executed the search.  There

13  were officers searching in one room when Pepe was located in another room.  During the search,

14  AIA Phillips went inside the house and followed the CNP officers.  AIA Phillips saw what items

15  the CNP officers found, and he took photographs during the search for his parallel investigation.

16  At one point, the CNP officers discovered rope in the closet.  When the officers told AIA Phillips

17  about the rope, he looked at it.  AIA Phillips also observed many items that corroborated the

18  information provided by I.T.  During the search, AIA Phillips wore gloves so that he would not

19  contaminate any of the evidence seized by the CNP.

20      On or about June 17, 2006, the CNP stopped the search.  AIA Phillips does not know

21  why they stopped the search.  The CNP taped the door and sealed it shut.  On or about June 19,

22  2006, the CNP returned to Pepe's residence, placed the seized items into burlap bags, put the

23  bags into trucks, and drove all of the seized items to the CNP offices.

24      Among the items seized by the CNP were a computer and computer media, including a

25  flashcard, memory card, and compact disks.  The CNP does not have the forensic capability to

26  analyze computer media.  Because ICE has the capability to forensically analyze computer

27  media, ICE offered to assist to the CNP in its analysis of the computer and media.  This is the

28

1  same assistance that ICE offers to law enforcement agencies throughout the world who lack the

2  technical resources and knowledge to analyze computers and computer media.  After accepting

3  ICE'S offer of assistance, the CNP turned over the hard drive, flashcard, memory card, and

4  compact disks to AIA Phillips, who later sent those items to ICE Singapore for forensic analysis.

5       AIA Phillips believes that the search warrant obtained by the CNP for Pepe's residence

6  complied with Cambodian law, and the search was executed in accordance with Cambodian law.

7       On or about November 16, 2006, ICE in the Central District of California received a

8  number of items seized by the CNP from Michael Pepe's Cambodian residence.  On or about

9  April 17, 2007, ICE Special Agent Chris Kuzma received additional media.  The items that

10  Special Agents Eddy Wang and Kuzma received included one Hewlett-Packard CPU, twenty-

11  seven pornographic compact disks, thirty-one miscellaneous compact disks, and five 3.5-inch

12  floppy disks.  These items had not previously been forensically examined by Special Agent

13  David Galante of the ICE Attache Office in Singapore, or anyone else.  Believing that these

14  items might be evidence or an instrumentality of criminal activity, I prepared a search warrant.

15  On or about May 17, 2007, after the warrant had been approved by Assistant United States

16  Attorney Patricia Donahue, ICE Special Agent Wang presented a search warrant and affidavit to

17  the Honorable Victor B. Kenton, United States Magistrate Judge for the Central District of

18  California.  After reviewing Special Agent Wang's affidavit, Magistrate Judge Kenton signed the

19  search warrant.  A true and correct copy of the search warrant affidavit is attached to Special

20  Agent Wang's declaration.

21       In the search warrant affidavit, Special Agent Wang detailed some of the evidence

22  discovered by the CNP that corroborated the victims' accounts of rape and abuse by Pepe.  In the

23  affidavit, Special Agent Wang also included descriptions of the images found by Special Agent

24  Galante during the forensic analysis he performed at the request of the CNP.  The images in the

25  media that Special Agent Galante examined included child pornography and photographs of

26  Pepe's victims in various states of undress.  However, even if ICE was unaware of this evidence

27  or was precluded from using this information, Special Agent Wang  still would have sought a

28

7

1   search warrant for the computer media based on the nature of the crime.  Based on Special Agent

2   Wang's training and experience, he knows that pedophiles often photograph their victims,

3   document and correspond with other pedophiles about their activities, and collect and store child

4   pornography.  Given the possibility that evidence might exist on the media that would

5   corroborate the victims, Special Agent Wang still would have applied for a search warrant.

6          Between May 17, 2007, and July 12, 2007, ICE Computer Forensic Analyst Timothy

7   Sullivan and Special Agent Wang examined the items enumerated in the search warrant.

8   Analysis of the items revealed that approximately eleven compact disks that contained visual

9   depictions of minors.  After conducting a preliminary examination of the media, Special Agent

10  Wang determined that the above disks contained evidence or an instrumentality of criminal

11  activity and needed a more detailed analysis.  Because the remaining items did not contain

12  evidence or were instrumentalities of criminal activity, Special Agent Wang determined that

13  those items could be returned to Pepe.  A true and correct copy of the Report of Investigation

14  documenting Special Agent Wang's findings is attached to his declaration as Exhibit B.  Prior to

15  July 15, 2006, Special Agent Wang sent his findings to the United States Attorney's Office and

16  asked that the Assistant United States Attorney inform Pepe's counsel that the items that did not

17  contain visual depictions of minors could be returned to Pepe.  Although the United States

18  Attorney's Office has furnished those findings to Pepe's attorneys, no one

19  acting on Pepe's behalf has picked up this media.

20         On or about July 12, 2007, Bruce Pixley, Senior Director of Aon Consulting, copied one

21  of the compact disks, and using forensic tools conducted a more detailed analysis of the compact

22  disk.  That analysis included an examination of the unallocated space on the disk.  In the

23  unallocated space of that compact disk, Mr. Pixley found child pornography and visual

24  depictions of minors.  On or about July 25 and 26, 2007, Mr. Pixley copied the remaining

25  compact disks and conducted a similar examination.  Mr. Pixley determined that at least two of

26  the compact disks that he examined contained visual depictions of minors in the unallocated

27  space.

28

**III**

**ARGUMENT**

**A.    THE FOURTH AMENDMENT DOES NOT APPLY TO THE SEARCH CONDUCTED BY THE CAMBODIAN NATIONAL POLICE**

The Ninth Circuit has recognized the "general and undisputed proposition" that "neither our Fourth Amendment nor the judicially created exclusionary rule applies to acts of foreign officials." United States v. Barona, 56 F.3d 1087, 1090-91 (9th Cir. 1995) (citations omitted). Thus, evidence obtained by foreign police officers from searches conducted in their own countries generally is admissible, regardless whether the search complied with the Fourth Amendment. See Stonehill v. United States, 405 F.2d 738, 743 (9th Cir. 1968) ("Neither the Fourth Amendment of the United States Constitution nor the exclusionary rule of evidence, designed to deter Federal officers from violating the Fourth Amendment, is applicable to the acts of foreign officials.").

**B.    NEITHER EXCEPTION TO THE RULE ADMITTING EVIDENCE FROM FOREIGN SEARCHES APPLIES HERE**

There are two "very limited exceptions" to the general rule admitting evidence resulting from foreign searches and arrests. Barona, 56 F.3d at 1091. Neither exception applies in this case.

**1.    The Search By The Cambodian National Police Did Not Shock The Judicial Conscience**

The first exception, inapplicable here, "occurs if the circumstances of the foreign search and seizure are so extreme that they shock the judicial conscience, so that a federal appellate court in the exercise of its supervisory powers can require exclusion of the evidence." Id. (citations omitted). Defendant has not alleged, nor is there any evidence, that the CNP engaged

9

in conduct that would "shock the judicial conscience." To the contrary, in compliance with Cambodian law the CNP obtained a search warrant for defendant's Phnom Penh residence. Thus, the first exception does not apply.

## 2.    The Search Conducted By The Cambodian National Police Was Not A "Joint Venture" With United States Law Enforcement

The second very limited exception to the rule admitting evidence resulting from foreign searches applies "when United States agents' participation in the investigation is so substantial that the action is a joint venture between United States and foreign officials." Id.; Stonehill, 405 F.2d at 743 ("If Federal agents [have] so substantially participated in the raids so as to convert them into joint ventures between the United States and the foreign officials, then the exclusionary rule may apply").

Whether the involvement of United States agents rises to the level of substantial participation is a fact-specific inquiry, with no one factor being determinative. In United States v. Stonehill, 405 F.2d at 741-42, 745 (9th Cir. 1968), the Ninth Circuit found no joint venture when United States officials were present during the planning of searches in the Phillippines and a few days after the searches they obtained some of the seized evidence. The fact that the Supreme Court of the Phillippines ultimately found the raid to be illegal, and that the raid would also have been found to be illegal in the United States, did not render the evidence inadmissible in the United States. Id. at 746. In United States v. Benedict, 647 F.2d 928, 930 (9th Cir. 1981), the court found no joint venture where the search was initiated by the Thai police under Thai law, a search warrant was procured under Thai law, and the Drug Enforcement Administration ("DEA") agents were invited by the Thai police to accompany them during the search because

10

the heroin seized at the Bangkok Airport that initiated the investigation was marked for shipment to the United States.  In <u>United States v. Rose</u>, 570 F.2d 1358, 1364 (9th Cir. 1978), the Ninth Circuit declined to find a joint venture where United States Customs officials did not direct or request the Canadians to search the defendant's luggage, did not participate in the search, and "[t]here is no evidence that United States agents were attempting to undermine the Fourth Amendment rights of a citizen by circuitous and indirect methods."  (citations omitted).  <u>See also</u> <u>United States v. Maher</u>, 645 F.2d 780, 783 (9th Cir. 1981) (no joint venture where investigation was initiated and controlled by Canadian police with limited support and assistance from American officials in the United States); <u>Pfeifer v. United States Bureau of Prisons</u>, 615 F.2d 873, 877 (9th Cir. 1980) (combination of treaty encouraging joint drug investigations and presence of American DEA agent with visible firearm in his jacket during interrogation by Mexican officials not sufficient to invoke joint venture doctrine).  By contrast, in <u>United States v. Peterson</u>, 812 F.2d 486, 490 (9th Cir. 1987), the Ninth Circuit found substantial participation where the DEA agents themselves termed their actions a "joint investigation," were involved daily in translating and decoding transmissions intercepted as a result of a Philippine wiretap, and assumed a substantial role in the case that was not subordinate to the role of Philippine authorities.[2]

---

[2]  <u>See also</u> <u>United States v. Behety</u>, 32 F.3d 503, 511 (11th Cir. 1994) (Fourth Amendment inapplicable because the search and seizure were conducted primarily by Guatemalan officials and the limited participation of U.S. officials did not constitute a joint venture sufficient to invoke the Fourth Amendment); <u>United States v. Marzano</u>, 537 F.2d 257, 269-70 (7th Cir. 1976) (finding no joint venture where United States law enforcement officers were merely present at scene of search and seizure); <u>Birdsell v. United States</u>, 346 F.2d 775, 782 (5th Cir. 1965) (holding although United States officers were "present and cooperating in some degree" with local officials, there was no joint venture sufficient to invoke the protections of

The cases where United States participation has been deemed enough to constitute a joint venture are where the evidence was obtained during an investigation that was essentially initiated and carried out by the United States law enforcement in a foreign country.  In this case, AIA Phillips did not initiate and carry out a joint investigation with the CNP.  The non-governmental organizations notified both AIA Phillips and the CNP about the allegations against a United States citizen in Cambodia.  The CNP investigated.  The CNP surveilled Pepe and his residence, obtained a search warrant, arrested Pepe, executed the search warrant, and seized substantial evidence corroborating the information provided by the 12-year old victim.  AIA Phillips also conducted his own parallel investigation.  He interviewed the victim without the CNP present.  His investigation was not joint with that of the CNP.  AIA Phillips was not present when the CNP arrested Pepe for violating Cambodian law, he did not instruct or advise the CNP to obtain a warrant to search Pepe's residence, he did not assist the CNP in obtaining the search warrant, he did not execute the warrant, and he did not seize the evidence.  The fact that he was present when the CNP executed the warrant does not rise to the level of substantial participation.  See Benedict, 647 F.2d at 930-31 (presence of DEA agents at search did not render the investigation joint where decision to search was made solely by Thai authorities and seizures and arrest of defendant were effected in furtherance of Thai prosecution).  Unlike the DEA agents in

_____

Fourth Amendment); United States v. Rosenthal, 793 F.2d 1214, 1231 (11th Cir. 1986) (no joint venture where United States agents helped plan raid of defendant's residence in Colombia, were present during the raid and arrest, and received all evidence obtained during the raid for use in defendant's prosecution in the United States); United States v. Gecas, 120 F.3d 1419, 1433-34 (11th Cir. 1997) (noting that cooperation with foreign governments, including sharing of information on specific cases, does not transform foreign governments into agents of the United States.

12

Peterson, AIA Phillips's involvement was subordinate to that of the Cambodian authorities.

In addition, the fact that AIA Phillips met with the CNP does not establish substantial participation.  The United States Government enjoys close cooperation with numerous foreign governments in specific areas of law enforcement activity.  Many of these cooperative relationships include specific obligations through treaty or agreement.  There is no caselaw suggesting that a meeting or general agreement to share information transform foreign law enforcement authorities into agents of the United States and render all foreign activity in that area a "joint venture.

**C.   EVEN IF THE SEARCH WAS A "JOINT VENTURE" WITH UNITED STATES LAW ENFORCEMENT, THE SEARCH WAS REASONABLE AND THE GOOD FAITH EXCEPTION APPLIES**

A foreign search is lawful under the Fourth Amendment if it is "reasonable." Barona, 56 F.3d 1087.  Reasonableness is achieved if the foreign authorities either (1) followed their own law; or (2) the United States agents acted in the good faith belief that the interception was in compliance with foreign law.  Id. at 1091-93.  In Peterson, 812 F.2d at 492, the Ninth Circuit held that even if the Philippine wiretap was illegal under Philippine law, reliance on its legality was objectively reasonable by the United States authorities participating in the joint narcotics investigation.  As the Ninth Circuit explained, "Permitting reasonable reliance on representations about foreign law is a rational accommodation to the exigencies of foreign investigation." Id.

Article 20 of the "Provisions Relating to the Judiciary and Criminal Law and Procedure Applicable in Cambodia During the Transitional Period, Decision of September 10, 1992," entitled "Searches", states:

In the case of flagrante delicto offenses police have the power to search.

13

Searches must be conducted in the presence of the suspect and two witnesses, preferably neighbors or owners of the building.

Except in cases of flagrante delicto offenses, searches must be authorized by one of the judges of the competent court or by the prosecutor. They may take place only between the hours of 6:00 a.m. and 6:00 p.m. They should take place in the presence of the suspect if possible, and two witnesses from among the suspect's family members.  Proof obtained in violation of the present article is not admissible in court.

Article 20, Provisions Relating to the Judiciary and Criminal Law and Procedure Applicable in Cambodia During the Transitional Period.

A translation of the search warrant is attached as Exhibit A to Phillips' declaration.  It is dated June 17, 2006.  As Pepe concedes, the search was conducted in Pepe's presence, in accordance with Article 20.  Article 20 also states that the search must be conducted in the presence of two witnesses, "preferably neighbors or owners of the buidling." (Exhibit "I" to defense suppression motion).   The plain language suggests a preference, but not a requirement, that the two witnesses be neighbors or owners.  In this case, as the property report states, one of the witnesses was a house owner, and there were ten other witnesses present.  (Ex. "A" to Phillips Declaration).  In addition, two of defendant's victims were present at his residence at the time of the search.[3]

---

[3] Article 20 also states that the search "should" take place in the presence of two members of the suspect's family.  The only family member of defendant's of whom the government is aware who was in Cambodia at the time of the search was defendant's wife.

14

1    In this case, even if the search was a joint venture, it appears to have been conducted in

2  compliance with Cambodian law.  In addition, even if there was a technical violation of a

3  provision of Cambodian law, Assistant ICE Attache Phillips acted in good faith belief that the

4

5  search was legal under Cambodian law.

6  **D.    THE SEARCH OF PEPE'S COMPUTER MEDIA IS VALID**

7    In his second suppression motion, Pepe contends that the search warrant of the computer

8  media seized by the CNP must be suppressed for a number of reasons.  As set forth in detail

9

10 below, each of these reasons fails.

11   Pepe claims that the search warrant for the media discovered at his home was tainted,

12 because it contains information about what the CNP seized during the search of his Cambodian

13 residence.  Although Pepe claims that the CNP'S search of his residence was "unlawful," as set

14

15 forth above, nothing was inappropriate about that search.  Therefore, because the CNP'S search

16 of his residence was lawful, Pepe cannot move to suppress the search of the seized computer

17 media.  Nevertheless, even if this Court determines that the CNP'S search was unlawful, the

18

19 subsequent search of the media still should not be suppressed.

20   The government does not dispute that "'evidence which is obtained as a direct result of

21 an illegal search and seizure may not be used to establish probable cause for a subsequent

22 search.'"  United States v. Barajs-Avalos, 377 F.3d 1040, 1054 (9th Cir. 2004) (quoting United

23 States v. Wanless, 882 F.2d 1459, 1465 (9th Cir. 1989)).  Nonetheless, "the mere inclusion of

24

25 tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized

26 pursuant to the warrant."  United States v. Heckenkamp, 482 F.3d 1142, 1149 (9th Cir. 2007)

27 (citation and quotation omitted); see United States v. Reed, 15 F.3d 928, 933 (9th Cir. 1994);

28

1   United States v. Vasey, 834 F.2d 782, 788 (9th Cir.1987).  Thus, "[w]hen an affidavit contains

2   evidence illegally obtained, '[a] reviewing court should excise the tainted evidence and

3
    determine whether the remaining, untainted evidence would provide a neutral magistrate with
4
5   probable cause to issue a warrant.'"  Barajs-Avalos, 377 F.3d at 1054 (quoting Vasey, 834 F.2d

6   at 788); see Heckenkamp, 482 F.3d at 1149.  If, after excising the warrant, the reviewing court

7   determines that there is probable cause and that the agents would have sought the warrant

8
    without the excised information, then the warrant stands.  See Murray v. United States, 487 U.S.
9
10  533, 542-43 (1988); United States v. Duran-Orozco, 192 F.3d 1277, 1281 (9th Cir. 1999).

11        In the instant case, if the Court were to excise information in the search warrant related to

12  the Cambodian search, it only should excise Paragraphs 12, 14, and 15 of the search warrant.[4]

13
    The paragraphs of the search warrant that remain, detail the actions of pedophile and child
14
15  pornographer sufficient to establish probable cause of the complained of crimes.  For example, in

16  Paragraph 9, the affiant, Special Agent Wang describes how ICE learned that Pepe sexually

17  abused and/or raped at least four girls:

18
        9.      Beginning on or about June 14, 2006, ICE Bangkok received information
19      from two Non-Governmental Organizations that a U.S. citizen, later identified as
        PEPE, had sexually abused and raped a number of children at his compound in
20      Phnom Penh, Cambodia.  During the course of the investigation, AIA Phillips
        interviewed four of the child victims (between the ages of 9 and 12 years-old)
21      who identified PEPE as the individual who sexually abused them.  Based upon
22

23  _____

24       [4]     In his motion to suppress the computer media, Pepe suggests that the Court to
    excise Paragraph 13 of the search warrant.  (Def.'s Mot. to Suppress Evidence Discovered as
25  Result of Computer Media Search Warrant ("Computer Media Suppression Mot."), at 4.)  This
    paragraph describes how U.S. Customs and Border Protection tracked Pepe's international
26  travels.  Given that none of this information is related to the search, this paragraph should not be
27  excised.

28
                                        16

their investigation, in June 2006, the Cambodian National Police ("CNP") arrested PEPE . . . .[5]

In Paragraph 13 of the search warrant, Special Agent Wang describes how law enforcement determined that Pepe traveled to Cambodia after the enactment date of the statute prohibiting persons from engaging in illicit sexual conduct in foreign places:[6]

> 13.    On July 20, 2006, U.S. Customs and Border Protection ("CBP") Officer Tim Kirkham checked for PEPE'S most recent travel details through the CBP computer systems that query passenger, reservation, and travel itinerary information from all international flights that depart from, arrive at, or transit through the U.S.  According to CBP computer systems, on September 1, 2005, PEPE departed Los Angeles International Airport for Manila, Philippines.  On September 3, 2005, PEPE departed Manila, Philippines for Phnom Penh, Cambodia by way of Bangkok, Thailand.

In Paragraph 16 of the search warrant, Special Agent Wang details a letter that Pepe sent to the United States, in which he admitted to some of the conduct at issue in this case:

> 16.    On September 12, 2006, one of PEPE's sisters provided Special Agent Carlos Ortiz and me with dozens of emails and letters received from PEPE while he was incarcerated in Cambodia that mostly detailed his requests and health.  Also, included was a letter, written by PEPE and contained within an envelope postmarked August 15, 2006 that detailed some of PEPE's actions in Cambodia.  The following is a summary of this letter:
>
>      a.    PEPE mentioned several of his child victims by name . . . .[7]

---

[5]    For purposes of excising the search warrant, the final sentence of Paragraph 9 was truncated.  The deleted portion of the sentence reads as follows:  "and executed search warrants at PEPE's compound in Phnom Penh, where evidence of PEPE's sexual abuse of his child victims was seized."

[6]    The enactment date for Title 18, United States Code, Section 2423(c) is April 30, 2003.  See United States v. Clark, 435 F.3d 1100, 1109 n.13 (9th Cir. 2006), cert. denied, ___ U.S. ___, 127 S. Ct. 2029 (2007).

[7]    Paragraph 16(a) has been excised to remove information about what was discovered during the CNP'S search and the subsequent analysis in Singapore of the computer hard drive.  The deleted portion of the sentence reads as follows:  "including one for which PEPE

b.      PEPE stated that his daily routine usually included a massage from the girls after they returned from school and another later in the evening.  Further, PEPE stated these massages led to "inappropriate touching, etc."

c.      PEPE stated that on one occasion, after he was given Viagra, PEPE bound a known child victim and slapped her in the face.  PEPE explained that the known child victim was given to him by her mother as a wife/girlfriend and described both his "sex drive" and "willpower" as "very low."

d.      PEPE admitted taking naked pictures, as SANG's request, of her two nieces.  Further, PEPE claimed that he erased these files from his computer.

These remaining portions of the search warrant affidavit establish probable cause that

Pepe, an American citizen in Cambodia, engaged in illicit sexual conduct in foreign places, a

violation of Title 18, United States Code, Section 2423(c).  Several of the Pepe's victims came

forward and detailed how he raped and sexually abused them.  Pepe admitted that he not only

knew at least one of his victims, but that he engaged in illicit sexual conduct with them, which

including "inappropriate touching" and bondage.  He also suggested that he had sexual relations

with this minor.  Finally, Pepe's admission that he took naked photographs of Sang's nieces,

which he stored and later deleted on his computer, established probable cause that there might be

digital evidence of this crime at his residence.  When the Court considers the handwritten

had dozens of pornographic and sexually-explicit photographs on his computer."

18

notations and titles on a number of the compact discs, probable cause for the search becomes

even stronger.[8]

Once probable cause is established, the only remaining issue that the Court must address

is whether the ICE agents would have sought the search warrant for the computer media without

the evidence discovered in the Cambodian search. See Murray, 487 U.S. at 542-43; Duran-

Orozco, 192 F.3d at 1281.  In this case, Special Agent Wang, the search warrant affiant, stated in

his declaration that ICE would have sought a search warrant for the computer media, even if the

agency did not have the knowledge of the depictions of minors and child pornography recovered

in Singapore from Pepe's computer media.  (See Decl. of Eddy Wang ("Wang Decl."), at ¶ 4.)

Because of the nature of the crimes, ICE would have sought a warrant for any computer media at

Pepe's residence to corroborate the victims' testimony.  (See id.)  Thus, had ICE been in

possession of Pepe's computer media, it would have sought the warrant.

Because Pepe cannot offer any evidence to refute this, other than conjecture and

speculation that ICE would not have sought a warrant, the warrant must stand.  Consequently,

any computer media seized pursuant to that warrant is valid and may be introduced against Pepe

at trial.

E.      THE SEARCH WARRANT ESTABLISHED PROBABLE CAUSE FOR THE
        MEDIA LISTED IN THE SEARCH WARRANT

Pepe also takes issue with the government's desire to search all of the computer media

seized at his residence for evidence that he raped and abused children, and photographed his

_____

[8]       These titles and handwritten notes include "15 years old little girls with crazy sex event," "Tender Baby," "14 Years Old Unsensor," "HOME 111605," "4 GIRLS," "HOME 102805," and "SKV & NEW GIRL." (See Wang. Decl., Ex. A, at ¶¶ 6(b) & 6(c)(1).)

victims while in Cambodia.  Pepe claims that the government should not have searched any media whose lacks a label or whose labels reflects that it might contain some content other than child pornography.  (See Computer Media Suppression Mot., at 5-6.)  Pepe insists that the only way that agents would be allowed to search that media is if the affidavit contained an explanation of how Pepe could have disguised child pornography in such a manner.  (See id.)  Such an assertion is not supported by the law.  Moreover, it ignores the Ninth Circuit's recent holding in United States v. Hill, 459 F.3d 966 (9th Cir. 2006).

In Hill, a child pornography case, the appellate court upheld an warrant authorizing the seizure of a defendant's computer equipment.  The defendant, like Pepe, claimed that "warrant was overbroad because it authorized seizure of storage media whether or not they contained child pornography.  He suggests it should have authorized seizure only of media containing child pornography."  Hill, 459 F.3d at 973.  The Ninth Circuit rejected this claim, recognizing that "it is impossible to tell what a computer storage medium contains just by looking at it.  Rather, one has to examine it electronically, using a computer that is running the appropriate operating system, hardware, and software."  Id.  Further, the Ninth Circuit held that although the search warrant did not explain why the wholesale seizure of computer equipment was necessary, suppression of the discovered child pornography was not appropriate.  Id. at 977.

The search in the instant case was not a "broad sweep."  Instead, the search was focused on a limited set of media, enumerated and described in the affidavit.  The fact that it did not include a paragraph explaining how and why child pornographers, like Pepe, store and hide pornography on various media, is not fatal in light of the Hill holding.  Moreover, by including the identifying information of the compact disks in the affidavit, the government ensured that the

20

1  reviewing magistrate was aware of what the agents planned to search.  Thus, when Magistrate

2  Judge Kenton issued the warrant, after considering the totality of the circumstances, he

3
4  determined that there was probable cause to search all of the enumerated media.  Because, that

5  finding was not erroneous, the warrant must be upheld.  See, e.g., United States v. Schmidt, 947

6  F.2d 362, 371 (9th Cir. 1991) (quoting United States v. McQuisten, 795 F.2d 858, 861 (9th Cir.

7
8  1988)) ("'In doubtful cases, preference will be given to upholding the validity of [a] search

9  warrant.'"); United States v. Castillo, 866 F.2d 1071, 1076 (9th Cir. 1988) (quoting McQuisten,

10  795 F.2d at 861) ("'We may not reverse a magistrate's finding of probable cause unless it is

11  clearly erroneous.'"); United States v. Fannin, 817 F.2d 1379, 1381 (9th Cir. 1987) (quoting

12  United States v. Angulo-Lopez, 791 F.2d 1394, 1396 (9th Cir. 1986)) ("The magistrate's finding

13
of a 'substantial basis' is given great deference.")

14
15  **F.      THE EXECUTION OF THE SEARCH WAS PROPER IN TIME AND SCOPE**

16          Pepe also suggests, without any evidence, that the search may not have been proper

17  because of the scope and timing of the execution of the warrant.

18          Pepe interprets dicta from Hill to require that the government affirmatively demonstrate

19
20  that "the computer search was properly limited to computer files that the searching agent could

21  reasonably believe might contain items which the search warrant allowed the agent to look for."

22  (Computer Media Suppression Mot., at 8.)  This claim fails because by the terms of the warrant,

23
the search was limited to computer media.  Therefore, given the nature of the media, it is not

24
25  evident whether anything but computer/electronic files could have been searched.  Further, by

26  trying to limit the files which the government can search, Pepe ignores the Ninth Circuit's

27  holding in Hill.  In that case, the Ninth Circuit explained the ease in which child pornographers

28
                                                      21

can hide their contraband and the difficulty of searching computer media to discover the

evidence of their crimes:

> Computer records are extremely susceptible to tampering, hiding, or destruction, whether deliberate or inadvertent. Images can be hidden in all manner of files, even word processing documents and spreadsheets. Criminals will do all they can to conceal contraband, including the simple expedient of changing the names and extensions of files to disguise their content from the casual observer. Forcing police to limit their searches to files that the suspect has labeled in a particular way would be much like saying police may not seize a plastic bag containing a powdery white substance if it is labeled "flour" or "talcum powder." There is no way to know what is in a file without examining its contents, just as there is no sure way of separating talcum from cocaine except by testing it.

Id. at 978 (quotation and citation omitted).

Thus, limiting the search as suggested by Pepe undermines the warrant and the Ninth

Circuit's holding in Hill.

Pepe also claims that any "items" discovered after July 15, 2007, must be suppressed,

because "[t]he search warrant placed a sixty-day time limit on the search of the computer

media . . . ." (Computer Media Suppression Mot., at 9.) Without any law, Pepe opines that

"[s]ubsequent searches of other items, unless within the sixty-day search period (which would

have ended on July 15, 2007), would not have been authorized by the search warrant and so any

evidence found in such subsequent searches would be product of a warrantless search." (Id.)

However, it is not clear what Pepe hopes to suppress. In fact, Pepe concedes that whether such

evidence actually exists is no more than pure speculation. (Id. n.3.) Nonetheless, if Pepe

suggests that the government could not search the seized media after the sixty-day period set

forth in the warrant, his motion must be denied.

In the instant case, the search warrant for the computer media dictates how the those

items must be searched:

> The ITEMS TO BE SEARCHED are already in the possession of United States
> Immigration and Customs Enforcement in the Central District of California.
> Consistent with the requirements of Rule 41, the ITEMS TO BE SEARCHED
> will be delivered to computer forensic technicians within 10 days of the effective
> date of this warrant to commence the search.  For the reasons noted in paragraph
> 19 of the Affidavit, the search will not be completed during the 10-day period.
> However, the ITEMS TO BE SEARCHED will be <u>preliminarily examined to</u>
> <u>determine whether they contain any evidence or are an instrumentality of the</u>
> <u>crime</u>, within 60 days.  If the computer forensic technicians determine that the
> data does not fall within any of the items to be seized pursuant to this warrant or
> is not otherwise legally seized, the government will return these items within a
> reasonable period of time not to exceed 60 days from the date of execution of the
> warrant.  If the government needs additional time to determine whether the data
> of the items to be seized pursuant to this warrant, it must obtain an extension of
> the time period from the Court within the original sixty day period.

(Wang Decl., Ex. A, at 5-6 (emphasis added).)  Contrary to Pepe's assertion, further analysis of

the computer media need not be completed within sixty days.  Instead, the government only

needs to conduct a "preliminary examin[ation] to determine whether they contain any evidence

or are an instrumentality of the crime, within 60 days."  (<u>Id</u>.)

In this case, the ICE agents' preliminary examination of the media occurred between

May 17, 2007, and July 12, 2007. (<u>See</u> Wang Decl., at ¶ 5.)  During that time period, the ICE

agents determined that only eleven of the seized compact disks contained evidence or were an

instrumentality of a crime.  (<u>See</u> <u>id</u>.)  The government informed defense counsel that they could

retrieve all of the computer media, except those disks that contained visual depictions of minors.

(<u>See</u> <u>id</u>.)  After fulfilling its obligations under the warrant, on July 12, 25, and 26, the

government conducted a more detailed analysis of the disks that disks contained visual

depictions of minors – evidence or an instrumentality of a crime.  (<u>See</u> <u>id</u>. at ¶ 6.)

To the extent that Pepe complains that items discovered during the detailed analysis of the disks must be suppressed simply because the analysis took place after July 15, 2007, his motion must fail. "Neither [Federal Rule of Criminal Procedure 41] nor the Fourth Amendment provides for a specific time limit in which a computer may undergo a government forensic examination after it has been seized pursuant to a search warrant." United States v. Hernandez, 183 F. Supp. 2d 468, 480 (D.P.R. 2002). Asking the Court to limit the government ability to conduct additional analysis of computer media seized pursuant to a search warrant is the same as asking the Court to prohibit the government to review documents also seized by a search warrant after the initial review. See, e.g., United States v. Habershaw, No. CR. 01-10195-PBS, 2002 WL 33003434, *8 (D. Mass. May 13, 2002) ("Further forensic analysis of the seized hard drive image does not constitute a second execution of the warrant or a failure to 'depart the premises' . . . any more than would a review of a file cabinet's worth of seized documents."); Hernandez, 183 F. Supp. 2d at 480 ("In most cases the forensic examination of the computer will take place at a different location than where the computer was seized. The same principle applies when a search warrant is performed for documents. The documents are seized within the time frame established in the warrant but examination of these documents may take a longer time, and extensions or additional warrants are not required. The examination of these items at a later date does not make the evidence suppressible."). Such a proposition is absurd, unfounded in law, and been rejected by other courts. See Habershaw, 2002 WL 33003434, at *8 (denying defendant's motion to suppress evidence discovered fourteen days after issuance of search warrant); Hernandez, 183 F. Supp. 2d at 480 ("We find that it was perfectly reasonable for the Government to take a longer time to search and inspect the images in the floppy drives,

24

particularly after already having discovered child pornography in Defendant's hard disk. Therefore, the evidence recovered will not be suppressed.").

The government has not, nor does it intend to at this time, to reexamine those compact disks that do not contain visual depictions of minors.  Should the government wish to reexamine those disks, it will seek a new search warrant.  Because there appears to be nothing to which Pepe can object, his suppression motion should be denied.

## IV

## CONCLUSION

For the foregoing reasons, the government respectfully requests that defendant's motions to suppress be denied