THOMAS P. O'BRIEN
United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
PATRICIA A. DONAHUE (SBN: 132610)
JOHN J. LULEJIAN (SBN: 186783)
Assistant United States Attorneys
Violent and Organized Crime Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:   (213) 894-0640/8603
     Facsimile:   (213) 894-3713
     E-mail:      Patricia.Donahue@usdoj.gov
     E-mail:      John.Lulejian@usdoj.gov

Attorney for Plaintiff
UNITED STATES OF AMERICA

                    UNITED STATES DISTRICT COURT

                FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,       ) No. CR 07-0168(A)-DSF
                                )
                Plaintiff,       ) GOVERNMENT'S TRIAL MEMORANDUM
                                )
             v.                  ) Trial Date:  May 7, 2008
                                ) Trial Time:  8:00 a.m.
MICHAEL JOSEPH PEPE,            )
                                ) [18 U.S.C. § 2423(c): Engaging
                Defendant.       ) in Illicit Sexual Conduct in
                                ) Foreign Places]
                                )
                                )
                                )
                                )

     Plaintiff United States of America, by and through its
counsel of record, the United States Attorney for the Central
District of California, hereby submits its trial memorandum.
///
///
///
///
///

# TABLE OF CONTENTS

PAGE

Table of Authorities . . . . . . . . . . . . . . . . . . . . . iii

I.   STATUS OF THE CASE . . . . . . . . . . . . . . . . . . . 1

II.  LAW UNDERLYING CHARGE  . . . . . . . . . . . . . . . . . 1

III. SUMMARY OF FACTS . . . . . . . . . . . . . . . . . . . . 4

     Count One - Victim I.T. . . . . . . . . . . . . . . . . 4

     Count Two - Victim L.K. . . . . . . . . . . . . . . . . 6

     Counts Three and Four - Victims S.R. and S.S. . . . . . 7

     Count Five - Victim K.S. . . . . . . . . . . . . . . . 9

     Counts Six - Victim N.T.D. . . . . . . . . . . . . . . 10

     Count Seven - Victim T.C. . . . . . . . . . . . . . . 11

IV.  EVIDENTIARY ISSUES . . . . . . . . . . . . . . . . . . 12

     A.   Expert Testimony . . . . . . . . . . . . . . . . 12

          1.   Examination of the Victims . . . . . . . . 13

          2.   "Grooming" of Child Victims  . . . . . . . 13

          3.   Cultural Issues and Traumatic Stress
               Related to Sexual Trauma . . . . . . . . . 14

          4.   Analysis of Seized Drugs . . . . . . . . . 15

          5.   Effects of Drugs on Children . . . . . . . 15

          6.   Forensic Computer Analysis . . . . . . . . 16

          7.   Age of Unidentified Victims in Sexually
               Explicit Photographs Seized from Defendant's
               Computer Media   . . . . . . . . . . . . . 16

          8.   Identification of Defendant through
               Biometrics and Spoilation of Evidence  . . . . 17

     B.   Hearsay . . . . . . . . . . . . . . . . . . . . . 17

          1.   Admissions and Self-Serving Hearsay  . . . . . 17

i

TABLE OF CONTENTS (Cont'd)

PAGE

C.   Identification of Defendant . . . . . . . . . . . .   19

D.   Impeachment of Witnesses  . . . . . . . . . . . .   20

E.   Cross-Examination of Defendant  . . . . . . . . .   20

F.   Chain of Custody  . . . . . . . . . . . . . . . .   21

G.   Authentication and Identification . . . . . . . .   22

H.   Order of Proof  . . . . . . . . . . . . . . . . .   23

I.   Photographs, Videotapes, and Diagrams . . . . . .   23

J.   Use of Summary Charts and Summary Witnesses . . . .   24

K.   Jury Nullification Arguments  . . . . . . . . . .   25

V.  CONCLUSION . . . . . . . . . . . . . . . . . . . . .   26

TABLE OF CONTENTS

FEDERAL CASES                                                    PAGE(S)

Geders v. United States,
     425 U.S. 80 (1976) . . . . . . . . . . . . . . . . . . .      23

Horning v. District of Columbia,
     254 U.S. 135 (1920)  . . . . . . . . . . . . . . . . . .      25

Rogers v. United States,
     422 U.S. 35 (1975) . . . . . . . . . . . . . . . . . . .      25

Stovall v. Denno,
     355 F.2d 731 (2d Cir. 1966)  . . . . . . . . . . . . . .      19

Thomas v. United States,
     343 F.2d 49 (9th Cir. 1965)  . . . . . . . . . . . . . .      19

United States v. Atchley,
     699 F.2d 1055 (11th Cir. 1983) . . . . . . . . . . . . .      24

United States v. Awkard,
     597 F.2d 667 (9th Cir. 1979)  . . . . . . . . . . . . . .     23

United States v. Black,
     767 F.2d 1334 (9th Cir. 1985)  . . . . . . . . . . 21, 22

United States v. Brannon,
     614 F.2d 413 (9th Cir. 1980) . . . . . . . . . . . . . .      23

United States v. Bright,
     588 F.2d 504 (5th Cir. 1979) . . . . . . . . . . . . . .      20

United States v. Collicott,
     92 F.3d 973 (9th Cir. 1996)  . . . . . . . . . . . . . .      19

United States v. Cueto, 6
     11 F.2d 1056 (5th Cir. 1980) . . . . . . . . . . . . . .      19

United States v. Cuevas,
     847 F.2d 1417 (9th Cir. 1988)  . . . . . . . . . . . . .      24

United States v. Cuozzo,
     962 F.2d 945 (9th Cir. 1992) . . . . . . . . . . . . . .      21

United States v. Dougherty,
     473 F.2d 1113 (D.C. Cir. 1972) . . . . . . . . . . . . .      25

United States v. Fernandez,
     839 F.2d 639 (9th Cir. 1988) . . . . . . . . . . . . . .      18

iii

```
 1                   TABLE OF AUTHORITIES (Cont'd)

 2   FEDERAL CASES                                       PAGE(S)
```

```
 3   United States v. Gaudin,
         515 U.S. 506 (1995)  . . . . . . . . . . . . .    25
 4
     United States v. Gay,
 5       967 F.2d 322 (9th Cir. 1992) . . . . . . . . .    21

 6   United States v. Gomez-Norena,
         908 F.2d 497 (9th Cir. 1990) . . . . . . . . .    12
 7
     United States v. Gorham,
 8       523 F.2d 1088 (D.C. Cir. 1975) . . . . . . . .    25

 9   United States v. Hedgcorth,
         873 F.2d 1307 (9th Cir. 1989) . . . . . . . .     20
10
     United States v. Hudson,
11       564 F.2d 1377 (9th Cir. 1977) . . . . . . . .     19

12   United States v. Jefferson,
         714 F.2d 689 (7th Cir. 1983) . . . . . . . . .    21
13
     United States v. Jones,
14       933 F.2d 807 (10th Cir. 1991) . . . . . . . .     25

15   United States v. Kaiser,
         660 F.2d 724 (9th Cir. 1981) . . . . . . . . .    22
16
     United States v. Knight,
17       416 F.2d 1181 (9th Cir. 1969) . . . . . . . .     23

18   United States v. Lemire,
         720 F.2d 1327 (D.C. Cir 1983) . . . . . . . .     25
19
     United States v. Malatesta,
20       583 F.2d 748 (5th Cir. 1978) . . . . . . . . .    20

21   United States v. Marchini,
         797 F.2d 759 (9th Cir. 1986) . . . . . . . . .    24
22
     United States v. Matta-Ballesteros,
23       71 F.3d 754 (9th Cir. 1995) . . . . . . . . .     21

24   United States v. McCollom,
         664 F.2d 56 (5th Cir. 1981) . . . . . . . . .     20
25
     United States v. McDowell,
26       918 F.2d 1004 (1st Cir. 1990) . . . . . . . .     19
```

```
27

28                            iv
```

TABLE OF AUTHORITIES (Cont'd)

FEDERAL CASES                                          PAGE(S)

United States v. Navarro-Varelas,
      541 F.2d 1331 (9th Cir. 1976)   . . . . . . . . . . .   18

United States v. Ortega,
      203 F.3d 675 (9th Cir. 2000)  . . . . . . . . . . . .   18

United States v. Powell,
      955 F.2d 1206 (9th Cir. 1991)   . . . . . . . . . . .   25

United States v. Sears,
      663 F.2d 896 (9th Cir. 1981)  . . . . . . . . . . . .   18

United States v. Smith,
      918 F.2d 1551 (11th Cir. 1990)  . . . . . . . . . . .   19

United States v. Stephens,
      779 F.2d 232 (5th Cir. 1985)  . . . . . . . . . . . .   24

United States v. Stuart,
      718 F.2d 931 (9th Cir. 1983)  . . . . . . . . . . . .   20

United States v. Verduzco,
      373 F.3d 1022 (9th Cir. 2004)   . . . . . . . . . . .   12

United States v. Whitworth,
      856 F.2d 1268 (9th Cir. 1988)   . . . . . . . . . . .   22

United States v. Willis,
      759 F.2d 1486 (11th Cir. 1985)  . . . . . . . . . . .   18

Zal v. Steppe,
      968 F.2d 924 (9th Cir. 1992)  . . . . . . . . . . . .   25


FEDERAL STATUTES

18 U.S.C. § 1591(c)(1)   . . . . . . . . . . . . . . . . .   4

18 U.S.C. § 2241(b)(1)   . . . . . . . . . . . . . . . . .   2

18 U.S.C. § 2241(b)(2)   . . . . . . . . . . . . . . . . .   2

18 U.S.C. § 2241(c) . . . . . . . . . . . . . . . . . . .   3

18 U.S.C. § 2242(1)   . . . . . . . . . . . . . . . . . .   3

18 U.S.C. § 2242(2)(B)   . . . . . . . . . . . . . . . . .   3

TABLE OF AUTHORITIES (Cont'd)

FEDERAL STATUTES                                          PAGE(S)

18 U.S.C. § 2243(a) . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 2246(2) . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 2246(2)(C) . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 2423(f) . . . . . . . . . . . . . . . . . . . . . 1


FEDERAL RULES

Federal Rule of Evidence 106 . . . . . . . . . . . . . . . . 19

Federal Rule of Evidence 405(a) . . . . . . . . . . . . . . 20

Federal Rule of Evidence 702 . . . . . . . . . . . . . . . . 12

Federal Rule of Evidence 703 . . . . . . . . . . . . . . . . 13

Federal Rule of Evidence 704 . . . . . . . . . . . . . . . . 12

Federal Rule of Evidence 801(d)(1)(B) . . . . . . . . . 18, 20

Federal Rule of Evidence 801(d)(1)(C) . . . . . . . . . . . 19

Federal Rule of Evidence 801(d)(2)(A) . . . . . . . . . . . 18

Federal Rule of Evidence 801(d)(2)(B) . . . . . . . . . . . 18

Federal Rule of Evidence 901(a) . . . . . . . . . . . . . . 22

Federal Rule of Criminal Procedure 15 . . . . . . . . . . . 5

vi

I.    STATUS OF THE CASE

Defendant is charged in a First Superseding Indictment, which was filed on December 20, 2007, with seven counts of Engaging in Illicit Sexual Conduct in Foreign Places, in violation of Title 18, United States Code, Section 2423(c).  A copy of the First Superseding Indictment is attached as Exhibit A.

During its case-in-chief, the government will call approximately 24 witnesses, 10 of whom will testify with the assistance of foreign language interpreters.  The government also expects to introduce a number of physical exhibits.  Defendant and the government also have exchanged proposed stipulations.

II.   LAW UNDERLYING CHARGE

Section 2423(c) provides in pertinent part, "Any United States citizen . . . who travels in foreign commerce, and engages in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both."

"Illicit sexual conduct" is defined in Section 2423(f) as follows:

> (1) a sexual act (as defined in section 2246) with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States; or
>
> (2) any commercial sex act (as defined in section 1592) with a person under 18 years of age.

18 U.S.C. § 2423(f).

A "sexual act" is defined in section 2246(2) as follows:

> (A) contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph, contact involving the penis occurs upon penetration, however, slight:

(B) contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus;

(C) the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade or arouse or gratify the sexual desire of any person; or

(D) the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.

18 U.S.C. § 2246(2).

Chapter 109A is entitled "Sexual Abuse" and sets forth the sexual acts that are prohibited in the special maritime and territorial jurisdiction of the United States.   The sections within Chapter 109A that set forth the sex acts relevant to this case are as follows:

Section 2241(b)(1) makes it a crime to "knowingly render[s] another person unconscious and thereby engages in a sexual act with that other person . . . or attempt[s] to do so;" 18 U.S.C. § 2241(b)(1).   Section 2241(b)(2) makes it a crime to "knowingly administer[s] to another person by force or threat of force, or without the knowledge or permission of that person, a drug, intoxicant or other similar substance and thereby – (A) substantially impairs the ability of that other person to appraise or control conduct; and (B) engages in a sexual act with that other person, or attempt[s] to do so."   18 U.S.C. § 2241(b)(2).   Section 2241(c) makes it a crime to "knowingly engage[s] in a sexual act with another person who has not

2

attained the age of 12 years, or knowingly engage[s] in a sexual
act under the circumstances described in subsections (a) and (b)
[of Section 2241] with another person who has attained the age of
12 years but has not attained the age of 16 years (and is at
least 4 years younger than the person so engaging), or attempt[s]
to do so."  18 U.S.C. § 2241(c).  Section 2242(1) makes it a
crime to "knowingly cause[s] another person to engage in a sexual
act by threatening or placing that other person in fear (other
than by threatening or placing that other person in fear than any
person will be subjected to death, serious bodily injury, or
kidnapping)."  18 U.S.C. § 2242(1). Section 2242(2)(B), states
"knowingly engage[s] in a sexual act with another person if the
other person is physically incapable of declining participation
in, or communicating unwillingness to engage in, that sexual
act."  18 U.S.C. § 2242(2)(B).  Section 2243(a) makes it a crime
to "knowingly engage[s] in a sexual act with another person who
has attained the age of 12 years but has not attained the age of
16 years; and (2) is at least four years younger than the person
so engaging."  18 U.S.C. § 2243(a).

The Chapter 109A violations all require the government to
prove that defendant acted knowingly.  Two of the definitions of
a "sexual act" require the government to show an intent to abuse,
humiliate, harass, degrade or arouse or gratify the sexual desire
of any person.  See 18 U.S.C. §§ 2246(2)(C) and (D).

"Commercial sex act" is defined in section 1591 as "any sex
act, on account of which anything of value is given to or

3

1  received by any person."  18 U.S.C. § 1591(c)(1).

2  III.  SUMMARY OF FACTS

3      The government will present evidence at trial proving the

4  following:

5      Defendant was born in Suffolk County, Massachusetts, in

6  1953, and thus, by nature of his birth, is a United States

7  citizen.

8      The defendant traveled in foreign commerce on September 1,

9  2005.  On that date, defendant traveled from Los Angeles

10  International Airport to Manila, Philippines, on Philippine

11  Airlines Flight PR103.  On September 3, 2005, he traveled from

12  Manila, Philippines to Bangkok, Thailand, on Philippine Airlines

13  Flight PR730.  On September 3, 2005, defendant traveled from

14  Bangkok, Thailand to Phnom Penh, Cambodia, on Bangkok Air Flight

15  PG926.

16      Between the late fall of 2005 and June 17, 2006, defendant

17  engaged in illicit sexual conduct with all seven victims at his

18  compound in Phnom Pehn, Cambodia.

19      Count One - Victim I.T.[1]

20      In late May, 2006, 11-12-year old I.T. approached a

21  non-governmental organization in Phnom Penh and disclosed that a

22  man whom she later identified as defendant had blindfolded,

23  bound, gagged  and raped her at his Phnom Penh residence.  I.T.

24  explained that she had been brought to defendant's house by two

25

26      [1]    Pursuant to Title 18, United States Code, Section
    3509(d), all identifying information about the victims has been
27  redacted.

28                                    4

1  women, with her mother's permission.   (One of those women was San

2  Thi Chhoeurn (also known as "Basang"), defendant's prostitute,

3  who procured little girls for him.)[2]   I.T. told ICE agents in a

4  recorded interview that upon arriving at defendant's house, one

5  of the women there forced her to take a pill.   Shortly

6  thereafter, defendant forced her to give him a massage and

7  perform oral sex on him.   He then blindfolded, gagged, bound, and

8  raped her.   I.T. stated that defendant raped her at least one

9  additional time before he kicked her out of his house because she

10  was constantly crying.

11      During a medical examination of I.T. conducted at Phnom Penh

12  Municipal Referral Hospital, Dr. Koam Phaly concluded that I.T.

13  had a healing vaginal injury consistent with forced penetration.

14      I.T. told ICE that while she was at defendant's residence,

15  four other girls (aged 9 to 15) lived there.   She described how

16  each girl took turns giving sexual massages to and performing

17  oral sex on defendant.   According to I.T., defendant gave each

18  girl $1 for giving him a massage, and $5 to the girl who caused

19  him to ejaculate when giving him oral sex.   I.T. also described

20  defendant, his home, and his bedroom.

21      On June 17 and 20, 2006, the Cambodian National Police

22  executed a search warrant at defendant's residence based on the

23

24      [2]   Basang currently is incarcerated in Cambodia for her
    role in defendant's activities.   She was charged with Pimping and
25  Trafficking under Cambodian law, and sentenced to an 11-year term
    of imprisonment for Pimping and a 16-year term for Trafficking.
26  Earlier this year, the government deposed Basang pursuant to
    Federal Rule of Criminal Procedure 15.   The government intends to
27  introduce her testimony during its case in chief.

28                                   5

information provided by I.T.  Among other things, they seized
ropes and pieces of cloth tied in slipknots, Viagra, KY Jelly,
condoms, white pills, children's books, stuffed animals, games,
children's clothes, newspaper articles regarding pedophiles, and
a map cover entitled, "Sex With Children is a Crime."  The
description that I.T. had given of defendant's residence was
accurate based on the observations of the officers executing the
search warrant – including her description of the headboard on
the bed in defendant's bedroom and the massage table.
Photographs seized from defendant's computer media show that I.T.
was present at defendant's residence.  The agents did not locate
any sexually explicit or naked photographs of I.T.

Count Two - Victim L.K.

13-14-year old L.K. was at Defendant's residence when the
search warrant was executed.  In a recorded interview with ICE,
L.K. stated that she was brought to defendant's house under the
ruse that she would be paid to work as a maid, and that defendant
began raping her on an average of every two to three days, and at
a minimum, once a week.  During a three month period, defendant
raped her approximately 20 times.  During the first month that
she lived in defendant's house, he tied her up on at least three
occasions and raped her on two of those occasions.  One time
defendant drugged and beat her before he raped her.  Each time
defendant raped her  with him, he gave her $1.  She received
about $50, as well as food, clothes, and toys from him.  Dr.
Laura Watson, the doctor who examined L.K., concluded that L.K.

had no hymen visible, that her "pubertal stage consistent with stated age.  Vaginal examination consistent with repeated penetration over time."

L.K. accurately described defendant to the ICE agents, including a mark or mole on his inner thigh near his penis.  L.K. also accurately described defendant's house to the agents.  She also identified items around the house, including a pink bottle containing baby oil hidden in the maid's room.

Photographs seized from defendant's computer media show that L.K. was present at defendant's residence in December 2005.  In addition there are naked photographs of L.K.  In one of these photographs, defendant is naked with his arm around her.  She is also naked and biting his nipple.

Counts Three and Four - Victims S.R. and S.S.

ICE also identified two sisters, S.S. and S.R. (ages 9 and 10) who had lived with defendant.  In a June 21, 2006 interview, S.R. told agents that on the night she and her sister arrived at defendant's house, Basang (defendant's prostitute) told them to take off their clothes and watch her perform oral sex on defendant.  S.R. stated that she, L.K. and S.S., and another girl gave defendant massages and took turns providing him with oral sex.  S.R. estimates that she sexually "massaged" defendant more than 30 times.  In exchange, defendant gave her $1 for massages and oral sex, and a monthly salary of $30.  She gave some of this money to her mother.

7

During a June 21, 2006, interview, S.S. told agents that she gave sexual massages and oral sex to defendant.  She also said that Basang showed the girls how to perform oral sex on him. S.S. stated that defendant tied her up and gave her oral sex on two occasions. She also said that defendant gagged her with a cloth rope.  After oral sex, defendant would shower with her.  In exchange, defendant gave her 4000 Riel (approximately $1) for massages and oral sex.

S.R. and S.S. accurately described defendant, the mark or mole on his inner thigh, and defendant's house to the agents. When shown defendant's photograph in a photographic lineup, both sisters immediately identified him.

According to Koung Lang, the mother of S.R. and S.S., defendant and Basang gave her husband a written contract so that defendant could adopt the children and send them to school. According to Lang, the contract read as follows: "Michael wants to adopt my two daughters because we are poor and to send them to school.  Nothing bad will happen to the daughters, if this is not true, you can do whatever you want."  Initially, defendant gave Lang a case of noodles, 20 kilograms of rice, and $5 for the girls.  She later visited defendant's home for approximately one hour where he told her about his good deeds.  After meeting with defendant, Lang and her husband agreed to let the girls live with him.  The mother estimates that in total, she received between $200 and $250 from defendant and Basang.

8

1       Photographs seized from defendant's computer show that S.R.

2  and S.S. were present at his residence.  The agents did not

3  locate any naked photographs of the girls.  There are also

4  photographs of Lang at defendant's residence.

5       Dr. Watson, who examined S.R. and S.S., concluded that they

6  had no apparent injuries and their pubertal stages were

7  consistent with their stated ages.

8       Count Five - Victim K.S.

9       During a September 27, 2006, interview, 13-year old K.S.,

10  told agents that she met Basang during the dry season and lived

11  at defendant's house for 1-1/2 months with three other girls

12  (L.K., S.R., and S.S.).  K.S. told agents that she cleaned

13  defendant's house and slept with him.  Two or three days after

14  she arrived, defendant forced her to perform oral sex on him.

15  She stated that she provided defendant oral sex on three separate

16  occasions.  In addition to oral sex, defendant touched and

17  digitally penetrated her vagina, performed oral sex on her, and

18  raped her.  On the one occasion that she refused to give

19  defendant oral sex, he beat her until she complied.  K.S. stated

20  that defendant paid her and the other girls $1 each time he had

21  sex with them.

22       K.S. accurately identified a photograph of defendant.  She

23  also stated that defendant used a camera to take photographs of

24  her when she was both clothed and unclothed.  Photographs seized

25  from defendant's computer show that K.S. was present at

26  defendant's residence.  The agents did not locate any naked

27

28                       9

1   photographs of her.

2   Dr. Watson, the doctor who examined K.S., concluded that she

3   has a wide-open vulva because her hymen has been torn completely.

4   Counts Six - Victim N.T.D.

5   During a June 7, 2006, interview, 14-year old N.T.D. told

6   agents that Basang came to the market where she worked and told

7   her that she knew her mother and that her mother was waiting for

8   her at defendant's house.  When she arrived at defendant's house

9   and realized that she had been tricked, Basang slapped her face,

10  dragged her into the house, brought her upstairs and pushed her

11  into a bedroom.  N.T.D. stated that defendant arrived and using

12  gestures instructed her to take off her clothes.  When she

13  refused, he slapped her, pushed her onto the bed, ripped off her

14  clothes, restrained and bound her with rope, covered her mouth

15  with a pillow, and raped her.  Afterwards, defendant untied her

16  and chased her out of the bedroom.  Defendant beat her many

17  times, sometimes causing her face to swell.  N.T.D. received

18  money from Basang who received it from defendant.  She is not

19  sure how much, but it was more than $20.

20  N.T.D. stated that she was held against her will and raped

21  three times a day.  Each time defendant raped her, he tied her

22  up.  After a week, Basang took her the market where they first

23  met.  Basang told her not to say anything.  Prior to her release,

24  Basang threatened to hire someone to kill her mother if she

25  spoke.  Based on this threat, N.T.D. never told her mother about

26  what happened.

27

28                                    10

N.T.D. accurately described Basang, and defendant's residence and bedroom.  She also identified photographs of Basang and defendant's residence and bedroom.

Photographs seized from defendant's computer show that N.T.D. was present at defendant's residence.  The agents did not locate any naked photographs of N.T.D.

Dr. Watson, who examined T.C., stated that her vagina is mildly inflamed and there is no hymen visible.

Count Seven - Victim T.C.

During an August 14, 2006, interview, 14-year old T.C. told agents that Basang approached her mother about selling her virginity to a foreigner.  T.C.'S mother refused this request. Basang approached the mother on another occasion and convinced her to allow T.C. to stay with a foreigner so she could attend school.  Approximately one week after T.C. arrived at defendant's house, defendant drugged her, tied her to the bed, and raped her. During her second week, defendant raped her four times.  He also instructed her to perform oral sex on him.  Defendant gave her $1 each time she was raped and $10 to buy clothes.  He also purchased stuffed animals (a bear and a lion) for her.

Two weeks after living at defendant's home, her mother discovered that she was living with an adult male and took her home.  Once home, her mother realized what had happened to T.C.

T.C. said that Basang once gave oral sex to defendant in front of her and three other girls (L.K., S.R., and S.S.) to teach them how to perform oral sex.

11

Photographs seized from defendant's computer show that T.C. was present at defendant's residence.  The agents did not locate any naked photographs of her.

Dr. Watson, who examined T.C., stated that she has an open vulva and a scar resulting from the tearing of her hymen.

## IV.   EVIDENTIARY ISSUES

### A.   Expert Testimony

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist a trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness had applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.   A decision to allow expert testimony is within the broad discretion of the trial judge and will be reviewed for abuse of discretion.  United States v. Verduzco, 373 F.3d 1022, 1032 n.6 (9th Cir. 2004).  Moreover, "testimony in the form of an opinion or inference otherwise admissible [not relating to the mental state of defendant] is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."  Fed. R. Evid. 704; see United States v. Gomez-Norena, 908 F.2d 497, 501-02 (9th Cir. 1990) (expert's opinion that cocaine seized was possessed with intent to distribute was allowed because expert did not opine about what defendant actually thought).  Also, expert testimony may be based upon hearsay, including facts made known to the expert at or before

12

1   the trial.   See Fed. R. Evid. 703.

2        At trial, the United States intends to call a number of

3   experts about a variety of subjects to assist the Court and the

4   trier of fact.

5                1.   Examination of the Victims

6        Dr. Koam Phaly, Vice Chief of Department of Gynecology and

7   Obstetric, Phnom Penh Municipal Referral Hospital, will testify

8   about the medical examinations that she performed on L.K.   Dr.

9   Phaly will testify as to the contents of her report, provide the

10  history of abuse that L.K. told her, and medical facts about

11  L.K., specifically that L.K. was raped, there were scratches on

12  her vagina, and that the rape caused her hymen to break.

13       Laura Watson, BM, DCH, MRCGP (UK), the Locum Chief Medical

14  Officer for AEA International SOS Clinic (Phnom Penh, Cambodia),

15  will testify about the medical examinations that she performed on

16  the seven minor victims.   She also will testify to the contents

17  of her reports, and provide the specific histories given to her

18  by each of the minor girls and the medical facts about each

19  victim.

20       The government has provided summaries of Drs. Phaly and

21  Watson's testimony by way of producing their underlying reports

22  in discovery.   The government further has provided the Curriculum

23  Vitae/Resume of both physicians to defense counsel.

24               2.   "Grooming" of Child Victims

25       Supervisory Special Agent James T. Clemente of the Federal

26  Bureau of Investigation's Behavioral Analysis Unit to testify

27

28                                  13

concerning "grooming," i.e., the contacting and gaining the trust of a child victim and, at times, a child victim's parent(s) and/or guardian(s), in order to gain access to the child for the purpose of engaging in, or attempting to engage in, sexual or other inappropriate acts with the child victim.

The government has provided a summary of Special Agent Clemente's expected testimony by way of producing slides from a Powerpoint presentation regarding the sex offender evaluation continuum, types of child sex offenders, and child sex victimization in discovery.  The government further has provided Special Agent Clemente's Curriculum Vitae/Resume to defense counsel.

 3. Cultural Issues and Traumatic Stress Related to Sexual Trauma

K. Wendy Freed, M.D., an Associate Clinical Professor at the University of Southern California Department of Psychiatry and a Consulting Psychiatrist at Miller Children's Abuse and Violence Intervention Center, will testify about the conduct of Cambodian and Vietnamese girls subjected to repeated sexual abuse, the trauma they suffer, and the impact on their lives, both socially and culturally.

The government has provided a summary of Dr. Freed's testimony by way of producing in discovery copies of several articles and a book excerpt she authored, and overheads related to lectures that she has given.  The government further provided Dr. Freed's Curriculum Vitae/Resume to defense counsel.

14

4.   Analysis of Seized Drugs

Absent stipulation, Jason Bordelon, Senior Forensic Chemist with the Drug Enforcement Administration Laboratory, will testify about his analysis of the drugs seized at Defendant's Cambodian residence.  The government has provided a summary of Mr. Bordelon's testimony by way of producing his underlying reports in discovery.  The government further provided Mr. Bordelon's Curriculum Vitae/Resume to defense counsel.

5.   Effects of Drugs on Children

Cynthia L. Morris-Kukoski, D. Pharm., Forensic Examiner (Chemist) Toxicology of the Federal Bureau of Investigation Laboratory at Quantico, Virginia, will testify about the pharmacology, uses, and effects of some of the drugs seized from Defendant's residence, including, but not limited to Flunitraepam (Rohypnol), Sildenafil, and Diazepam.  Dr. Morris-Kukoski will explain the consequences and the effects of giving those drugs to children, including those of the same sex, weight, and height of each victim.  She also will testify about the use, frequency, connection, and effects of Benzodiazepines in instances of sexual assault and/or rape.

The government has provided a summary of Dr. Morris-Kukoski's testimony by way of producing her underlying reports in discovery.  The government anticipates producing a supplemental report prior to her testimony, related to those drugs analyzed by the DEA shortly before the start of trial.  The government further provided Dr. Marris-Kukoski's Curriculum Vitae/Resume to

15

1  defense counsel.

2         6.   Forensic Computer Analysis

3       ICE Special Agent David Nguyen-Galante and forensic examiner

4  Bruce Pixley analyzed defendant's computer media, and will

5  testify about their analyses and what they located on the media.

6  Among the computer related topics that Mr. Pixley is expected to

7  testify about are the types of files that defendant had on his

8  computer, including digital photographs, and explain about the

9  information (including date and time) that is embedded in each

10  photograph.  He is expected to testify that the date each

11  photograph was taken is approximately 185 days later than the

12  date embedding in the photograph.

13      The government has provided summaries of Mr. Pixley and

14  Special Agent Galante's expected testimonies by way of producing

15  their underlying reports in discovery.  The government further

16  has provided the Curriculum Vitae/Resume of both agents to

17  defense counsel.

18         7.   Age of Unidentified Victims in Sexually Explicit

19              Photographs Seized from Defendant's Computer Media

20      Carol Diane Berkowitz, M.D., Executive Vice Chair of the

21  UCLA Department of Pediatrics, will testify that the child who is

22  tied up on defendant's bed and in his bedroom, and later performs

23  oral sex on the person believed to defendant, is a minor girl.

24  These photographs were recovered from the unallocated space of

25  defendant's computer media.  She also will testify to the ages of

26  other girls whose images appeared in Defendant's photographs.

27

28                              16

The government has provided a summary of Dr. Berkowitz's
testimony by way of producing her underlying reports in
discovery.  The government further provided Dr. Berkowitz's
Curriculum Vitae/Resume to defense counsel.

       8.   <u>Identification of Defendant through Biometrics and
Spoilation of Evidence</u>

Noah Craft, M.D., Ph.D., DTM&H, an Assistant Professor of
Medicine of Harbor-UCLA Medical Center, Department of Medicine,
and the Staff Dermatologist for Harbor-UCLA Dermatology, will
testify whether the mark identified by the victims on defendant's
body has been removed.  During the investigation, the government
recovered photographs of a man receiving oral sex from a minor
child and ejaculating on her genitals in defendant's bedroom from
defendant's computer media.  Dr. Craft also will testify that
based on his examination of defendant's lower torso and the
application of hard biometrics, defendant is the man sexually
abusing the minor girl in the photographs.

The government has provided a summary of Dr. Craft's
testimony by way of producing his underlying reports in
discovery.  The government further provided Dr. Craft's
Curriculum Vitae/Resume to defense counsel.

    B.   <u>Hearsay</u>

       1.   <u>Admissions and Self-Serving Hearsay</u>

In this case, the government will offer admissions made by
defendant.

A defendant's statement is admissible only if offered

17

against him by the government; a defendant may not elicit her own prior statements.  See Fed. R. Evid. 801(d)(2)(A); <u>United States v. Fernandez</u>, 839 F.2d 639, 640 (9th Cir. 1988); <u>United States v. Willis</u>, 759 F.2d 1486, 1501 (11th Cir. 1985).  A defendant's statement is not hearsay if the defendant "manifested an adoption or belief in its truth . . . ."  Fed. R. Evid. 801(d)(2)(B). Before admitting an adoptive admission, the court must find that "sufficient foundational facts have been introduced for the jury to reasonably conclude that the defendant did actually hear, understand, and accede to the statement."  <u>United States v. Sears</u>, 663 F.2d 896, 904 (9th Cir. 1981).

However, a defendant is not able to elicit her own prior statements, either on direct examination of her own witness, or cross-examination of the government's witness, because those statements are inadmissible hearsay.  See <u>United States v. Ortega</u>, 203 F.3d 675, 682 (9th Cir. 2000).  Indeed, even where the government elicits the inculpatory portion of a defendant's statement from a witness, on cross-examination, the defendant is not entitled to elicit any exculpatory portion.  See <u>id.</u> at 682.

A defendant cannot rely upon Fed. R. Evid. 801(d)(1)(B), as an alternative basis for the admissibility of such testimony.  A prior consistent statement is not admissible if it is introduced in the absence of impeachment.  See <u>United States v. Navarro-Varelas</u>, 541 F.2d 1331, 1334 (9th Cir. 1976).  Statements not offered for their truth, but to provide context for what the defendant has said, such as the statements of persons in a

18

conversation with the defendant, are not hearsay.  <u>See</u> <u>United</u>
<u>States v. Smith</u>, 918 F.2d 1551, 1559 (11th Cir. 1990); <u>United</u>
<u>States v. McDowell</u>, 918 F.2d 1004, 1007-08 (1st Cir. 1990).

A defendant's argument that the "rule of completeness"
allows her to introduce her own admissions applies only to
written or recorded statements, not unrecorded oral statements.
<u>See</u> Fed. R. Evid. 106, and advisory notes.  However, evidence
that is inadmissible is not made admissible by recitation of the
rule of completeness.  <u>United States v. Collicott</u>, 92 F.3d 973,
983 (9th Cir. 1996) (hearsay not admitted regardless of Rule
106).

C.   <u>Identification of Defendant</u>

The government anticipates calling witnesses to identify the
defendant.  The prosecution is entitled to produce any evidence
tending to establish a defendant's identity.  <u>Thomas v. United</u>
<u>States</u>, 343 F.2d 49, 53 (9th Cir. 1965); <u>Stovall v. Denno</u>, 355
F.2d 731, 736-37 (2d Cir. 1966).  A prior identification outside
the courtroom is admissible not only to corroborate an
identification made at trial, but also as independent evidence of
identity.  Under Federal Rule of Evidence 801(d)(1)(C), the
testimony of a declarant testifying at trial and subject to
cross-examination as to a prior identification of a person after
perceiving him or her is not hearsay, even if the prior
identification is equivocal.  <u>United States v. Hudson</u>, 564 F.2d
1377, 1379 (9th Cir. 1977); <u>United States v. Cueto</u>, 611 F.2d
1056, 1063 (5th Cir. 1980); Fed. R. Evid. 801(d)(1)(C).  The fact

19

1 | that an identification in court is less than positive does not

2 | render it inadmissible. <u>United States v. Malatesta</u>, 583 F.2d 748

3 | (5th Cir. 1978).

4 |   D.   <u>Impeachment of Witnesses</u>

5 |   As a general rule, character witnesses called by the

6 | defendant may not testify about specific acts demonstrating a

7 | particular trait or other information acquired only by personal

8 | observation and interaction with the defendant; the witness must

9 | summarize the reputation or opinion of the defendant as known in

10 | the community. <u>United States v. Hedgcorth</u>, 873 F.2d 1307, 1313

11 | (9th Cir. 1989).

12 |   On cross-examination of defendant's character witnesses, the

13 | government may inquire into specific instances of defendant's

14 | past conduct relevant to the character trait at issue. Fed. R.

15 | Evid. 405(a). The only prerequisite to such inquiries into

16 | specific instances of conduct is that there be a good faith basis

17 | that the incidents inquired about be relevant to the character

18 | trait at issue. <u>United States v. McCollom</u>, 664 F.2d 56, 58 (5th

19 | Cir. 1981); <u>United States v. Bright</u>, 588 F.2d 504 (5th Cir.

20 | 1979). Prior consistent statements are admissible to rebut a

21 | charge of recent fabrication, improper influence, or motive.

22 | Fed. R. Evid. 801(d)(1)(B); <u>United States v. Stuart</u>, 718 F.2d

23 | 931, 934 (9th Cir. 1983).

24 |   E.   <u>Cross-Examination of Defendant</u>

25 |   A defendant who testifies at trial waives her right against

26 | self-incrimination and subjects herself to cross-examination

27 |

28 |                              20

concerning all matters reasonably related to the subject matter
of her testimony.  The scope of defendant's waiver is co-
extensive with the scope of relevant cross-examination.  United
States v. Cuozzo, 962 F.2d 945, 948 (9th Cir. 1992); United
States v. Black, 767 F.2d 1334, 1341 (9th Cir. 1985) ("What the
defendant actually discusses on direct does not determine the
extent of permissible cross-examination or his waiver.  Rather,
the inquiry is whether 'the government's questions are reasonably
related' to the subjects covered by the defendant's testimony").

Federal Rule of Evidence 404(b) "restricts the use of
evidence solely for purposes of demonstrating a criminal
proclivity.  It does not proscribe the use of other act evidence
as an impeachment tool during cross-examination." United States
v. Gay, 967 F.2d 322, 328 (9th Cir. 1992).

F.   Chain of Custody

The government intends to introduce several items of
physical evidence.  To avoid defects in chain of custody, there
must be a showing that the evidence is in substantially the same
condition as when it was seized.  United States v. Matta-
Ballesteros, 71 F.3d 754, 768-769 (9th Cir. 1995).  Alleged gaps
in a chain of custody go to the weight of the evidence, rather
than its admissibility.  Id. at 769.

When exhibits are at all times in official custody, a
presumption of regularity attends the discharge of official
duties.  United States v. Jefferson, 714 F.2d 689, 696 (7th Cir.
1983). Factors to be considered in the court's determination

21

1  include the nature of the article, the circumstances surrounding

2  the preservation and custody of it, and the likelihood of

3  intermeddlers tampering with it.  United States v. Kaiser, 660

4  F.2d 724, 733 (9th Cir. 1981).

5      The government will seek stipulations to the chain of

6  custody where possible.

7      G.   Authentication and Identification

8      The government may seek to introduce photographs and other

9  tangible exhibits.  The Federal Rules of Evidence treat

10 authenticity and identification under Rule 901 as simply "a

11 special aspect of relevancy."  Fed. R. Evid. 901(a) (Advisory

12 Committee Notes).  Under Rule 901, the condition or fact to be

13 satisfied is whether there is sufficient evidence that the item

14 proffered is what the proponent claims.  United States v.

15 Whitworth, 856 F.2d 1268, 1283 (9th Cir. 1988).

16     When proffered evidence is challenged on grounds of

17 authenticity or identity, the evidence should be admitted once

18 the government makes a prima facie showing of authenticity.

19 United States v. Black, 767 F.2d 1334, 1342 (9th Cir. 1985).  As

20 stated in Black, the trial judge's decision is simply whether

21 "sufficient proof has been introduced so that a reasonable juror

22 could find in favor of authenticity or identification."  The

23 credibility or probative force of the evidence offered is,

24 ultimately, an issue for the jury.  Id. at 1342 (citing 5 J.

25 Weinstein & M. Berger, Weinstein's Evidence, § 901(a)(1), at 901-

26 17 (1983)).

27

28                                    22

H.  Order of Proof

The Court has a great deal of discretion regarding the presentation of evidence at a criminal trial:

> Our cases have consistently recognized the important role the trial judge plays in the federal system of criminal justice. [T]he judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law.  A criminal trial does not unfold like a play with actors following a script; there is no scenario and can be none.  The trial judge must meet situations as they arise and to do this must have broad power to cope with the complexities and contingencies inherent in the adversary process.  To this end, he may determine generally the order in which parties will adduce proof; his determination will be reviewed only for abuse of discretion.

Geders v. United States, 425 U.S. 80, 86 (1976) (quotation and citations omitted); see also United States v. Awkard, 597 F.2d 667, 670 (9th Cir. 1979) ("Generally, the order of proof at trial is also a matter of discretion for the trial judge.") (citing United States v. Peterson, 549 F.2d 654, 657 (9th Cir. 1977)); United States v. Knight, 416 F.2d 1181, 1185 (9th Cir. 1969) ("The order of proof in a conspiracy case is within the discretion of the trial judge.").

I.  Photographs, Videotapes, and Diagrams

The government may offer diagrams of the defendant's home and Phnom Penh.  Some of these diagrams may not be to scale. The government also will offer photographs and/or videotapes of these locations, and various items of evidence seized by the Cambodian National Police officers.  See United States v. Brannon, 614 F.2d

23

1  413, 416 (9th Cir. 1980) (evidence that photographs accurately

2  depict relevant scene provides sufficient foundation for

3  admission under Federal Rule of Evidence 901(a)).

4       J.   Use of Summary Charts and Summary Witnesses

5       The government will seek to introduce summary charts at

6  trial through agents testifying as summary witnesses and through

7  expert witnesses.  The Ninth Circuit has recognized that summary

8  testimony concerning the evidence adduced at trial is admissible.

9  See United States v. Cuevas, 847 F.2d 1417 (9th Cir. 1988)

10  (summary of trial evidence by expert witness admitted); United

11  States v. Marchini, 797 F.2d 759, 766 (9th Cir. 1986) (IRS agent

12  in tax case permitted to testify as expert summary witness based

13  upon his having heard the testimony of previous witnesses and

14  having reviewed the government's exhibits).

15       Similarly, summary charts or exhibits may be properly

16  admitted at trial.  Federal Rule of Evidence 1006 provides that

17  "[t]he contents of voluminous writings . . . which cannot

18  conveniently be examined in court may be presented in the form of

19  a chart, summary, or calculation."  See also Marchini, 797 F.2d

20  at 766 (upholding admission of summary chart at trial to assist

21  jury in understanding tax case); United States v. Atchley, 699

22  F.2d 1055 (11th Cir. 1983) (upholding admission of summary chart

23  relating to telephone toll records); United States v. Stephens,

24  779 F.2d 232 (5th Cir. 1985) (upholding admission of flow charts

25  tracing proceeds of loan funds, and rejecting defense argument

26  that Rule 1006 is restricted to summaries of documents that

27

28                              24

1  cannot feasibly be admitted into evidence); <u>United States v.</u>
2  <u>Lemire</u>, 720 F.2d 1327 (D.C. Cir 1983) (finding admissible summary
3  charts tracing cash flow through offshore companies).

4      K.    <u>Jury Nullification Arguments</u>

5      A jury may "bring in a verdict in the teeth of both law and
6  facts." <u>Horning v. District of Columbia</u>, 254 U.S. 135, 138
7  (1920), <u>not followed on other grounds</u>, <u>United States v. Gaudin</u>,
8  515 U.S. 506, 520 (1995); <u>United States v. Dougherty</u>, 473 F.2d
9  1113, 1133 (D.C. Cir. 1972).  Recognition of that power, however,
10  does not countenance admission of evidence or argument supporting
11  jury nullification.  <u>See</u> <u>United States v. Powell</u>, 955 F.2d 1206,
12  1213 (9th Cir. 1991).

13      A defendant is not entitled to present evidence or argument
14  solely to promote jury nullification.  "[N]either a defendant nor
15  his attorney has a right to present to a jury evidence that is
16  irrelevant to a legal defense to, or an element of, the crime
17  charged.  Verdicts must be based on the law and the evidence, not
18  on jury nullification as urged by either litigant." <u>Zal v.</u>
19  <u>Steppe</u>, 968 F.2d 924, 930 (9th Cir. 1992) (concurring opinion);
20  <u>see also</u> <u>United States v. Gorham</u>, 523 F.2d 1088, 1097-98 (D.C.
21  Cir. 1975).  Unless specifically authorized by statute, juries
22  must reach their verdicts "without regard to what sentence might
23  be imposed." <u>Rogers v. United States</u>, 422 U.S. 35, 40 (1975).
24  As a result, "it is improper to inform the jury of the
25  defendant's possible punishment." <u>United States v. Jones</u>, 933
26  F.2d 807, 811 (10th Cir. 1991).

27

28                              25

V.   CONCLUSION

    The government requests leave to file such additional memoranda as may become appropriate during the course of the trial.


DATED: April 28, 2008          Respectfully submitted,

                               THOMAS P. O'BRIEN
                               United States Attorney

                               CHRISTINE C. EWELL
                               Assistant United States Attorney
                               Chief, Criminal Division


                               /s Patricia A. Donahue
                               PATRICIA A. DONAHUE
                               Assistant United States Attorney


                               /s John J. Lulejian
                               JOHN J. LULEJIAN
                               Assistant United States Attorney

                               Attorney for Plaintiff
                               UNITED STATES OF AMERICA

26