SEAN K. KENNEDY (No. 145632)
Federal Public Defender
(E-mail: Sean_Kennedy@fd.org)
Federal Public Defender
CHARLES C. BROWN (No. 179365)
Deputy Federal Public Defender
(E-mail: Charles_Brown@fd.org)
3801 University Avenue, Suite 150
Riverside, California 92501
Telephone (951) 276-6226
Facsimile (951) 276-6368

Attorneys for Defendant
MICHAEL PEPE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> MICHAEL PEPE, ) <br> ) <br> Defendant. ) <br> _____ ) | NO. CR 07-168-DSF <br><br> DEFENSE MOTION FOR NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE OF INTERPRETER BIAS AND MISCONDUCT <br><br> Hearing Date:   TBA <br> Hearing Time:   TBA |

## MOTION

Defendant Michael Pepe, by and through his attorney of record, Deputy Federal Public Defender, Charles C. Brown, hereby files the following motion for a new trial based on newly discovered evidence of interpreter bias and misconduct.

This motion is based upon the attached Memorandum of Points and Authorities, Declaration of Counsel, all files and records in this case, and any further evidence as may be adduced at the hearing on this motion.

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED: July 28, 2010          By      /S/
                              CHARLES C. BROWN
                              Deputy Federal Public Defender

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . 3
I. INTRODUCTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
II. STATEMENT OF FACTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      A.    Background.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      B.    Impact of Interpreter Bias.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
III. ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      A.    A New Trial is Necessary Because the Interpreters' Bias and Misconduct Rendered the Proceedings Fundamentally Unfair. . . . . . 10
           1.    The Bias and Misconduct Was So Insidious Prejudice Should be Presumed.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
           2.    The Interpreter Misconduct and Secret Bias Prejudiced Mr. Pepe. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
V. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                                                      PAGE

*Caliendo v. Warden*,
   365 F.3d 691 (9th Cir. 2004).................................................. 13

*Davis v. Alaska*,
   415 U.S. 308 (1974). ........................................................... 14

*Delaware v. Van Arsdall*
   475 U.S. 673,
   106 S.Ct. 1431 (1986)........................................................ 14

*Mattox v. United States*,
   146 U.S. 140, 13 S. Ct. 50,
   36 L. Ed. 917 (1892). ......................................................... 12

*Prince v. Beto*,
   426 F.2d 875 (5th Cir. 1970)................................................ 11

*Remmer v. United States*,
   347 U.S. 227, 74 S. Ct. 450,
   98 L. Ed. 654 (1954). ......................................................... 12

*United States v. Abel*,
   469 U.S. 45 (1984). ............................................................ 10

*United States v. Dutkel*,
   192 F.3d 893 (9th Cir. 1999)............................................ 12, 13

**STATE CASES**

*Nader v. State*,
   86 Tex. Crim. 424,
   219 S.W. 474 (1919). ......................................................... 10

*State v. Lazarone*,
   130 La. 1, 57 So. 532 (La. 1912).. ................................... 10-11

**FEDERAL STATUTES**

Fed. R. Crim. P. 33. ................................................................. 10

## **MEMORANDUM OF POINTS AND AUTHORITIES**

### **I.**

### **INTRODUCTION**

During the Pepe trial, no one questioned the integrity and reliability of the Vietnamese and Khmer interpreters selected by the government. Though the government's case centered on the testimony of several young witnesses who testified in Khmer and Vietnamese – languages not common to the area – everyone trusted that the interpretation of their critical testimony was reasonably accurate and impartial.

Only after Mr. Pepe was convicted did the defense learn that the Vietnamese language interpreter was not the disinterested interpreter that she appeared. After the conclusion of the trial, it was revealed that the Vietnamese interpreter had developed a secret intimate and sexual relationship with the government's lead case agent that affected the quality of her and her company's interpretation. Beyond creating the unsavory appearance of impropriety, her apparent and actual bias resulted in the misleading and skewed interpretation of the testimony of the government's key witnesses that was so infused with subtle shades of meaning it undermined the defense's ability to properly cross examine the witnesses. We now know that what the jury heard during the trial was not what the witnesses said but what the interpreters said they said – at times so divergent from the actual responses that they cannot simply be attributed to good faith misunderstandings. The interpreters secretly allied themselves with the witnesses and unfairly bolstered their testimony and at the same time sabotaged the defense. By doing so, the interpreters made the already difficult job of cross examine a child witness in a foreign language virtually impossible.

The Vietnamese interpreter's hidden bias corrupted the integrity of the entire proceedings and deprived Mr. Pepe of his fundamental right to a fair trial. The

interpreters' actions also violated Pepe's Sixth Amendment right to confront and cross-examine the witnesses and the right to the effective assistance of counsel. Her unsuspected partisan involvement with members of the prosecution team is all the more egregious given the importance of the case, the uniqueness of languages involved, and the great reliance placed in her services. The taint of her bias was so fundamental and interwoven into the fabric of these proceedings that justice requires a new trial.

## II.
## STATEMENT OF FACTS[1]

**A.  Background.**

The case agent and the Vietnamese interpreter first met prior to Mr. Pepe's trial. They met in February 2008 during the foreign deposition of Basang, a Vietnamese speaking witness who was in custody in Phnom Penh, Cambodia. According to the Vietnamese interpreter, in late April 2008, she met the case agent again when he returned to the United States with the government's witnesses to prepare for trial. According to her, in the two weeks leading up to trial, the Vietnamese interpreter, the AUSA, and the agents "worked together for long hours most days."  She and her staff went out to lunch on a few occasions with the prosecution team and "on one occasion" she went to lunch with The Case agent alone. The Vietnamese interpreter states that a friendship developed towards the end of May 2008 between herself and the case agent when she helped him study for an exam. They also spent the day together "sightseeing in local beach neighborhoods and had dinner together that evening." The Vietnamese interpreter further claims that it was not until the case agent's birthday in early June 2008 that they first had sex.

---

[1]  The statement of facts is based on the discovery received in this case, the declarations filed by the government in their *In Camera* submission, and the evidence presented at the evidentiary hearing.

4

The Vietnamese interpreter apparently fell in love with the case agent. In April 2009, she asked the Assistant United States Attorney assisting Ms. Donahue on the case if the case agent was returning to Los Angeles for Mr. Pepe's sentencing hearing. She told the AUSA that she "wished she could express the feelings she had for [the case agent]."

The case agent at first provides a different time frame of events. He states that when he and the witnesses returned to the United States in April 2008 he met up with The Vietnamese interpreter at a mock trial a few days after the victims arrived in Los Angeles. As they worked together they "became friends." He states, "[a]s we became friends over the next few weeks we had a spontaneous physical relationship." Although the case agent could not recall an exact date, to the best of his knowledge "it was sometime after the start of trial or near the end of the trial (mid to late May 2008)." The case agent goes on to state that when The Vietnamese interpreter was helping him study for a forensics class he did "recall being romantically involved" although he could not recall "if this was the very first time." Later the case agent recalled "a couple of instances" when he and The Vietnamese interpreter were romantic. Once when he took the victims to Disneyland and another that occurred before that "possibly before [I.T.] testified."

The AUSA assisting Ms. Donahue describes his own relationship with the Vietnamese interpreter as a "professional and platonic friendship." He states he met her first in January 2008 when she was hired by the government and he first introduced the Vietnamese interpreter to the case agent in "her professional capacity" prior to Basang's deposition in Cambodia in February 2008. He further states that he did not play any role in "facilitating a romantic relationship between [the case agent] and the Vietnamese interpreter." According to the AUSA assisting Ms. Donahue, in April 2009, when he suspected that the case agent and the Vietnamese interpreter may have had a sexual relationship he contacted his office's ethics department.

//

1    The case agent's subsequent declaration calls into question the AUSA's
2 version of events.[2] The case agent states that prior to meeting the Vietnamese
3 interpreter in February 2008, the AUSA told him, "wait till you see who I hired, she is
4 Vietnamese and is very hot." After she arrived in Cambodia, the AUSA told the case
5 agent, "you should go and take care of her, its her birthday, and you should not leave
6 her alone in a foreign country." According to the case agent, he declined the AUSA's
7 suggestion to "take care" of the Vietnamese interpreter because he was tired and had
8 work to do.
9    The case agent further states that the AUSA assisting Ms. Donahue was "fully
10 aware" of his friendship with the Vietnamese interpreter. Although the case agent did
11 not directly admit having a sexual relationship to the AUSA until 2009, the AUSA
12 often joked with the case agent about the Vietnamese interpreter and suggested again
13 that the agent should "take care of her." When the case agent suggested that the
14 AUSA should be the one who "took care" of the Vietnamese interpreter, the AUSA
15 responded that he could not have a sexual relationship with her because he hired her.
16    However, according to the case agent, the AUSA was clearly "enamored" with
17 the Vietnamese interpreter. Both the AUSA assisting Ms. Donahue and the
18 Vietnamese interpreter confided in the case agent and told him that the two would
19 talk on the phone "for long hours" and "often late in the morning hours." The AUSA
20 also showed the case agent various photographs that he had of the Vietnamese
21 interpreter on his phone, including ones that she did not approve of, and that he spent
22 several hours at a time using photo software to edit her photographs.
23 //
24 //
25 //
26

---

27    [2] In his second declaration The Case agent attempts to use his journal
   entries in his calendar to reconstruct the dates of his sexual encounters with The
28 Vietnamese interpreter and concludes that he did not first with her until late May
   2008.

6

## B. Impact of Interpreter Bias.

After the problems with the Vietnamese interpreter and her company were brought to light, the defense obtained experts in both Vietnamese and Khmer to analyze the interpretation provided at trial. The experts found numerous problems with the trial interpretation provided by the Vietnamese interpreter and her company. The most startling example of this occurred during Mr. Gunn's cross-examination of S.R., a Khmer speaking witness. During the examination, the witness, speaking in Khmer, conceded the crucial point that she did not describe an injury to her inner thigh until it was suggested to her by the case agent. When the witnesses stated "true" in Khmer, the interpreter did not translate the witness's response. Instead, the interpreter responded "what do you mean?" as if the witness did not understand the question instead of properly translating the correct answer. The expert noted that the "interpreter misled Mr. Gunn and everyone in the courtroom to think that the witness did not understand Mr. Gunn. . ." Exhibit A, Vietnamese and Khmer Evaluation of Interpretation, Prepared by Jimmy Nguyen and Associates, Part 2 at 21.

During the examination of T.C., the defense expert noted that the government's Khmer interpreter "carried a dialogue with the witness" instead of directly translating what was being said. *Id.* at 3. The "interpreter took liberty to provide her own phrases to help the witness answer questions" which is "not acceptable during a court testimony because everyone sitting in the courtroom needs to hear everything that the witnesses was speaking." *Id.*

At one point during the testimony of T.C., the Khmer interpreter mistranslated the response "I didn't sleep because I was afraid of him" into "I meant that I wouldn't let him insert his penis in my vagina." *Id.* at 4. The defense expert concluded that the interpreter's insertion of her own statement for the witness's response clearly violated the professional practice of interpretation. *Id.* The defense expert also observed that there were numerous times where the Khmer interpretation was so

7

inaccurate and confusing using "completely different" words and meanings that the expert had to conclude that "one cannot deduce that the witness understood and actually answered the . . . questions." *Id.* at 18.

The misinterpretation of questions and answers occurred throughout the examination of the government's witnesses in both Vietnamese and Khmer. The government's own expert, Ms. Chau Stotelmyre,[3] observed that during cross examination of N.T.D., a Vietnamese speaking witness, defense counsel asked "was [I.T.] at Mr. Pepe's house?" Unbeknownst to defense counsel, N.T.D. responded, "[I.T.] was **not** there." Like the Khmer interpreter above, instead of interpreting this critical response that contradicted the government's version of events and benefitted the defense, the Vietnamese interpreter interceded, stating, "can you ask me again?" Govt's In Camera Filing, Exhibit B at 4. Later, when asked "what did you think you were going to do at Michael's house?" The Vietnamese interpreter again incorrectly stated "I would be [going] to school" (which was the government's theory of the case) when the actual answer was "he would let me eat a lot." *Id.* at 10.

The defense expert who reviewed the Vietnamese interpretation provided by the Vietnamese interpreter concluded that she "often inserted her opinions and thoughts into her interpretation from English into Vietnamese and vice-versa. Her discrepancies in interpretation often adversely changed the significance of the questions and the answers." Exhibit A, Part 1 Vietnamese Analysis at 1. According to the defense expert, The Vietnamese interpreter's "incompetence" was the result of her "lack of knowledge of the culture or fluency [in] the Vietnamese language. . ." *Id.*

Other problems with the interpretations were more subtle but equally problematic. For example, the defense expert discovered that the Vietnamese interpreter frequently referred to the prosecutor as "Quan Toa" translated from Vietnamese as "the Judge." Exhibit A, at 1. Second, the Vietnamese interpreter

---

[3] The excerpts of the Government's expert's finding were attached as a part of the Government's In Camera Filing as Exhibit B.

8

constantly addressed the child witnesses in Vietnamese as "Con" which means "my child" or "child." This is significant because in the Vietnamese culture, only respected family members, elders, or someone with close familial or social ties use this term to show both "affection and authority" in daily conversations. According to the defense expert, this form of address was inappropriate in a legal setting and demonstrated an unprofessional level of familiarity with the witness. *Id.* at ¶ 3.

    The same problem occurred with the girls who testified in Khmer. The Khmer interpreter used the Khmer word "koan" to interpret the English word "you" when addressing the children witnesses. According to the Khmer language expert "koan" is defined as a "child, daughter or son" but is "commonly used to show affection or sympathy" and not the appropriate word choice in a legal setting because it subtly demonstrates that the interpreter is not being impartial. Exhibit B, Khmer Evaluation of Interpretation at 1.

    In contrast, a different word choice and meaning was conveyed when defense counsel questioned the witnesses. When T.C. was questioned by defense counsel the interpreter translated "**I** have to ask you a few questions . . ." as "**He** would like to ask you some questions . . ." *Id.* at 5-6. This pattern would repeat itself when defense counsel questioned L.K., another Khmer speaking witness. When Mr. Gunn stated, "**I** need to ask you some questions" was translated at "**He** wants to ask you some questions." But the question "Michael did send you to school while you were living at his home . . ?" became "When you, daughter, were living at Michael's house, did Michael send you to school?" As the defense expert noted, the manipulation of pronouns by the interpreter sent the subtle but powerful message that it was "us-against-him." By calling the witness "daughter" and defense counsel "he" the interpreter seemed to side with the witness and created the appearance of "bias." *Id.* at 9. This misuse of pronouns continued throughout the defense's examination of L.K. and all the Khmer speaking witnesses. *Id.* at 10, 15.

//

9

# III.

# ARGUMENT

## A.

## A New Trial is Necessary Because the Interpreters' Bias and Misconduct Rendered the Proceedings Fundamentally Unfair.

Federal Rule of Criminal Procedure Rule 33 provides that "upon the defendant's motion, the court may vacate any judgement and grant a new trial if the interest of justice so requires." FED.R.CRIM.P. 33(a). A motion for new trial based on newly discovered evidence must be filed "within 3 years after the verdict . . ." FED.R.CRIM.P. 33(b).

The Supreme Court has defined bias as "the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party. Bias may be induced by a witness' like, dislike, or fear of a party or the witness' self interest." *United States v. Abel,* 469 U.S. 45, 52 (1984).

The few criminal cases addressing issues of interpreter bias suggest the very important role an interpreter plays in the process. The stern language used in these cases make it clear that a biased and interested interpreter can render a criminal proceeding fundamentally unfair.

> Inasmuch as the case must be reversed for the admission of the testimony referred to, we further observe that one should not be sworn and used as an interpreter who is a partisan, or cognizant of material facts . . .

*Nader v. State*, 86 Tex.Crim. 424, 219 S.W. 474 (1919).

Courts have found in no uncertain terms that "[t]he person chosen to interpret into English testimony given in a tongue not understood by jury, court, or counsel must be absolutely disinterested, unprejudiced, and unbiased . . ." *State v. Lazarone*,

10

1  130 La. 1, 57 So. 532 (La. 1912).  For example, when a trial court appointed an
2  obviously biased interpreter, the Fifth Circuit found,

> . . . the facts of the instant case 'passes the line of tolerable imperfection and falls into the field of fundamental unfairness . . .' One can imagine few situations in which there would be a greater potential for bias by an interpreter. The trial court's appointment injected an intensely interested party into the center of an emotion-packed criminal trial to interpret the testimony of the only witness to the alleged offense. This conduct is intolerable.

*Prince v. Beto*, 426 F.2d 875 (5th Cir. 1970).

   Here, the Vietnamese interpreter's bias is well established.  She had worked closely with the government and their lead case agent in the months and days leading up to Mr. Pepe's trial and the two developed an intimate relationship.  What is troubling and intolerable in this case is not that two people may have fallen in love but that it was kept secret from the defense, the court, and lead counsel for the government.  Surely, had this information been known, the court would have disqualified the Vietnamese interpreter as the interpreter in this very important and costly trial.  As stated before, the languages involved in the Pepe trial were completely foreign to all the parties involved.  No one spoke Vietnamese or Khmer and no one was in a position to critique the quality of the interpretation services provided.  Because the Vietnamese interpreter presented herself as a court certified interpreter and was selected by the government, her qualifications, her integrity and her impartiality were presumed.  No one, certainly not the defense, thought to question her role in the case.  Everyone trusted that the interpretation she and her company provided would be reasonably accurate and fair.  Given the languages involved, the seriousness of the case, and youthfulness of the witnesses, the interpreter's role in the case was critical.

//

The revelation that the Vietnamese interpreter had a secret relationship with the case agent calls into question the integrity of the entire proceedings. She was no longer a disinterested officer of the court. At best, it meant she had an "unconscious" desire to see her side prevail. At worst, it meant she was an interested party who made a knowing decision to manipulate the answers of the witnesses to insure that the government's case was presented in the best light possible and that the defense efforts at cross examination would be secretly sabotaged. Because of the appearance of impropriety and the potential for harm the Vietnamese interpreter and her company should not have been interpreting for the witnesses in this case.

**1.     The Bias and Misconduct Was So Insidious Prejudice Should be Presumed.**

Though there are few cases that actually address the issue of interpreter misconduct and bias, here the situation is akin to jury tampering and an analogy can be drawn to the long line of cases addressing that issue. In those cases, like here, the Court has found that because jury tampering "cuts to the heart of the Sixth Amendment's promise of a fair trial, we treat jury tampering cases very differently from other cases of jury misconduct." *United States v. Dutkel*, 192 F.3d 893, 899 (9th Cir. 1999); *see also, Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954) (*Remmer I* ); see also *Mattox v. United States*, 146 U.S. 140, 150, 13 S.Ct. 50, 36 L.Ed. 917 (1892). Once tampering is established, the court is to presume prejudice and put a heavy burden on the government to rebut the presumption. The Supreme Court has stated in categorical terms:

> In a criminal case, any ... tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial.... The presumption is not conclusive, but the burden rests heavily upon the Government to

> establish ... that such contact with the juror was harmless to the defendant.

*Dutkel,* 192 F.3d at 895.

The Ninth Circuit granted habeas relief to a California state prisoner because a state court had not applied the presumption of prejudice to a twenty minute hallway conversation between a chief prosecution witness and some jurors, stating:

> The *Mattox* rule applies when an unauthorized communication with a juror crosses a low threshold to create the potential for prejudice. A communication is possibly prejudicial, not de minirnis, if it raises a risk of influencing the verdict. Prejudice is presumed under these circumstances, and the defendant's motion for a new trial must be granted unless the prosecution shows that there is no reasonable possibility that the communication will influence the verdict.

*Caliendo v. Warden*, 365 F.3d 691 (9th Cir. 2004);

Here, the Vietnamese interpreter's hidden bias was tantamount to jury tampering. Her secret role as a partisan deprived the jury of the opportunity to fairly hear and judge the witnesses' actual responses to questions – especially during cross examination. Her hidden agenda is all the more egregious because as officers of the court, interpreters are ordinarily beyond reproach and the entire court process operates on the everyday assumption that, with a reasonable degree of accuracy, the interpreter is translating what the witness is communicating. Given their important role in the process, the mere appearance of impropriety is enough to short-circuit the entire process and invalidate Mr. Pepe's conviction. Here, the potential for harm caused by the interpreter's misconduct is so great a heavy burden should be placed on the government to rebut the serious presumption that Mr. Pepe was harmed by the misconduct.

//

//

### 2. The Interpreter Misconduct and Secret Bias Prejudiced Mr. Pepe

The Confrontation Clause of the Sixth Amendment, which "guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him,' " *Delaware v. Van Arsdall*, 475 U.S. at 678, 106 S.Ct. 1431, includes "the right of effective cross-examination." *Davis v. Alaska*, 415 U.S. 308, 318 (1974). Effective cross-examination is critical to a fair trial because "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis*, 415 U.S. at 316.

Mr. Pepe's case was materially harmed by the performance of the Khmer and Vietnamese interpreters at trial. But for the government's compliance with its duty to bring the issue to light we would have never known the subtle ways the interpreters undermined the defense and deprived Mr. Pepe of a fair trial.

The most glaring examples of this occurred during Mr. Gunn's cross-examination of R.S., a Khmer speaking witness and during Mr. Brown's cross examination of N.T.D., a Vietnamese speaking witness. During Mr. Gunn's cross examination R.S. conceded the crucial point that she did not describe an injury to her inner thigh until it was suggested to her by the case agent. Inexplicably, the Khmer the interpreter failed to translate R.S.'s response "true" to Mr. Gunn's question. Instead, the interpreter responded "what do you mean?" as if the witness did not understand the question. The defense expert who analyzed the interpretation noted that the "interpreter misled Mr. Gunn and everyone in the courtroom to think that the witness did not understand Mr. Gunn. . ." Exhibit A, Vietnamese and Khmer Evaluation of Interpretation, Prepared by Jimmy Nguyen and Associates, Part 2 at 21.

The significance of this apparent intentional mistranslation cannot be overstated. One of the theories of Mr. Pepe's defense was that the witnesses had been coached and unduly influenced by suggestive and leading questioning by the government and non-governmental investigators. Had defense counsel known that

14

S.R. had in fact admitted that she was coached into suggesting additional injuries by the case agent, it would have led to further inquiry and additional cross examination. The defense posture would have entirely changed. Further, such admission would have made a significant difference at closing argument. The defense theory of coaching and undue influence would have been bolstered by S.R.'s admission. Moreover, the jury would have had a different view of S.R.'s credibility as a witness had they known that in fact some of her testimony was indeed influenced by the government agent.

Instead, as the defense expert observed, the interpreter "misled Mr. Gunn and everyone in courtroom" and created the appearance that the witness simply did not understand Mr. Gunn's question – undermining the persuasive force of Mr. Gunn's cross-examination and depriving him of further avenues of inquiry. Such intentional misconduct is simply intolerable in a trial of this magnitude.

The same problem arose when defense counsel was questioning N.T.D. Defense counsel asked "was [I.T.] at Mr. Pepe's house?" in an effort to establish the whereabouts of the purported victims and attack the government's time line of events. Unbeknownst to defense counsel, N.T.D. responded, "[I.T.] was **not** there." Like the Khmer interpreter above, instead of interpreting this critical response that contradicted the government's version of events and benefitted the defense, The Vietnamese interpreter interceded, stating, "can you ask me again?" as if the witness did not understand the question and had answered the question in a way that hurt the government's case. Such mis-statements cannot be seen as harmless errors. To the contrary, they were acts that greatly sabotaged the defense efforts at cross examination – whether done intentionally or subconsciously.

The same can be said for the more subtle yet equally powerful ways the interpreters undermined the defense position and bolstered the government's at trial. By the subtle use of words and cultural coding, both the Vietnamese and Khmer interpreters secretly shaped the atmosphere at what was already an emotionally

charged trial in ways the unfairly harmed Mr. Pepe's defense.  By referring to the prosecutor with the honorific title of "judge," repeatedly calling the witnesses "daughter" or "my child," and derisively using third person pronouns to refer to defense counsel as "he" during questioning, the interpreters created an environment in which the government and witnesses were empowered and the defense posture diminished.

Naturally, such power dynamics exist in almost any criminal trial and can shift depending on the issues and complex flow of proceedings.  And, given the allegations in this case, the defense would concede that the government would, not surprisingly, find itself in a more favorable position in the eyes of the jury and its own witnesses.  The problem here is that, beyond natural alliances and sympathies, the interpreters were secretly manipulating the persuasive force of the parties' positions and altering the natural course of events.  By using deferential and honorific language to refer to the prosecutors, the witnesses were invited to be more open and deferential.

Conversely, by secretly undermining defense counsel's position, the interpreters magnified the already difficult job of cross examining a child witness in a foreign language.  In essence, the interpreters were acting as secret allies for the witnesses and were intentionally acting to deprive the defense of their one critical tool during cross examination – the persuasive force of their questioning.  Such conduct on the part of the interpreters was highly prejudicial to the defense.

That fact that this was occurring in secret beneath the court and counsel's radar only heightens the unfairness of the situation.  Had defense counsel known that their question: "If you don't mind young lady I would like to ask you a question . . ." was for all intents and purposes translated as "this jerk has something to ask you my dear child" he could have adjusted his approach or brought the issue to the court's attention. By reframing counsel's questions in language coded with layers of cultural meaning, the Khmer and Vietnamese interpreters short circuited the defense's ability to effectively cross examine the witnesses.

The blatant and subtle ways in which interpreters manipulated the examination of the witnesses prejudiced Mr. Pepe because they denied him an opportunity to properly and thoroughly cross examine the witnesses against him. Given all of the above there is little doubt that the interpreter bias and misconduct deprived Mr. Pepe a right to a fair trial.

## IV.
## CONCLUSION

For the foregoing reasons, the defense respectfully requests that the Court grant Mr. Pepe's request for a new trial in the interest of justice.

                                                Respectfully submitted,

                                                SEAN K. KENNEDY
                                                Federal Public Defender

DATED: July 28, 2010                     By      /S/
                                                CHARLES C. BROWN
                                                Deputy Federal Public Defender