CHARLES C. BROWN (Bar No. 179365)
(Email: CharlesBrown@parzivalgroup.com)
Law Offices of Charles C. Brown
1 South Fair Oaks Avenue, Suite 401
Pasadena, California 91105
Tel:  626-594-4875

CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
HOWARD SHNEIDER (Bar No. 309483)
(Email: howard_shneider@fd.org)
ISABEL BUSSARAKUM (Bar No. 295046)
(Email: isabel_bussarakum@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone:  (213) 894-2854
Facsimile:  (213) 894-0081

Attorneys for Defendant
MICHAEL JOSEPH PEPE

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 07-168-DSF |
| Plaintiff, | |
| v. | **MICHAEL JOSEPH PEPE'S POSITION REGARDING SENTENCING; EXHIBITS** |
| MICHAEL JOSEPH PEPE, | |
| Defendant. | Hearing Date:  February 14, 2021<br>Hearing Time: 8:30 a.m. |

//
//
//
//
//
//

1    Michael Joseph Pepe, through his counsel, files his position regarding factors
2    relevant to sentencing.
3
4                                        Respectfully submitted,
5                                        CHARLES C. BROWN
                                         Law Office of Charles C. Brown
6
                                         CUAUHTEMOC ORTEGA
7                                        Federal Public Defender
8
9    DATED:  January 24, 2022            By   /s/ Howard Shneider
10                                       HOWARD SHNEIDER
                                         ISABEL BUSSARAKUM
11                                       Deputy Federal Public Defenders
12                                       Attorneys for MICHAEL PEPE
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF CONTENTS**

Page

I. INTRODUCTION ..................................................................................... 1

II. GUIDELINE CALCULATION ............................................................... 1

    A.    Mr. Pepe objects to the 5-level enhancement under Section 4B1.5(b) of the guidelines ............................................................................... 1

    B.    Mr. Pepe objects to the four-level increase under § 2A3.1(b)(2)(A) ........... 4

III. SENTENCING CONSIDERATIONS UNDER 18 U.S.C. § 3553(A) ..................... 5

    A.    The conditions of imprisonment will be harder on Mr. Pepe due to his medical conditions, so a 25-year custodial term will meet the goals of sentencing. ........................................................................................ 5

    B.    Mr. Pepe's age will also result in harsher punishment and higher costs to the BOP, further justifying a 25-year sentence. ......................................... 8

IV. OBJECTIONS TO PSR .......................................................................... 9

V. RESTITUTION ..................................................................................... 10

    A.    Restitution Amount ..................................................................... 12

    B.    Ability to Pay ............................................................................ 15

VI. CONCLUSION .................................................................................... 16

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Blakely v. Washington*,
  542 U.S. 296 (2004)..................................................................................11

*Hester v. United States*,
  139 S. Ct. 509 (2019) (Gorsuch, J., joined by Sotomayor, J., dissenting
  from denial of certiorari on this issue) ................................................12

*H.J. Inc. v. Nw. Bell Tel. Co.*,
  492 U.S. 229 (1989).....................................................................................4

*Kelly v. Robinson*,
  479 U.S. 36 (1986)......................................................................................11

*Nelson v. Colorado*,
  137 S. Ct. 1249 (2017)................................................................................11

*Pasquantino v. United States*,
  544 U.S. 349 (2005)....................................................................................11

*Turner v. Cook*,
  362 F.3d 1219 (9th Cir. 2004) ....................................................................4

*United States v. Alvarez*,
  835 F.3d 1180 (9th Cir. 2015) ..................................................................11

*United States v. Doe*,
  488 F.3d 1154 (9th Cir. 2007) ..................................................................15

*United States v. Ferdman*,
  779 F.3d 1129 (10th Cir. 2015) ...........................................................12, 15

*United States v. Follet*,
  269 F.3d 996 (9th Cir. 2001) ....................................................................13

*United States v. George*,
  949 F.3d 1181 (9th Cir 2020) ...................................................................11

*United States v. Green*,
  722 F.3d 1146 (9th Cir. 2013) ..................................................................11

*United States v. Swor*,
  728 F.3d 971 (9th Cir. 2013) ....................................................................13

# TABLE OF AUTHORITIES

Page(s)

*United States v. Yeung*,
   672 F.3d 594 (9th Cir. 2012) .......................................................................12

**Federal Statutes**

18 U.S.C. § 1961 ..........................................................................................3, 4

18 U.S.C. § 2248 ...........................................................................10, 12, 13, 15

18 U.S.C. § 2426(b)(1)(A) ................................................................................2

18 U.S.C. § 3553(A) ...............................................................................5, 6, 7, 16

18 U.S.C. §3663A(d) ......................................................................................12

**Other Authorities**

Biggerstaff, T., and C. Richter. *Reusability framework, assessment, and
   directions* ...................................................................................................3

Corrections, *Correctional Health Care: Addressing the Needs of Elderly,
   Chronically Ill, and Terminally Ill Inmates* (2004) ......................................8

Inspector General, *The Impact of an Aging Inmate Population on the
   Federal Bureau of Prisons* (revised Feb. 2016) .........................................8

# I. INTRODUCTION

After the jury's verdict, Mr. Pepe now faces this Court's judgment. The government and the Probation Office both recommend that Mr. Pepe die in prison. A life sentence is authorized under the applicable law in this case. But retribution is just one factor in the sentencing calculus. In arriving at its judgment, the Court must also balance other competing factors and temper the fire of vengeance with wisdom and parsimony. The defense urges the court to see in Mr. Pepe all of his tragic and flawed humanity. We ask the Court to please consider Mr. Pepe's background, his family ties, his service, his age, his poor health as well as his documented struggles with mental illness as mitigating factors in this case. We also respectfully request that the Court carefully consider how Mr. Pepe's specific history and characteristics implicate the broader societal interests in deterrence, incapacitation, and rehabilitation in arriving at a sentence that is sufficient but *not greater than necessary* to further the interest of justice.

As set forth in more detail below, Michael Pepe's age and feeble health are factors that mitigate against the imposition of a sentence of death in prison. His poor health and advanced age will mean that the conditions of his confinement in BOP custody will be unduly harsh. These facts also mean that the societal interest in incapacitation and specific deterrence are lessened because the risk of any future harm by Mr. Pepe would be almost zero even if the Court imposed a sentence of just 10 or 15 years. However, for the reasons below, Mr. Pepe requests a sentence of 25 years as a fair and just sentence.

## II. GUIDELINE CALCULATION

### A.   Mr. Pepe objects to the 5-level enhancement under Section 4B1.5(b) of the guidelines.

Section 4B1.5(b) provides for a five-level enhancement where there is a "pattern of activity involving prohibited sexual conduct" in "any case in which the defendant's instant offense of conviction is a covered sex crime." Assuming that Mr. Pepe's

1

convictions are for covered sex crimes, the government cannot establish the required "pattern of activity involving prohibited sexual conduct."

In *Stinson v. United States*, the Supreme Court recognized that the Sentencing Guidelines manual contains three kinds of text: guidelines provisions, policy statements, and commentary. 508 U.S. 36, 40-41 (1993). Guidelines must be submitted to Congress for review, so it can approve, modify, or disapprove them. *Id*. at 41. In contrast, Congress does not review the Commission's commentary. *Id*. at 39-40. The Supreme Court therefore treated guidelines provisions as the equivalent of legislative rules adopted by federal agencies and commentary as akin to an agency's interpretation of its own rules. *Id*. at 44-45. Given its agency-deference precedent at that time, it held that a court must follow commentary in the Sentencing Guidelines unless it's inconsistent with, or a plainly erroneous reading of, the text of the guideline itself. *Id*. at 38, 45. In *Kisor v. Wilkie*, however, the Supreme Court recently clarified that the "possibility" of the kind of agency deference at issue in *Stinson* "can arise only if a regulation is genuinely ambiguous." 139 S. Ct. 2400, 2414 (2019); *see also id.* ("And when we use that term, we mean it—genuinely ambiguous, even after a court has resorted to all the standard tools of interpretation."). "If uncertainty does not exist, there is no plausible reason for deference. The regulation [or guideline] then just means what it means—and the court must give it effect, as the court would any law." *Id.* at 2415. Even where "genuine ambiguity remains," the agency's (or Sentencing Commission's) "reading must still be 'reasonable.'" *Id.* at 2415-16.

Here, § 4B1.5(b) does not define either "pattern of activity" or "prohibited sexual conduct," but its commentary purports to define both terms. The only arguably applicable part of the prohibited-sexual-conduct definition is "any offense described in 18 U.S.C. § 2426(b)(1)(A) or (B)[.]" U.S.S.G. § 4B1.5, comment. (n.4(A)). Assuming both that "prohibited sexual conduct" is ambiguous and that the Commission's interpretation of that term is reasonable, the only arguably applicable part of that statute covers offenses under chapter 109A and chapter 117 of Title 18. Thus, only Mr. Pepe's

2

purported travel crimes—not the individual alleged sex acts in Cambodia—are potentially acts of prohibited sexual conduct, so (at best) there were two qualifying acts: the May 2005 and September 2005 return trips to Cambodia.

As to whether that amounts to a "pattern," the commentary provides: "the defendant engaged in a pattern of activity involving prohibited sexual conduct if on at least two separate occasions, the defendant engaged in prohibited sexual conduct with a minor." U.S.S.G. § 4B1.5, comment. (n.4(B)(i)); *see also id.*, comment. (n.4(B)(ii)) ("An occasion of prohibited sexual conduct may be considered for purposes of subsection (b) without regard to whether the occasion (I) occurred during the course of the instant offense; or (II) resulted in a conviction for the conduct that occurred on that occasion."). Assuming that "pattern of activity" is ambiguous, the Commission's interpretation of that term is not reasonable because two acts do not constitute a pattern, at least not under the circumstances presented here.

It is almost axiomatic that a pattern can be called a pattern only if it has been applied to a real-world solution at least three times. Biggerstaff, T., and C. Richter. *Reusability framework, assessment, and directions*,  Hawaii International Conference on System Sciences, January 7-10, 1987, pp. 502-12.

The idea that just two things can amount to a pattern is consistent with how Congress defined "pattern" for purposes of RICO. *See* 18 U.S.C. § 1961(5) ("'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity[.]"). Still, even under that RICO definition,

> while two predicate acts are required under the Act, they are not necessarily sufficient. A 'pattern' of racketeering activity also requires proof that the racketeering predicates are related and that they amount to or pose a threat of continued criminal activity. Evidence of multiple schemes is not required to show a threat of continued criminal activity, and, indeed, proof of a single scheme can be sufficient so long as the predicate acts involved are not isolated or sporadic. . . . 'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature

3

projects into the future with a threat of repetition. A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement.

*Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004) (cleaned up); *see also H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237-39 (1989) ("Section 1961(5) does indicate that Congress envisioned circumstances in which no more than two predicates would be necessary to establish a pattern of racketeering—otherwise it would have drawn a narrower boundary to RICO liability, requiring proof of a greater number of predicates. But, at the same time, the statement that a pattern requires at least two predicates implies that while two acts are necessary, they may not be sufficient. Section 1961(5) concerns only the minimum number of predicates necessary to establish a pattern; and it assumes that there is something to a RICO pattern beyond simply the number of predicate acts involved.") (cleaned up).  Under this RICO standard, Mr. Pepe's two trips (four months apart) don't amount to a pattern of activity involving prohibited travel for sex.

## B. Mr. Pepe objects to the four-level increase under § 2A3.1(b)(2)(A).

The PSR applies a four-level increase under §2A3.1, which provides that the increase should be applied if a victim had not attained the age of twelve years. PSR ¶¶ 78, 91, 103. The PSR notes that because the jury found certain victims were under the age of 12 at the time of the abuse, the increase applies. But as argued in Mr. Pepe's Rule 29 motion and reply, the evidence regarding age was too unreliable to establish that the victims named in Counts 3 and 4 were under 12 years old at the time of the offense. *See* Dkt. 836 at 33-37; Dkt. 846 at 9-10. Mr. Pepe incorporates the arguments from the Rule 29 motion by reference here. Based on those same arguments, the four-level increase should not apply.

//

//

4

### III. SENTENCING CONSIDERATIONS UNDER 18 U.S.C. § 3553(A)

**A.** **The conditions of imprisonment will be harder on Mr. Pepe due to his medical conditions, so a 25-year custodial term will meet the goals of sentencing.**

Imprisonment will have harsher effects on Mr. Pepe than it does on others due to his many health problems. Attached as exhibit A is a declaration from Philip Wise, who served as the Assistant Director of the Federal Bureau of Prisons, with responsibility for health care, from 1999 to 2002. His declaration highlights just some of the problems Mr. Pepe will encounter when it comes to receiving proper medical treatment in prison. Based on available medical records, Mr. Wise summarizes Mr. Pepe's situation as follows:

> From the information available to me, it appears that Mr. Pepe is a 68 year old individual who has been diagnosed with 21 chronic medical conditions, including Essential hypertension, Diabetes Mellitus type 2, Diabetic Nephropathy, Morbid Obesity, COPD, Obstructive sleep apnea, Benign prostatic hyperplasia, SARS, as result of COVID 19, Hypokalemia, Hypoosmolality and hyponatremia, Bipolar disorder, History of chest pain, Osteoarthritis, chronic, PTSD, Muscle weakness, Asthma, Major depressive disorder, Atherosclerotic heart with stint placement, and Heart failure, unspecified. To manage this complex constellation of conditions, he requires 32 medications. Mr. Pepe requires substantial assistance with activities of daily living, including ambulation, dressing, transitioning from bed to chair, and bathing. He currently resides in a nursing home where that level of care is provided by medical staff, along with a regular course of physical therapy. As many of his conditions are progressive, while their progression may be slowed by medical intervention, it is likely that his medical status will continue to decline, as will his ability to function independently, and he will require increasingly frequent medical intervention and assistance as he ages. Based on the combination of his diagnoses, he is likely facing a shortened life expectancy.

Ex. A ¶ 3; *see* Ex. B, Medical Records; PSR ¶¶ 146-48 (summarizing Mr. Pepe's medical conditions and medications based on records provided to the USPO).[1]

---

[1] Exhibits A and B are filed under seal because they include detailed personal medical information.

5

Mr. Pepe's numerous diagnoses coupled with the limitations placed on the BOP's ability to provide medical care will lead to Mr. Pepe receiving substandard medical treatment and harsher conditions of confinement. To begin with, the BOP will likely not provide Mr. Pepe with all prescribed medications. As Mr. Wise explains, "some of his medications may be viewed as medically appropriate, but not medically necessary, and thereby denied." Ex. A ¶ 9. In particular, of the 32 medications Mr. Pepe is prescribed, 5 are not available on the BOP National Formulary. *Id.* ¶ 13. As a result, these five medications "will either be discontinued, a request for authorization for non-formulary medication can be submitted, or a similar medication that is on the formulary can be prescribed. This may cause a significant delay, assuming eventual approval, in Mr. Pepe receiving the current medications." *Id.* ¶ 14.

The limitations on providing prescription medications also applies to "evaluations and interventions" that Mr. Pepe will not be able to access in prison. *Id.* ¶ 9. Of particular note are the failings of the BOP to address the long term chronic care needs of individuals like Mr. Pepe. A February 2008 audit conducted by the Inspector General of the Department of Justice (OIG), revealed that "in over 18% of the BOP facilities inspected, inmates in chronic care clinics 'were not monitored as required.'" *Id.* ¶ 16. No more recent data has been released since that audit. *Id.* The OIG also found that the BOP failed "in 21% of the quarters reported to achieve its internal goal of having 70% of inmates on hypertensive medication achieve blood pressure of 140/90 or lower." *Id.* ¶ 17. And the BOP met its goals for managing diabetic patients only "39% of the time." *Id.* ¶ 18.

These statistics regarding the BOP's deficiencies in providing adequate chronic care treatment are troubling for any inmate in BOP custody who requires medical treatment, but they are especially worrisome for Mr. Pepe who suffers from a host of chronic care issues—including diabetes and hypertension—and will be relying on the BOP to provide the treatment he needs to stay alive.

In addition to receiving inadequate medical treatment in a BOP facility, Mr. Pepe's health problems coupled with his charges of conviction will make his time in custody ever more difficult. As Mr. Wise explains, individuals with charges like Mr. Pepe's are often a target for violence. *Id.* ¶ 21; *see* PSR ¶ 146(j) (describing an incident at MDC that came about for the same reasons explained by Mr. Wise). Because of these safety concerns, it is likely Mr. Pepe will spend some period of time in the SHU, "where he will share a cell with another inmate for 23 hours per day with restricted phones and other activities." Ex. A ¶ 21. Whether in the SHU or elsewhere, Mr. Pepe's medical conditions and charges of conviction put him at increased risk of threat. Because he will always have to look over his shoulder for fear attack, his time in custody will be all the harder.

Although Mr. Pepe has spent the last 15 years in custody for the same or similar charges, his medical problems have gotten worse in recent times. *See* Ex. B (detailing Mr. Pepe's deteriorating health over the last two years). As a result, he is in a different position now than he was during the majority of his time in custody. His past time in BOP custody is not indicative of how he will fare in the future in light of his worsening health. The Court should take this change into account when fashioning a fair sentence.

The BOP's struggle to properly care for inmates with medical issues has been brought into sharp focus during the pandemic. As of this writing 52,447 federal inmates and 10,777 BOP staff contracted COVID-19 throughout the course of the pandemic. *See* BOP, *COVID-19 Updates*.[2] Tragically there have been 279 inmate and 7 BOP staff member deaths. *Id.* Two BOP prisons in California—FCI Terminal Island and FCI Lompoc—experienced conditions that prompted civil lawsuits seeking injunctive relief due to the inability of the BOP to keep its inmates safe. *See* Case Nos. CV 20-CV-4450-CBM-PVC & 20-CV-4451-MWF-PVC. That the BOP has struggled mightily to meet its basic functions of properly treating its inmates' medical needs during the

---

[2] Available at https://www.bop.gov/coronavirus/ (last visited January 24, 2022).

7

pandemic is illustrative of its larger structural problems with treating its medically vulnerable inmate population.

With the many risks Mr. Pepe will face in BOP custody to his health and safety, a 25-year sentence is sufficient, but not greater than necessary, to meet the ends of just sentencing here.

**B.    Mr. Pepe's age will also result in harsher punishment and higher costs to the BOP, further justifying a 25-year sentence.**

At 68 years old, Mr. Pepe's age will also translate into more difficult circumstances in prison and much higher costs for the BOP. The Department of Justice considers inmates 50 and older to be "aging inmates"—a population it has determined to be more costly to incarcerate, far less likely to recidivate, and lacking in programming and adequate staffing to meet their needs in BOP facilities. *See* Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (revised Feb. 2016) (OIG Report).[3] This is due in part to the fact that incarceration accelerates the aging process. National Institute of Corrections, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates* (2004) (NIC Report) at 8-9.[4] Studies show that "an inmate's physiological age averages 10-15 years older than his chronological age due to the combination of stresses associated with incarceration and the conditions that he or she may have been exposed to prior to incarceration." OIG Report at 1-2. It is unsurprising, then, that older inmates suffer age-related health problems at a younger age than those in the general population. NIC Report at 29.

The cost of incarcerating aging inmates is greater than the already significant cost of incarcerating younger inmates, and that cost is continuing to rise at a faster rate. OIG Report at 10. As Mr. Wise points out, "the cost of confining an inmate in a BOP

---

[3] Available at https://oig.justice.gov/reports/2015/e1505.pdf

[4] Available at https://s3.amazonaws.com/static.nicic.gov/Library/018735.pdf

medical facility averaged approximately $75,000 in 2020, compared with a cost of approximately $23,000 to house an inmate in a minimum security level facility." Ex. A ¶ 8. BOP facilities only "have limited medical staff within institutions to address aging inmates' medical needs" and "aging inmates experience delays in receiving medical care." OIG Report at 16-17. The longer Mr. Pepe's sentence and the more he ages in prison, the more the lack of resources available for medical treatment will put an increased strain on Mr. Pepe's health and the BOP's costs to maintain him.[5]

Considering Mr. Pepe's advanced age and ailing health, by the time he is released from prison if he were to serve a 25-year sentence, conditions of supervised release will be sufficient to protect the public. It is not necessary that he die in prison when conditions of supervised release can meet the same goals of protecting the public without burdening the BOP with Mr. Pepe's medical issues and the associated costs.

## IV. OBJECTIONS TO PSR

Mr. Pepe objects to the statements in the PSR regarding the commission of sex acts and abuse against the victims. PSR ¶¶ 14, 16-60. Mr. Pepe disagrees that any of the described sex acts or abuse occurred.

As noted in the objections to the guidelines calculation, Mr. Pepe objects to the PSR's conclusions about the age of the victims for the reasons argued in the Rule 29 motion. PSR ¶¶ 78, 91, 103; *see* Dkt. 836 at 33-37; Dkt. 846 at 9-10.

To extent that the PSR implies that Mr. Pepe had the required intent for the commission of the crimes charged, that he crossed a state line or border with the required intent, or that Mr. Pepe is charged in the proper venue, Mr. Pepe objects. The defense incorporates by reference the arguments made on these points int the Rule 29 motion. *See* Dkt. 836, 846.

---

[5] Besides the more difficult custodial experience, Mr. Pepe's age also reduces the likelihood he will reoffend. Data shows that a person in Mr. Pepe's age bracket is far less likely to recidivate. *See OIG Report* at 38-41 (showing aging offenders have a far lower recidivism rate than younger offenders).

Mr. Pepe objects to the PSR's conclusion that for Counts 3 and 4 the "minimum term of imprisonment is 30 years." PSR ¶ 172. Before July 2006, the penalty for violating § 2241(c) was "imprison[ment] for any term of years or life[.]" Thus, there is no mandatory minimum for any count.

Mr. Pepe requests corrections or additions to the following portions of the PSR:

- The PSR states that Mr. Pepe's father "was a retired Marine Corps captain." PSR ¶ 133. In reality his father was a U.S. Navy First Class Petty Officer.
- The PSR states, "Pepe said that he suffers from Post-Traumatic Stress Disorder (PTSD) which was not triggered by combat duty." PSR ¶ 149(d). Mr. Pepe seeks to add that although his PTSD was not triggered by combat duty, it was triggered by other military service and events during incarceration.
- The PSR states that, "Between 1987 to 2000, Pepe attended classes at Adams State College." PSR ¶ 156. The date range should be 1997 to 2000.
- Mr. Pepe wishes to point out that when he worked as an employee for the State of California in the Ventura and Oxnard areas, PSR ¶ 158(d), that he counseled disabled veterans.

## V. RESTITUTION

The Probation Office recommends that the Court order restitution payments to Hagar International Missions and Agape—international charitable organizations that provided care for the victims in this case. The Probation Office concludes that Hagar is entitled to restitution in the amount of $35,400 and Agape in the amount of $211,813 for a total restitution amount of $247,213. In both the PSR and the recommendation letter, the Probation Office relies on 18 U.S.C. § 2248 as the statutory authority for the proposed restitution order in this case. The Court previously relied on this section in its previous restitution order. *See* PSR ¶¶ 184-86; *see also* Judgement and Order dated Feb. 28, 2014, Dkt. 492.

The requested restitution amount is improper under 18 U.S.C. § 2248. In *Apprendi v. New Jersey*, the Supreme Court held that the Fifth Amendment's Due

10

Process Clause and the Sixth Amendment's jury-trial guarantees require that "any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." 530 U.S. 466, 476 (2000) (cleaned up). For *Apprendi* purposes, the "statutory maximum" is "the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely v. Washington*, 542 U.S. 296, 303 (2004). In *Southern Union Company v. United States*, the Court wrote: "In stating *Apprendi's* rule, we have never distinguished one form of punishment from another. Instead, our decisions broadly prohibit judicial factfinding that increases maximum criminal 'sentences,' 'penalties,' or 'punishments'—terms that each undeniably embrace fines." 567 U.S. 343, 350 (2012) (cleaned up). Elsewhere, the Supreme Court has recognized that restitution, like a fine, is also punishment. *See Pasquantino v. United States*, 544 U.S. 349, 365 (2005) ("The purpose of awarding restitution in this action [wire fraud for scheme to avoid Canadian taxes] is not to collect a foreign tax, but to mete out appropriate criminal punishment for that conduct."); *Kelly v. Robinson*, 479 U.S. 36, 53 (1986) ("Because criminal proceedings focus on the State's interests in rehabilitation and punishment, rather than the victim's desire for compensation, we conclude that restitution orders imposed in such proceedings operate 'for the benefit of' the State."); *see also Nelson v. Colorado*, 137 S. Ct. 1249, 1252 (2017) (holding that restitution collected based on conviction later reversed must be returned to defendant, like any other monetary penalty). For example, in *Paroline v. United States*, the Supreme Court concluded that "[t]he primary goal of restitution is remedial or compensatory, but it also serves punitive purposes[.]" 572 U.S. 434, 456 (2014) (cleaned up) (citing *Pasquantino* and *Kelly*). It therefore follows that *Apprendi* must apply to restitution. The Ninth Circuit has nevertheless ruled to the contrary. *See, e.g., United States v. George*, 949 F.3d 1181, 1188 (9th Cir 2020); *United States v. Alvarez*, 835 F.3d 1180, 1185 (9th Cir. 2015); *United States v. Green*, 722 F.3d 1146, 1148-51 (9th Cir. 2013). Mr. Pepe understands that this Court must

11

follow circuit precedent, but he hereby preserves this issue for potential en banc or Supreme Court review. *See Hester v. United States,* 139 S. Ct. 509, 509-11 (2019) (Gorsuch, J., joined by Sotomayor, J., dissenting from denial of certiorari on this issue).

## A. Restitution Amount

The Probation Office recommends that restitution be ordered in the amount of $247,213 at a rate of not less than $2,200 per month pursuant to 18 U.S.C. § 2248. The government bears the burden to prove by a preponderance of the evidence the amount of loss sustained by each alleged victim as a result of the offense. *See* 18 U.S.C. §3663A(d), §3664(e). "Restitution must not unjustly enrich crime victims or provide them a windfall." *United States v. Ferdman*, 779 F.3d 1129, 1132 (10th Cir. 2015); *see also United States v. Yeung*, 672 F.3d 594, 602 (9th Cir. 2012) (same), *abrogated on other grounds*, *Robers v. United States*, 134 S. Ct. 1854 (2014). Under § 2248, the term "full amount of the victim's losses" includes any costs incurred by the victim for—

(A) medical services relating to physical, psychiatric, or psychological care;

(B) physical and occupational therapy or rehabilitation;

(C) necessary transportation, temporary housing, and child care expenses;

(D) lost income;

(E) attorneys' fees, plus any costs incurred in obtaining a civil protection order; and

(F) any other losses suffered by the victim as a proximate result of the offense. 18 U.S.C.A. § 2248.

For purposes of § 2248, the term "victim" means the "individual harmed as a result of a commission of a crime under this chapter, including, in the case of a victim who is under 18 years of age, incompetent, incapacitated, or deceased, the legal guardian of the victim or representative of the victim's estate, another family member, or any other person appointed as suitable by the court, but in no event shall the defendant be named as such representative or guardian." 18 U.S.C. § 2248.  Moreover,

under § 2248 charitable organizations are not "victims" entitled to mandatory restitution. *See United States v. Follet*, 269 F.3d 996 (9th Cir. 2001).

Under the precise language of § 2248, "[a] cost for which the victim will never have to pay because the services will be provided directly by a governmental or charitable organization is not 'incurred' by the victim, even if that organization will incur costs for the benefit of the victim." *Id.* Thus, § 2248 is different from other mandatory restitution provisions that use different language "that may well permit orders of restitution to governmental or charitable institutions that provide covered services to the victim." *Id.* at 1000.

Here, both Hagar International Missions and Agape are international charitable organizations that are funded by either private donations, governmental grants, or both. They provided treatment and care to victims of the offense free of charge, even though that have incurred costs as a result of their efforts. To that extent, they are indistinguishable from crises center in *Follet*. Accordingly, like the government funded crisis center in that case, Hagar and Agape are not technically "victims" of the offense and are therefore not entitled to mandatory restitution under the precise language of § 2248.

Moreover, since this issue was last addressed by this Court, the Ninth Circuit has issued opinions to further clarify the scope of conduct covered by orders of restitution. Thus, "restitution 'may be awarded only for losses for which the defendant's conduct was an actual *and* proximate cause.'" *United States v. Swor*, 728 F.3d 971, 974 (9th Cir. 2013) (emphasis in original). "'But for' cause is insufficient." *Id*. Therefore, the government must "'show not only that a particular loss would not have occurred but for the conduct underlying the offense of conviction, but also that the causal nexus between the conduct and the loss is not too attenuated (either factually or temporally).'" *Id*.

Here, the restitution claims are overstated and beyond the scope of § 2248. For example, Hagar's spreadsheet for I.T. and N.T.D. included some costs for "medical" ($883) and "counseling" ($1,794). But it also included expenses for things like

13

"dental" and "cosmetic surgery" even though there is nothing in the record to suggest that those expenses have anything to do with what Mr. Pepe allegedly did. But the primary problem is that *most* of the expenses listed on the spreadsheet were for the following things that are not even arguably within the narrow scope of the restitution authorized by §3663A: daily food, soy milk, family visits, family support, case manager, school fees, uniform, education materials, transportation to school, clothes, caregiver, recreation, board, repairs and maintenance, and administrative fees. Therefore, the $35,400 in restitution directed at Hagar is clearly inflated.

Agape's spreadsheet for T.C., L.K., K.S., S.S., and S.R. suffered from the same problem. That spreadsheet was split into two parts. The first part covered 2007- 2010, and for that period, Agape could not account for the costs associated with individual girls, so it took its total operating expenses, divided it by the number of girls at its shelter to get a per-girl cost, and then multiplied that by five. That part of the spreadsheet included entries for "counseling / therapy tools" ($2,456) and "girls healthcare" ($12,122), without any explanation of exactly what they encompassed.  But as with Hagar's spreadsheet, the primary problem is that *most* of the expenses listed on Agape's spreadsheet were for the following things that are not even arguably within the narrow scope of the applicable restitution statute; the salaries for every person who worked at the shelter (academic teacher, assistant counselor, assistant director, consulting psychologist, cook/cleaner, counselors/social workers, directors, drivers, foster care administrator, groundskeeper, house mothers, lead teacher, maintenance worker, manager, security personnel, vocational teacher, and "other"), staff cell phones phone cards, employee education, "staff appreciation," staff healthcare, staff training, translator, advocacy fund, classroom supplies, education expenses, facility rental, food, clothing, residence equipment, toiletries, "girls travel, special events, gifts, field trips," government advocacy, healthcare equipment, "holidays/birthdays/local trips," internet, kitchen supplies, maintenance, ministry supplies, office supplies, reintegration fund, security equipment, social worker expenses, transportation, utilities, van operation,

14

vocational training, and "other expenses."  In contrast, the second part of the spreadsheet (covering 2010-2014) included just three entries for "counselor expenses" ($10,951), "educational expenses" ($2,891), and "girls healthcare" ($5,994). But educational expenses are not covered by § 3663A. And the counseling and healthcare expenses are only covered to the extent that they relate to what Mr. Pepe allegedly did. For all these reasons, the $211,813 in restitution directed at Agape is also inflated.

The restitution determination requires "some precision" when calculating restitution, so mere speculation that every expense actually furthered the girls' "treatment" isn't sufficient. *United States v. Ferdman*, 779 F.3d 1129, 1133 (10th Cir. 2015). Rather, a court must estimate restitution "with some reasonable certainty." *United States v. Doe*, 488 F.3d 1154, 1160 (9th Cir. 2007). Here, as in *Doe,* the Court should require assurances that claimed medical expenses would go only to services causally related to the offense. *Id*. at 1161. If so, then the restitution order in this case should be closer to the average $2,000 per victim upheld in *Doe*, *id*. at 1160-62, instead of the average $35,000 per victim suggested again now.

Even the entries on Hagar's and Agape's spreadsheets for "medical" and "counseling" expenses do not necessarily reflect costs that can be included in restitution ordered under §2248. There is simply no evidence that establishes that the medical care and counseling provided to the victims in this case was the "proximate" result of the harms attributed to Mr. Pepe. Rather, Hagar and Agape appear to have simply aggregated these any bona fide medical and counseling costs with all of their other operating expenses. Without a more accurate accounting and analysis, the requested restitution order is overbroad and inflated.

## B.   Ability to Pay

The defense objects to the Probation Officer's finding that Mr. Pepe has the ability to make payments in the amount of $2,200 toward restitution and/or a fine. The $4000 relied on by the Probation Office in paragraph 167 of the PSR is not accurate. According to records provided by the defense, Mr. Pepe's gross monthly retirement

15

payment is just $3,179.00. *See* Ex. C, Retirement Account Statement. Of that amount, $1,938.59 is garnished for back child support payments. There is also federal income tax withholding in the amount of $196.54. Accordingly, Mr. Pepe's net monthly retirement income is just $1,045.48. This amount is also reflected in Mr. Pepe's bank statements. *See* Ex. D, Bank Statement.[6] Mr. Pepe is informed and believes that he is not receiving any social security payments nor is he receiving any additional pension from the VA. For these reasons, the defense requests that the Court impose only nominal restitution payments in the amount of $50 per month in this case.

### VI. CONCLUSION

Under all of the circumstances of the case, including the passage of time, the age and failing health of Mr. Pepe, and the other § 3553(a) factors, a sentence that would result in Mr. Pepe dying in custody is overly retributive and would not serve the ends of justice. Instead, a sentence of 25 years is sufficient, but not greater than necessary, to do justice here.

Respectfully submitted,

CHARLES C. BROWN
Law Office of Charles C. Brown

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  January 24, 2022

By  */s/ Howard Shneider*

HOWARD SHNEIDER
ISABEL BUSSARAKUM
Deputy Federal Public Defenders

Attorneys for MICHAEL PEPE

---

[6] The "New Balance" column was blacked out by Elaine Pepe-Williams who provided the bank statement to the defense.

16